## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FOUNDATION CAPITAL RESOURCES          :Civil Action NO. 3:17-cv-00135-JAM
INC.                                  :

v.                                    :
                                      :
PRAYER TABERNACLE CHURCH              :May 25, 2017
OF LOVE, INC.

### DEFENDANT'S ANSWER, SPECIAL DEFENSES AND COUNTERCLAIMS


### ANSWER


The Defendant denies all of the allegations in the Plaintiff's complaint.


### FIRST SPECIAL DEFENSE:   VIOLATION OF C.G.S. SEC. 33-921


1.  Plaintiff Foundation Capital Resources, Inc., a Georgia Corporation with an office now

    or formerly at 1661 North Booneville Avenue, Springfield, Missouri, 65803 (new

    address: 3900 South Overland Avenue. Springfield, MO 65807) is a foreign

    corporation which has brought this action in the Superior Court for Connecticut at

    Bridgeport.

2.  Plaintiff, during the time relevant to this action, has also been known as AG Financial

    Solutions which, upon information and belief, is a foreign corporation also with offices

    in Springfield, MO.

3. Defendant Prayer Tabernacle Church of Love, Inc. is a not-for-profit religious institution organized and existing under the laws of the State of Connecticut, with an office and place of business at 729 Union Street, Bridgeport, Connecticut, 06607

   (hereafter "Defendant Church").

4. During all of the time relevant to the complaint in this action, Plaintiff purported to act as a mortgagee lender to Defendant Church and will hereafter be referred to as

   "Plaintiff Bank".

5. By its complaint dated June 17, 2013, Plaintiff Bank claims that it agreed to make and did make secured loans to Defendant Church on December 12, 2007 (the "2007 loan") and on December 19, 2008, (the "2008 loan"). Plaintiff Bank pleads the 2007 loan evidenced by a Promissory Note and Mortgage, was secured by first priority mortgage liens on fifteen (15) parcels of land owned by Defendant Church, all located in Bridgeport, CT ("the Property"). In addition, as security Plaintiff Bank took from defendant Church assignments of leases and rents as a certain Security Agreement. The 2008 loan, evidence by a Promissory Note and Mortgage, which Plaintiff pleads was secured by a second priority mortgage on the Property.

6. Defendant Church proposed to build and to own a new, to be constructed, church home structure located at the 729 Union Avenue site. Plaintiff Bank was to provide construction financing and thereafter permanent financing for the new church home.

7. As early as January 2008, and continuing thereafter, employees, agents and representatives of Plaintiff Bank undertook to engage in activities well beyond those characterized by a bank/lender relationship which activities represent transacting business in Connecticut.

8. Plaintiff Bank's agents, employees and representatives took control of a campaign to solicit contributions from Defendant Church parishioners. In addition, Plaintiff Bank's agents, employees and representatives took control of the commercial construction activities related to the new church construction, including developing and publishing the Schedule of Values for the project and preparing the documents for and submitting the monthly payment requests related to the construction project. A Vice President of Plaintiff Bank took over construction management of the new church project and dealt directly with subcontractors. He actually purchased equipment and materials for the project work and involved himself with payments to and claims of subcontractors and with Mechanic's lien waivers from subcontractors.

9. In its dealings with the new church project, Plaintiff Bank transacted business in Connecticut.

10. Plaintiff Bank did not have and as of the institution of this law suit does not have a certificate of authority from the Connecticut Secretary of State authorizing it to transact business in Connecticut. Attached hereto as Exhibit A is a certification from the Secretary of State evidencing that Plaintiff Bank has no such certificate of authority.

11. Plaintiff Bank's activities amounting to transacting business in this State without authority is a violation of Connecticut General Statute Sec. 33-921.

12. Plaintiff Bank may not maintain this suit in a Connecticut court unless it first obtains a certificate of authority from the Secretary of State.

**<u>SECOND SPECIAL DEFENSE:   FRAUD</u>**

1. - 6.  Paragraphs 1 through 6 of the First Special Defense are hereby restated as paragraphs 1 to 6 of this Second Special Defense.

7.      Plaintiff Bank's conduct toward Defendant Church constitutes a scheme to defraud the Defendant Church, whereby the Plaintiff Bank preyed upon the

Defendant Church's religious beliefs and desires to do good works and benefit its community to entice Defendant Church to enter into an initial loan agreement, which Plaintiff Bank knew would not be sufficient to complete construction of the proposed church, and then interfere with, delay and halt the project as a means to force Defendant Church to obtain additional loans from Plaintiff Bank in order to complete the project. In doing so Plaintiff Bank intended to obtain additional loan origination fees from Defendant Church for each successive loan, and also charge increasing rates of interest for the successive loans.

8.      Plaintiff Bank's scheme also included persuading or requiring Defendant Church to provide collateral for the loan, in the form of mortgages not only upon the property to be constructed but also upon multiple other properties owned by

Defendant Church, the value of which exceeded the value of the loan. Plaintiff Bank lent Defendant Church money in quantities, at interest rates, and with terms and conditions for adjustable rates, monthly payments, pre-payment penalties and late charges, which Plaintiff Bank knew, or reasonably should have known,

Defendant Church would not be able to meet resulting in default on the loan.

9.      Plaintiff Bank's scheme also included significant pre-payment penalties on the loans whereby if the Defendant Bank attempted to re-finance the loans within the

first 36 to 48 months of the loans with another lending institution at more favorable interest rates or terms, the Plaintiff Bank would assess a pre-payment penalty ranging from 1% to 4% of the principal balance.  Plaintiff Bank's purpose in assessing such significant pre-payment penalties was to prevent and thwart the

Defendant Church from obtaining more favorable loan terms from another lender.

10.   Plaintiff Bank's scheme also included the offering of multiple loans to the Defendant Church at progressively unfavorable terms, and with each new set of loan documents or agreements regarding the payment of loans the Plaintiff Bank unfairly changed the order of the application of Defendant Church's payments between the various loans and among the categories of charges within the loan.

11.   The purpose of the Plaintiff Bank's scheme was, therefore, to trap Defendant Church in a cycle of excessive interest, late fees, pre-payment penalties and other charges that resulted in a maximization of these charges paid to the Plaintiff Bank and a minimization of payments attributable to the principle of the loan, which was designed to ultimately cause Defendant Church to default on the loan.

12.   Defendant Church's default on the loan would then allow Plaintiff Bank to foreclose on multiple complete properties, which could then be resold to other buyers at a profit.

13.   Plaintiff Bank holds itself out to the public and to loan applicants and held itself out to Defendant Church as specializing in the financing of mortgages, construction loans and other financial instruments for Christian churches.

14.   Plaintiff Bank, advertised, held itself out to the public and to loan applicants and to the Defendant Church, as having a "different" purpose from other lenders, and

expressly advertised, marketed, and stated to its prospective loan applicants that its mission was to "help build the Kingdom [of God] by providing mortgage financing to churches and ministries."

15.     Plaintiff Bank advertised, held itself out to the public and to loan applicants and to Defendant Church as having construction experts who would be on hand to provide free consultation with each loan to support in the planning, budgeting, design and construction process.

16.     Plaintiff Bank advertised, held itself out to the public and to loan applicants, and to Defendant Church, as providing fully amortized, first-mortgage financing with flexible terms and "completive rates" to help the loan applicant purchase facilities or refinance existing loans.

17.     Plaintiff Bank advertised, held itself out to the public and to loan applicants, and to Defendant Church, as providing construction loans that included "interest-only payments during construction to ease cash flow" and that after construction "there is a guaranteed, no cost conversion to permanent financing at competitive rates."

18.     Plaintiff Bank advertised, held itself out to the public and to loan applicants, and to Defendant Church that construction loans are handled by approving a total loan amount at closing, which allows the church to then borrow as much as is needed during the construction phase by requesting draws from the Plaintiff Bank's office. Plaintiff Bank advertised, and represented to the public, to loan applicants and to the defendant that at the end of each month the church would be billed only for the interest on the amount that it had drawn to date.

19.    Prior to December 12, 2007, the Defendant Church provided to Plaintiff Bank an application for a construction loan in order to build a new church building to be located at 729 Union Avenue, Bridgeport, Connecticut. (Hereinafter the project will be referred to as the "Church Construction Project.")

20.    As part of the application, Defendant Church provided to Plaintiff Bank a Schedule of Values reflecting the estimated costs of the Church Construction Project, which stated that the total estimated cost of the project was $7,789,163.40, and that the unpaid amount of the project was $6,676,794.22.

21.    At the time of the application for the loan, the Defendant Church had a prior mortgage on the land on which the new church was to be constructed, which had a balance of approximately $1,212,412.00 at an interest rate of 7.63%.

22.    As part of the loan application, the Defendant Church also requested refinancing of the prior mortgage, based upon the Plaintiff's Bank's representation that it would offer competitive and lower rates of interest.

23.    In or about December 12, 2007, Plaintiff Bank and Defendant entered in to an agreement entitled, "Adjustable Rate Secured Note," whereby Plaintiff Bank agreed to lend Defendant Church up to $6,123,000.00 for the Church Construction Project, which sum included $1,212,412.00 to refinance the prior loan leaving only $4,910,588.00 for the construction loan.  Therefore, from inception of the loan the Plaintiff Bank knew or reasonably should have known that the loan was insufficient to fully finance the construction of the church.

24. The 2007 Note provided that Defendant would pay an 'initial interest rate of eight and three-eighths percent (8.375%) per annum. Upon conversion to permanent financing, Borrower will pay interest at the rate of eight and three eighths percent (8.375%) per annum."

25. The 2007 Note provided that payments by Defendant Church would be applied first to late fees, then to interest and then to the principle of the loan.

26. The 2007 Note also required as an additional term that Defendant "maintain a One Million Dollar ($1,000,000.00) Key Man life insurance policy on Kenneth Moales, Sr." and that Plaintiff Bank be the primary beneficiary on the policy.

27. The 2007 Note provided multiple mechanisms under which interest might vary but that "at no time will the interest rate on this Note be less than eight and three eighths percent (8.375%) per annum except as otherwise be agreed to in writing."

28. The 2007 Note also provided for late payments equal to 10% of the amount of a monthly payment.

29. The 2007 Note also provided for an increase in interest in the event that the Plaintiff Bank determined that the Defendant Church was in default, pursuant to which an additional 5% interest would be assessed.

30. The 2007 Note also provided that if Defendant Church made a "full prepayment of the Note with Borrowed Funds," *i.e.* if Defendant Church refinanced with another lender, within the first 48 months of the loan, then Defendant Church would incur a pre-payment penalty ranging from 1% to 4%, depending upon the timing of the refinance.

31.   Simultaneous with the Adjustable Rate Secured Note, the Plaintiff Bank and the

      Defendant Church also entered into a "Construction Loan Agreement", with

      effective date December 12, 2007, which defined the terms and conditions and

      methods for distribution of funds to be used in the Church Construction Project.

32.   The Construction Loan Agreement included a provision that named Plaintiff Bank

      as Defendant Church's "true and lawful attorney-in-fact with full power of

      substitution to complete the construction of the Improvements in the name of

      Borrower [Defendant Church][.]"

33.   The Construction Loan Agreement also provided Plaintiff Bank with authority to

      make additions, changes, and corrections to the plans and specifications of

      Church Construction Project, and to disburse funds toward the completion of the

      Church Construction Project, and to charge such funds against the Defendant

      Church, without requiring the permission, agreement, approval or consent of the

      Defendant Church to the additions, changes, corrections or charges.

34.   The Construction Loan Agreement also allowed Plaintiff Bank to employ

      contractors, subcontractors, agents, architects, and inspectors in order to

      complete the Church Construction Project, and to pay, settle or compromise all

      existing or future bills and claims related to the Church Construction Project.

35.   As such, the terms of the Construction Loan Agreement allowed the Plaintiff Bank

      to increase the Defendant Church's indebtedness without its knowledge,

      permission, agreement, approval or consent.

36. At the time of the 2007 Loan, Plaintiff Bank knew or reasonably should have known that the amount loaned was insufficient to cover the full costs of the

Church Construction Project, which could result in delay or stalling of the Church Construction Project, due to insufficient funds, which pursuant to the terms of the

2007 Loan would be considered a default.

37. However, Plaintiff Bank nonetheless encouraged the Defendant Church to commence the Church Construction Project, and repeatedly promised the Defendant Church that it would provide all funds necessary to complete the

Church Construction Project via a second loan.

38. As part of the 2007 Loan, Plaintiff Bank and Defendant Church also entered into an "Open Ended Mortgage, Assignment of Lease and Rents and Security

Agreement," dated December 12, 2007.

39. This document provided Plaintiff Bank with a mortgage not only upon the church property under construction at 729 Union Avenue, Bridgeport, Connecticut, but also upon multiple other parcels of land as collateral.

40. The value of these parcels of land likely exceeded the value of the loan.

41. The 8.375% interest was above market rates prevailing at the time of the loan, and was also above the rate that Defendant Church was paying on its prior mortgage on the land but Plaintiff Bank promised the Defendant that the rate would prevail only during construction, which was expected to be completed by June 15, 2009, and that upon completion the loan would be converted to a traditional mortgage with a lower interest rate.

42. Plaintiff Bank repeatedly promised the Defendant Church that Plaintiff's Bank's concern was to assist the Defendant Church in building its church for the greater glory of God, and that it would, in fact, provide loans fully covering the completion of the construction project at competitive rates that were guaranteed to be rolled into a permanent mortgage upon completion of the project, at a lower, more affordable interest rate.

43. At various points throughout the life of the 2007 Loan the Plaintiff Bank has charged the Defendant Church interest at a rate of 13.375% per year or higher, as well as substantial fees including improperly assessed "pre-payment" fees.

44. As a requirement of the 2007 Loan, the Plaintiff Bank required that the Defendant Church participate in a campaign to raise funds for the Church Construction Project, which the Plaintiff Bank referred to as the MasterPlan Stewardship Services Plan.

45. The Plaintiff Bank charged the Defendant Church an excessive fee of approximately $78,000.00 to participate in the capital campaign and for the Plaintiff Bank's services in orchestrating and leading the campaign. This fee was folded into the principal of the 2007 Loan.

46. The Plaintiff Bank represented to the Defendant Church that it considered the capital campaign fundraising campaign necessary in order to ensure that the Defendant Church would be able to pay the 2007 Loan and any subsequent loans.

47.    The Plaintiff Bank promised the Defendant Church that the second loan to complete the Church Construction Project would be in an amount equivalent to 80% to 100% of the amount pledged to the capital campaign.

48.    The capital campaign commenced after the 2007 Loan documents went into effect and continued through at least November 2008.

49.    Plaintiff Bank orchestrated, organized and controlled the capital campaign including, but not limited to, setting the schedule and calendar of events, providing Defendant Church with written materials to follow in the implementation of the campaign, designing the written materials for the campaign that were provided to Defendant Church's parishioners, attending and leading meetings wherein Plaintiff's Bank's agents, servants or employees instructed the Defendant Church in how to carry out the capital campaign, and attending church services of the Defendant Church and delivering sermons or speeches to Defendant

Church's parishioners that encouraged Defendant Church's parishioners to pledge to the campaign.

50.    Pledges amounting to $3,768,964.00 were secured.

51.    On or about September 17, 2008, while Plaintiff Bank was processing Defendant Church's application for the second loan that was needed to complete the Church Construction Project, Defendant Church informed Plaintiff Bank that an additional $2,317,117.81 was required to complete the Church Construction Project.

52.    Plaintiff Bank's promise to lend at least eighty percent of the pledge amount indicated that Plaintiff Bank should have loaned Defendant Church at least

$3,015,712.00, which would have been sufficient to complete the Church Construction Project.

53. However, Plaintiff Bank refused to lend Defendant Church sufficient funds to complete the Church Construction Project, and instead agreed to lend Defendant Church only $1,175,000.00 as the principle of the 2008 Loan.

54. In addition, prior to issuing the loan Plaintiff Bank had promised to Defendant Church that the interest rate on the 2008 loan would not exceed 6.5% and that the interest rate would float at between as low as 4.5% and not exceed 6.5%.

55. Notwithstanding Plaintiff Bank's prior representations, the 2008 Loan contained an interest rate of ten and one-half (10.5%) percent per annum.

56. The 2008 Loan provided that payments would be applied first to late fees, then interest and then the principle of the loan.

57. The 2008 Loan also included a pre-payment penalty whereby if Defendant Church paid the loan with "borrowed funds," meaning if it attempted to refinance the loan, within the first 36 months of the loan, that the Plaintiff Bank would assess a penalty of between 1% and 3% of the principle balance.

58. The Plaintiff Bank also charged the Defendant Church an excessive loan origination fee of $23,500 in order to transact the 2008 Loan.

59. Plaintiff Bank once again represented and promised to Defendant Church that it would provide all funds necessary to complete the Church Construction Project, and that upon completion of construction it would convert both the 2007 Loan and the 2008 Loan to permanent financing with a lower interest rate.

60. In order to attempt to complete the Church Construction Project, Defendant

Church had no choice but to accept the Plaintiff Bank's inadequate loan terms, excessive loan origination fee and excessive interest rate.

61.     As Plaintiff Bank knew or reasonably should have known, the 2008 Loan was insufficient to complete the Church Construction Project.

62.     By March 2009, the Church Construction Project was still incomplete and Defendant Church has fallen behind on its payments on the 2007 Loan.

63.     The Plaintiff Bank assessed an exorbitant late payment and/or default penalty, which the Plaintiff Bank called a "prepayment penalty," against the Defendant Church in the amount of $183,244.88.

64.     The "prepayment penalty" was in addition to late fees that the Plaintiff Bank charged in an amount in excess of $20,000.

65.     The amount of the "prepayment penalty" was far in excess of the total arrearage and late fees owed on the mortgage at the time.

66.     In March 2009, the Plaintiff Bank and Defendant Church entered into a "Forbearance and Settlement Agreement," with effective date of March 26, 2009.

67.     The March 2009 Forbearance Agreement required that the "prepayment penalty" be added to the arrearage of the mortgage, and as such it more than doubled the amount of the arrearage as it existed in March 2009.

68.     The March 2009 Forbearance Agreement required that the Plaintiff Church make weekly payments in the amount of $15,000 for 23 weeks in order to pay the claimed arrearage.  These weekly payments were in addition to the other monthly payments of over $25,000 that were owing on the 2008 Loan.

69.   In approximately March 2009, Plaintiff Bank exercised its authority pursuant to the 2007 Construction Loan Agreement to take over management of the Church Construction Project.

70.   In doing so, the Plaintiff Bank assigned its Vice-President of Construction Service to act as the construction manager for the project.

71.   In doing so, Plaintiff Bank represented and promised to Defendant Church that it would ensure swift completion of the Church Construction Project and would secure a certificate of occupancy for the property without further budget overruns.

72.   Plaintiff Bank represented and promised to Defendant Church that it would conduct an audit or accounting of all construction work that had been completed and would review all of the invoices and debts owed in relation to the Church Construction Project.

73.   Plaintiff Bank represented and promised to Defendant Church that it would negotiate settlements of all bills and invoices owed to contractors, subcontractors and vendors on the Church Construction Project for work that had already been completed.

74.   Plaintiff Bank represented and promised to Defendant Church that the settlements it negotiated with the contractors, subcontractors and vendors for work that had already been performed would be at significantly reduced amounts from what had been invoiced by the contractors, subcontractors and vendors in order to allow the defendant to afford to complete the Church Construction Project.

75.     The Plaintiff Bank represented and promised to Defendant Church that it would pay the contractors, subcontractors and vendors directly and that the funds paid would constitute a third loan to Defendant Church.

76.     The Plaintiff Bank represented and promised to Defendant Church that it would obtain final mechanics lien waivers from all contractors, subcontractors and vendors with whom it reached settlements.

77.     The Plaintiff Bank represented and promised Defendant Church that it would ensure that all work was completed on the Church Construction Project in a timely manner and that it would obtain a permanent certificate of occupancy for the new church building.

78.     By June 2009, the Church Construction Project was still not complete, and the Defendant Church had again fallen behind on payments of the 2008 Loan and the payments required by the 2009 March Forbearance and Settlement Agreement.

79.     Plaintiff Bank and Defendant Church entered into a "Settlement Agreement," effective June 5, 2009 regarding a claimed arrearage on the 2008 Loan.

80.     Pursuant to those terms the Plaintiff Bank increased Defendant Church's interest rate to on the 2008 Loan to 13.375%, and provided for various payments to make up the arrearage.

81.     At the same time, Plaintiff Bank and Defendant Church also entered into an "Addendum to Forbearance and Settlement Agreement," effective June 5, 2009 related to the "Forbearance and Settlement Agreement" that had been executed in March 2009.  (Hereinafter referred to as "Addendum").

82.  The Addendum, provided that the interest rate on the 2007 Loan would also increase to 13.375%, and set an established schedule for making up the claimed arrearages.

83.  During the course of the Forbearance agreement, the Plaintiff Bank accepted and received but failed to apply, or applied incorrectly, one or more of the Defendant Church's payments.

84.  By September 2009, Plaintiff Bank had not completed its audit of the Church Construction Project and the Church Construction Project still was not complete.

85.  Additionally, by that time several of the contractors and subcontractors on the construction project had ceased work due to failure to be paid. Additionally, due to Plaintiff Bank's failure to properly manage and timely authorize construction payments, several contractors had begun assessing late payments against Defendant Church, and threatened foreclosure of mechanics liens and other legal actions due to failure to be paid.

86.  The Plaintiff Bank and Defendant Church entered into the 2009 Loan, whereby the Plaintiff Bank agreed to loan Defendant Church up to $850,000.00 in additional funds for the purpose of completing the Church Construction Project.

87.  The loan documents for the 2009 Loan included a document entitled "Adjustable Rate Secured Note," with effective date of September 14, 2009, which provided for a principle of up to $850,000.00, and an interest rate of 11.5% per annum.

88.  The 2009 Note provided that Defendant Church would continue to make payments as agreed in the Forbearance Agreements and provided for additional

lump sum payments, and that all payments would be applied "first to the interest due on the current First Loan [2007 Loan], and then the interest due on the Second Loan [2008 Loan] and the remaining amount shall be applied to the principal and interest due on this loan."

89.     The 2009 Note also expressly provided, "Borrower [Defendant Church] agrees that all draws are subject to the monitoring and oversight of AG Financial Construction Services."

90.     By November 2009, the church construction project was still not completed, and a certificate of occupancy had not been obtained.  By that time, the Defendant Church had again fallen behind on its loan payments.

91.     On or about November 20, 2009, the Plaintiff Bank and the Defendant Church entered into a "Forbearance and Settlement Agreement" regarding the 2007 Loan, 2008 Loan and 2009 Loan, with effective date October 30, 2009.

92.     The November 20, 2009 Forbearance and Settlement Agreement included an improper assessment of a "pre-payment penalty" against the Defendant Church in relation to the 2007 in the amount of $183,244.88, thus improperly purporting to increase the Defendant Church's total indebtedness at on the 2007 Loan.

93.     The November 2009 Forbearance and Settlement Agreement, included an improper assessment of a "pre-payment penalty" against the Defendant Church in relation to the 2008 Loan in the amount of $33,119.18, thus improperly purporting to increase the Defendant Church's total indebtedness on the 2008 Loan.

94. The November 2009 Forbearance and Settlement Agreement provided that interest on the loans would revert to 8.375% on the 2007 Loan, 10.5% on the 2008 Loan, and 11.5% on the 2009.

95. The November 2009 Forbearance and Settlement Agreement provided that payments would be applied first to the "interest only of the First Note [2007 Note], interest only of the Second Note [2008 Note], and the balance applied to the amortization of the Third Note [2009 Loan]."

96. The November 2009 Forbearance and Settlement Agreement provided that upon payment in full of the 2009 Loan, the payments would then be applied first "to the interest only of the First Note [2007 Loan] and the balance applied to the amortization of the Second Note [2008 Loan].

97. The November 2009 Forbearance Agreement required that all payments be deposited in a "30-day demand account with AG Financial Solutions."

98. The November 2009 Forbearance and Settlement Agreement provided, "The proceeds from the Third Note [the 2009 Loan] will be used to make final payments to the contractors for the completion of the building and to settle outstanding invoices owed to the contractors.  All funds will be disbursed directly to the contractors by the Lender [Plaintiff Bank] in exchange for the necessary final lien waivers."

99. The Plaintiff Bank, however, did not perform upon its promises and failed to properly manage the construction project.

100. Although the Plaintiff Bank represented to the Defendant Church that it had negotiated with its contractors and subcontractors to obtain settlements of accounts receivable and mechanics lien waiver, the Plaintiff Bank did not in fact do so.

101. The Plaintiff Bank failed to obtain written settlement documents and/or mechanics lien waivers from multiple contractors and subcontractors for payments that were made to the contractors and subcontractors.

102. Additionally, Plaintiff Bank made false representations to the Defendant Church regarding the settlement or negotiation of the outstanding accounts of the contractors and subcontractors. While the Plaintiff Bank informed the Defendant Church that all payments to contractors and subcontractors were negotiated as final payments and that mechanics liens were obtained, the Plaintiff Bank told several of the contractors and subcontractors that payments made to them did not constitute final payments and that the contractors and subcontractors could seek additional payments directly from the Defendant Church.

103. The Plaintiff Bank failed to obtain written settlement agreements and/or waivers of mechanics liens from several of the contractors and subcontractors.

104. During the period of time in which it was managing the Church Construction Project, the Plaintiff Bank, authorized changed orders with contractors, subcontractors, and vendors, purchased additional supplies and materials, and generally took actions that unnecessarily increased the costs of the Church

 Construction Project without the knowledge, consent or permission of the Defendant Church.

105. The Plaintiff Bank charged amounts to the 2009 Loan as principle in excess of $850,000, which Plaintiff Bank claimed it had expended to pay contractors, subcontractors and vendors for completion of the Church Construction Project.

106. Despite multiple requests from the Defendant Church and from Defendant's Church's legal counsel, the Plaintiff Bank has never provided the Defendant Church with proof that it actually paid any sums to the contractors, subcontractors or vendors in the amounts that Plaintiff Bank Claims.

107. Plaintiff Bank has repeatedly ignored and failed to comply with Defendant Church's request for an accounting of the fund, which the Plaintiff Bank claims make up the principle of the 2009 Loan.

108. The Plaintiff Bank through its construction manager made intermittent efforts and work upon the Church Construction Project through at least March 2010 but eventually abandoned the project, failing to ensure completion of the construction, failing to obtain waivers of mechanics liens or other legal settlement documents from all of the vendors contractors and subcontracts, and failing to obtain a permanent certificate of occupancy for the church despite multiple request from the Defendant Church that the Plaintiff Bank complete the construction as promised.

109. By September 20, 2010, despite Plaintiff Bank's promises to timely complete the Church Construction Project, the project still was not complete.

110. On September 20, 2010, Bishop Kenneth Moales, Sr. died.

111. As a result of Bishop Moales' death, Plaintiff Bank sought provisions of the Key

Man life insurance policy that had been required by the 2007 Loan documents.

112. At that time, however, it was determined that due to a paper processing error, Bishop Moales' policy did not list Plaintiff Bank as beneficiary and instead provided for $1,000,000 in benefits to Defendant Church, and $2,500,000 in benefits his wife.

113. After the death of his father, Pastor Kenneth Moales, Jr., took over the ministry of the Defendant Church, and in seeking to comply with the terms of the 2007 Loan, offered Plaintiff Bank $1,000,000 from the insurance policy for which the Defendant Church was the beneficiary.

114. Plaintiff Bank, however, rejected this offer, and instead demanded the full $3,500,000 of life insurance. Plaintiff Bank refused to take any action on the Defendant's debts or to complete construction of the church, as had been previously promised, unless Defendant Church paid $3,500,000 to Plaintiff Bank.

115. The Plaintiff Bank's refusal to take action unless paid in excess of the amount that is was contractually owed on the life insurance policy, caused the Defendant Church to suffer additional delay in construction and incur additional costs from its construction contractors, including late fees on payments, as well as unnecessary additional interest and late fees on its loans owed to Plaintiff Bank.

116. On or about April 29, 2011, the parties reached an agreement regarding disbursal of the insurance proceeds, whereby $1,700,000 was distributed to Plaintiff Bank, which was an amount in excess of what was contractually owed to the Plaintiff Bank.

117. Pursuant to the terms of the Agreements in place at the time, the $1,700,000 should have been sufficient to have completely paid off any all outstanding late

charges and interest on the 2007, 2008 and 2009 Loans (to the extent that any was validly owed), and to pay the entire principal owing on the 2009 Loan (if any was validly owed), with any remaining balance being applied to the principal of the 2008 Loan and 2007 Loan respectively.

118.    However, Plaintiff Bank improperly applied the $1,700,000 payment by allocating the payment among the three loans in such a manner as to prevent the principal of the 2009 Loan from being paid, and resulting in a continued accrual of a high rate of interest on the 2009 Loan balance, as well as accrual of higher interest on the remaining loan balances, as well as any "late fees" or other charges that the Plaintiff Bank may have assessed since that time.

119.    On or about March 27, 2012, the Defendant Church and the Plaintiff Bank entered into three agreement to modify the terms of the 2007, 2008 and 2009 Mortgages and Notes, which terms provided for modification of the amounts and terms of payments.

120.    The mortgage modification agreements provided provided that all future payments would be applied first to the 2009 Loan, then to the 2008 Loan, and then to the 2007 Loan.

121.    The Defendant Church continued to make payments after these modifications but upon information and belief, the Plaintiff Bank failed to property apply the payments, and instead applied any payments against "late fees," "interest" and charges in such a manner as to continue to maximize payments of "late fee," "interest" and other charges, and to minimize payments applied to the principal of the loans.

122.    Additionally, upon information and belief, at various times throughout the course of the loan, the Plaintiff Bank, failed to appropriately apply the defendant's payments, and/or failed to timely apply the defendants' payment resulting in improper charges for late fees and excessive accrual of interest.

123.    The Defendant Church has paid the Plaintiff Bank in excess of Two Million Five Hundred Thousand Dollars ($2,500,000.00) in payments since the inception of the loans.

124.    Upon information and belief, the Plaintiff Bank has not applied any of those payments to the principal of the loan.

125.    The relationship of Plaintiff Bank and Defendant Church was a fiduciary relationship.

126.    The foregoing actions of the Plaintiff Bank constitute a fraud upon the defendant.


**Third Special Defense: Unconscionability**

1– 126.  Paragraphs 1 through 126 of the Second Special Defense are hereby incorporated by reference as if set forth fully herein.

127.    Plaintiff is a sophisticated lender, engaged with financing church construction in many states and communities.

128.    The Construction Loan Agreement entered into on December 12, 2007 by the Plaintiff and Defendant Church contained multiple unconscionable provisions, including, but not limited to, granting Plaintiff Bank an irrevocable power of attorney over the Defendant Church's construction project, including but not

limited to permitting the Plaintiff to: declare a default if Plaintiff, by its own

judgment, determined construction could be completed on or before the

Completion Date under the Agreement; take over construction after default and incur additional construction debts to be attributed to Defendant Church; and to

make changes to the Plans and Specifications of construction improvements, all

without the Defendant Church's permission or consent; unconscionable

prepayment penalty provisions; unconscionable default provisions that allowed

the

Plaintiff Bank to assess late charges, increased default interest and a

"prepayment penalty" in the event of default by the defendant.

129.    Additionally, the interest rate on the "Bridge Note" entered into on December 19,

2008 by the Plaintiff and the Defendant Church contains an interest rate of

10.50%, with an additional 10% late charge, as well as a 5% default interest rate

increase, as well as a prepayment penalty ranging from 1-4%, which included

charging the "prepayment penalty" in the event of acceleration of the note, in

addition to other late fees, interest charges, and legal fees, unconscionable terms

unrelated to those promised to the Defendant Church.

130.    Furthermore, the March 2009 Forbearance and Settlement Agreement, was

unconscionable in that it incorporated within and unconscionable, unethical,

exorbitant and improperly assessed "prepayment penalty" on the 2007 Loan in

the amount of $183,244.88, over and above the $20,000 in late fees that had

already been assessed on the loan, thus resulting in the Defendant Bank's

mortgage arrearage more than doubling.

131.     Furthermore, the Addendum to Forbearance and Settlement Agreement entered into on June 9, 2009 by the Plaintiff and Defendant Church agreeing to an interest

rate of 13.375%  on the 2007 and 2008 Loans, and requiring weekly payments in the amount of $15,000.00 constitute terms so excessively burdensome on the Defendant as to be unconscionable.  Additionally, this Forbearance Agreement incorporated the improperly assessed "pre-payment penalty" referenced in the paragraphs above.

132.     Furthermore, the 2009 Loan also contained unconscionable provisions, including but not limited to a rate of interest of 11.5%.

133.     Furthermore, the November 2009 Forbearance and Settlement Agreement was unconscionable in that in incorporated significant unethical, unconscionable, excessive, unwarranted and improperly assessed "pre-payment" penalties in the amount of $183,244.88 on the 2007 Loan, and $33,119.18 on the 2008 Loan, as well as excessive and unconscionable weekly payment schedules.   Additionally, the payment continued to be applied in such a manner as to prevent payment from reaching the principles on the loan.

134.     Plaintiff's actions and activities, including taking over the construction management of the new church project, interfering with the relationships and contracts as between Defendant Church and its subcontractors, making the loans pursuant to unconscionable terms unrelated to those promised to the Defendant Church, and modifying the 2007 and 2008 loans so as to impose

grossly excessive interest rates upon Defendant Church amount to

oppressive,

unconscionable business practices to the actual, demonstrable detriment of

Defendant Church.

135.    Foreclosure is an equitable proceeding, Plaintiff's conduct and actions

occurring after the execution of the loan documents afford Defendant Church a

recognized defense to the foreclosure sought.


**Fourth Special Defense: Unclean Hands**

1-126.    Paragraphs 1 through 126 of the Second Special Defense are hereby

incorporated by reference as if set forth fully herein.

127.    Plaintiff Bank seeking mortgage foreclosure is obliged in its dealings with

Defendant Church to do equity.

128.    During the lending process, the Plaintiff Bank's representatives knowingly

made misrepresentations informing Defendant Church that interest rates

contained in loan agreements were different from the interest rates contained

in the loan documents.


129.    Plaintiff Bank knowingly entered into loan agreements and modifications with

Defendant Church that contained unconscionable provisions including

excessively high interest rates and late fees and the granting to the Plaintiff of

an irrevocable Power of Attorney of the Defendant Church's building project.


130.    Furthermore, Plaintiff Bank assumed control of the Defendant Church's

building project through its employees and agents and accumulated excessive

and unreasonable construction debts in the Defendant Church's name.

131.     Plaintiff Bank's conduct occurring during the lending process, after execution of the loan documents, and through much of its lender-bank and obligorchurch relationship with Defendant Church evidences failure to act equitably.

132.     The Plaintiff Bank's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people.

133.     Plaintiff Bank in its dealings with Defendant Church has been guilty of having unclean hands which doctrine the Court ought apply in this matter.

## BY WAY OF COUNTERCLAIM:

## Count One: Breach of Implied Duty of Good Faith and Fair Dealing

1-126.     Paragraphs 1 through 126 of the Second Special Defense are hereby incorporated by reference as if set forth fully herein.

127.     The Plaintiff Bank assumed control of Defendant Church's fund raising efforts in order to create a basis for obtaining the Church's assent to a loan that the Plaintiff Bank knew would be in excess of what the Church would be able to repay.

128.     Additionally, the Plaintiff Bank made misrepresentations to the Defendant Church in the loan process with the purpose of inducing assent to the terms of the loan documents and modifications, which the Plaintiff Bank knew to be unconscionable.

129.    Furthermore, the Plaintiff Bank assumed control of the Defendant Church's construction project, accumulating excessive construction debts in the Defendant Church's name and interfering with the Defendant Church's relationships with its contractors.

130.    Plaintiff Bank's actions and conduct in the course of its dealings with Defendant Church constitute a breach of the implied duty of good faith and fair dealing.

131.    As a result of the Plaintiff Bank's breach of the implied duty of good faith and fair dealing, the Defendant Church has been required to take over management of the construction itself, and has incurred additional costs to move toward completion of the project.

132.    As a result of the Plaintiff's Bank's breach of the implied duty of good faith and fair dealing the Defendant Church has been unable to secure a permanent certificate of occupancy for the church.

133.    As a result of the Plaintiff's Bank's breach of the implied duty of good faith and fair dealing, the Defendant Church incurred late fees and interest from its vendors, contractors and subcontractors due to failure of the Plaintiff bank to make timely and complete payments as promised, thus unnecessarily increasing the costs of construction.

134.    As a result of the Plaintiff's Bank's breach of the implied duty of good faith and fair dealing the Defendant Church has had multiple claims and lawsuits brought against it by contractors and subcontractors, who claimed that they had not been fully paid for their services when Plaintiff Bank had represented to Defendant

Church that the contractors had indeed been paid.  The Defendant Church has been required to incur substantial legal fees and investigatory fees to defend and settle these claims.

135.    As a result of the Plaintiff's Bank's breach of the implied duty of good faith and fair dealing the defendant church has been required to incur substantial legal fees, including the costs of bringing litigation, to obtain discharge of mechanics liens and other liens against the church property.

136.    As a result of the Plaintiff's Bank's breach of the implied duty of good faith and fair dealing, Defendant Church suffered money damages, including but not limited to, excessive and improperly assessed late fees, excessive and improperly assessed interest charges, assessed by the Plaintiff Bank.

137.    As a result of the Plaintiff Bank's breach of the implied duty of good faith and fair dealing, the Defendant Church has suffered the loss of use of monies that it has over-paid to the Plaintiff Bank by virtue of the Plaintiff Bank's cover charging of late fees, "pre-payment penalties," interest and improper application of payments.

**COUNT TWO:**      **Breach of Contract – 2007 Construction Loan Agreement**

1-126.      Paragraphs 1 through 126 of the Second Special Defense are hereby incorporated by reference as if set forth fully herein.

127.    The Plaintiff Bank breached its obligations under the Construction Loan Contract with the Defendant Church to provide construction management services in one or more of the following manners:

a. It failed to timely, properly, competently and effectively supervise the construction of the church;

b.  it failed to timely, properly, competently and effectively manage contractors and subcontracts on the church construction project to ensure that all work was performed in a workmanlike manner;

c.  if failed to timely, properly, competently and effectively manage contractors and subcontractors on the church construction project to ensure that all work was performed in a timely manner;

d.  it failed to timely, properly, competently and effectively manage contractors and subcontracts on the church construction project to ensure that all work was performed within budget;

e.  it failed to timely, properly and effectively negotiate payments to contractors and subcontractors to ensure that costs remained within budget;

f.  it failed to timely and fully pay contractors and subcontracts;

g.  if failed to negotiate with the contractors and subcontractors for payment of their services on the Defendant Church's behalf;

h.  it failed to timely and properly obtain waivers of mechanics liens for payments that were made to contractors and subcontractors;

i.  it failed to timely, properly, adequately and effectively communicate with local government agencies and officials in Bridgeport, Connecticut to ensure that the Defendant Church would be able to timely obtain a certificate of occupancy for the church;

j. it failed to ensure that the church construction was completed in such a manner as to ensure that the Defendant Church would be able to obtain a certificate of occupancy;

k. it failed to obtain a permanent certificate of occupancy on behalf of the Defendant Church;

l. it failed to complete the management of the construction project;

m. it abandoned the church construction project prior to its completion;

n. it failed to timely, properly, and accurately account for the church construction costs and to keep the Defendant Church informed of those costs;

o. it failed to timely, properly, and accurately keep records of the construction activities and of its dealings with contractors, subcontractors and local government officials;

p. it failed or refused to timely provide documentation to the Defendant Church of the construction costs, waivers of mechanics liens and other important construction documentation to the Defendant Church;

q. it improperly authorized excessive payments to contractors, subcontracts and vendors;

r. it improperly and without the knowledge, consent, or approval of the Defendant Church, expanded the scope of work of the contractors, subcontractors, and vendors;

s.  it improperly and without the knowledge, consent, or approval of the Defendant Church, increased the contract prices, authorized change orders, and otherwise increased the indebtedness of the Defendant Church in relation to the Church Construction Project;

t.  in that it made partial payments on outstanding invoices to contractors, subcontractors, and vendors without the knowledge, consent or permission of the Defendant Church;

u.  in that it informed the Defendant Church that it had made full payments on outstanding invoices to contractors, subcontractors, and vendors, when, in fact, it had informed the contractors, subcontracts and/or vendors that payments were partial, and it recommended that the contractors, subcontractors and/or vendors seek additional payments from the Defendant Church; and

v.  in that it misapplied payments received from the Defendant Church.

128. As a result of the Plaintiff Bank's breach of contract, the Defendant Church has been required to take over management of the construction itself, and has incurred additional costs to move toward completion of the project.

129. As a result of the Plaintiff's Bank's breach of contract the Defendant Church has been unable to secure a permanent certificate of occupancy for the church.

130. As a result of the Plaintiff's Bank's breach of contract, the Defendant Church incurred late fees and interest from its vendors, contractors and subcontractors due to failure of the Plaintiff bank to make timely and complete payments as promised, thus unnecessarily increasing the costs of construction.

131. As a result of the Plaintiff's Bank's breach of contract the Defendant Church has had multiple claims and lawsuits brought against it by contractors, subcontractors, and vendors who claimed that they had not been fully paid for their services when Plaintiff Bank had represented to Defendant Church that the contractors, subcontractors and vendors had indeed been paid. The Defendant Church has been required to incur substantial legal fees and investigatory fees to defend and settle these claims.

132. As a result of the Plaintiff's Bank's breach of contract the defendant church has been required to incur substantial legal fees, including the costs of bringing litigation, to obtain discharge of mechanics liens and other liens against the church property.

133. As a result of the Plaintiff Bank's breach of the implied duty of contract, Defendant Church suffered money damages, including but not limited to, excessive and improperly assessed late fees, excessive and improperly assessed interest charges, assessed by the Plaintiff Bank.

134. As a result of the Plaintiff Bank's breach of contract, the Defendant Church has suffered the loss of use of monies that it has over-paid to the Plaintiff Bank by virtue of the Plaintiff Bank's cover charging of late fees, "pre-payment penalties," interest and improper application of payments.

### COUNT THREE:  Breach of Contract – 2009 Forbearance and Settlement Agreement

1-126. Paragraphs 1 through 126 of the Second Special Defense are hereby incorporated by reference as if set forth fully herein.

127.    The Plaintiff Bank breached its obligations under the Forbearance and
Settlement Agreement, with effective date October 30, 2009, in one or more of
the following ways:

   a.   It failed to timely, properly, competently and effectively supervise the
        construction of the church;

   b.   it failed to timely, properly, competently and effectively manage contractors
        and subcontracts on the church construction project to ensure that all work
        was performed in a workmanlike manner;

   c.   if failed to timely, properly, competently and effectively manage contractors
        and subcontractors on the church construction project to ensure that all
        work was performed in a timely manner;

   d.   it failed to timely, properly, competently and effectively manage contractors
        and subcontracts on the church construction project to ensure that all work
        was performed within budget;

   e.   it failed to timely, properly and effectively negotiate payments to
        contractors and subcontractors to ensure that costs remained within
        budget;

   f.   it failed to timely and fully pay contractors and subcontracts;

   g.   if failed to negotiate with the contractors and subcontractors for payment of
        their services on the Defendant Church's behalf;

   h.   it failed to timely and properly obtain waivers of mechanics liens for
        payments that were made to contractors and subcontractors;

i.  it failed to timely, properly, adequately and effectively communicate with local government agencies and officials in Bridgeport, Connecticut to ensure that the Defendant Church would be able to timely obtain a certificate of occupancy for the church;

j.  it failed to ensure that the church construction was completed in such a manner as to ensure that the Defendant Church would be able to obtain a certificate of occupancy;

k.  it failed to obtain a permanent certificate of occupancy on behalf of the Defendant Church;

l.  it failed to complete the management of the construction project;

m.  it abandoned the church construction project prior to its completion;

n.  it failed to timely, properly, and accurately account for the church construction costs and to keep the Defendant Church informed of those costs;

o.  it failed to timely, properly, and accurately keep records of the construction activities and of its dealings with contractors, subcontractors and local government officials;

p.  it failed or refused to timely provide documentation to the Defendant Church of the construction costs, waivers of mechanics liens and other important construction documentation to the Defendant Church;

q.  it improperly authorized excessive payments to contractors, subcontracts and vendors;

r.  it improperly and without the knowledge, consent, or approval of the Defendant Church, expanded the scope of work of the contractors, subcontractors, and vendors;

s.  it improperly and without the knowledge, consent, or approval of the Defendant Church, increased the contract prices, authorized change orders, and otherwise increased the indebtedness of the Defendant Church in relation to the Church Construction Project;

t.  in that it made partial payments on outstanding invoices to contractors, subcontractors, and vendors without the knowledge, consent or permission of the Defendant Church;

u.  in that it informed the Defendant Church that it had made full payments on outstanding invoices to contractors, subcontractors, and vendors, when, in fact, it had informed the contractors, subcontracts and/or vendors that payments were partial, and it recommended that the contractors, subcontractors and/or vendors seek additional payments from the

Defendant Church;

v.  in that it misapplied payment received from the Defendant Church.

128. As a result of the Plaintiff Bank's breach of contract, the Defendant Church has been required to take over management of the construction itself, and has incurred additional costs to move toward completion of the project.

129. As a result of the Plaintiff's Bank's breach of contract the Defendant Church has been unable to secure a permanent certificate of occupancy for the church.

130.     As a result of the Plaintiff's Bank's breach of contract, the Defendant Church incurred late fees and interest from its vendors, contractors and subcontractors due to failure of the Plaintiff bank to make timely and complete payments as promised, thus unnecessarily increasing the costs of construction.

131.     As a result of the Plaintiff's Bank's breach of contract the Defendant Church has had multiple claims and lawsuits brought against it by contractors and subcontractors, who claimed that they had not been fully paid for their services when Plaintiff Bank had represented to Defendant Church that the contractors had indeed been paid.  The Defendant Church has been required to incur substantial legal fees and investigatory fees to defend and settle these claims.

132.     As a result of the Plaintiff's Bank's breach of contract the defendant church has been required to incur substantial legal fees, including the costs of bringing litigation, to obtain discharges of mechanics liens and other liens against the church property.

133.     As a result of the Plaintiff Bank's breach of contract, Defendant Church suffered money damages, including but not limited to, excessive and improperly assessed late fees, excessive and improperly assessed interest charges, assessed by the Plaintiff Bank.

134.     As a result of the Plaintiff Bank's breach of contract, the Defendant Church has suffered the loss of use of monies that it has over-paid to the Plaintiff Bank by virtue of the Plaintiff Bank's over charging of late fees, "pre-payment penalties," interest and improper application of payments.

**COUNT FOUR: <u>Violation of the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. § 42-110a et seq.</u>**

1-126.  Paragraphs 1 through 126 of the Second Special Defense are hereby

incorporated by reference as if set forth fully herein.

127.    The above described actions by the Plaintiff Bank constitute illegal, immoral,

unethical, oppressive or unscrupulous methods, practices or conduct in a trade or commerce, in violation of the Connecticut Unfair Trade Practices Act,

which is codified at Conn. Gen. Stat. § 42-110a *et seq.*

128.    As a result of such conduct the Defendant Church as suffered pecuniary loss,

including but not limited to:

a.      Increased costs of construction;

b.      Late fees and interest charges assessed by its vendors, contractors and subcontractors;

c.      legal fees, investigations fees, costs and other pecuniary loss associates with defendant multiple claims, including lawsuits, brought by contractors, subcontractors, and vendors;

d.      legal fees, investigation fees, costs and other pecuniary loss associated required to clear the church title of mechanics liens and other liens, including costs and legal fees associated with litigation; and

e.      excessive and improperly assessed late fees, excessive and improperly assessed interest charges, assessed by the Plaintiff Bank.

**COUNT FIVE:     <u>Statutory Theft, Violation of Conn. Gen. Stat. § 52-564</u>**

1.-126. Paragraphs 1 through 126 of the Second Special Defense are hereby

incorporated by reference as if set forth fully herein.

127.    Through out the negotiation of the multiple loans, the Defendant Church

repeatedly protested and questioned the loan documents, which routinely

contained loan conditions that were less favorable than those that had been

previously promised.

128.    On each occasion, the Plaintiff Bank promised either: 1) that the language in the loan documents was "just for the lawyers" or "just for the FDIC," and stated that the terms and conditions that would actually prevail would be more favorable than those incorporated into the documents; or 2) that the terms of the loan documents were temporary, and that the agreements would be revised upon completion of construction to provide for more favorable terms.

129.    By virtue of the above described false representations and promises the Plaintiff Bank obtained valuable property, including but not limited to mortgage deeds upon multiple parcels of the Defendant Church's real estate, assignments of leases and rents owing to the Defendant Church, mortgage origination fees, fees ostensibly paid for provisions of capital campaign fundraising services, and other fees.

130.    The conduct described in the previous paragraphs constitutes Civil Theft in violation of Conn. Gen. Stat. § 52-564, by virtue of violation of Conn. Gen. Stat. §§ 53a-119(3) and 53a-119(5)(I).

**Wherefore**, Prayer Tabernacle Church of Love, Inc., the Defendant-Counterclaim

       Plaintiff, seeks the following relief:

a.  JURY TRIAL on so triable issues.

b.  Compensatory money damages;

c.  Interest and costs;

d.  Common law punitive damages;

e.  Punitive damages pursuant to Conn. Gen. Stat. § 42-110g

f.  Costs and attorneys fees pursuant to Conn. Gen. Stat. § 42-110g;

g.  Treble damages pursuant to Conn. Gen. Stat. § 52-564;

h.  Equitable rescission of the loans and mortgage agreements; and.

i.  Equitable reformation of the loans and mortgage agreements.

 

       DEFENDANT

       Prayer Tabernacle Church of Love, Inc.

By:    _/s/ Ct29012_____

       Andre Cayo (ct29012)
       84 W. Park Place
       Stamford, CT 06901
       Phone: 203-517-0416
       Fax: 203-517-0418
       Email: cayolaw@gmail.com

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the above was mailed, postage-prepaid or electronically delivered on this the above date to all counsel and pro se parties of record and to:

Vernon, CT 06066 Kristin B. Mayhew, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
30 Jelliff Lane
Southport, CT 06890

Ray Weiner, LLC
Shepro & Hawkins, LLC
2103 Main Street
Stratford, CT 06615

HOP Energy, LLC
Reveley Williams & Associates, LLC
PO Box 657
FDIC as Receiver for the Community's
Bank
Cohen & Wolh, PC
PO Box 1821
Bridgeport, CT 06601

Commissioner of Consumer Protection
165 Capital Ave.
Hartford, CT 06106

Office of the Attorney General
55 Elm Street
Hartford, CT 06106



DEFENDANT

Prayer Tabernacle Church of Love, Inc.


By:    /s/ Ct29012___

     Andre Cayo (ct29012)

84 W. Park Place
Stamford, CT 06901
Phone: 203-517-0416
Fax: 203-517-0418
 Email: cayolaw@gmail.com