## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FOUNDATION CAPITAL RESOURCES,
INC.,
     *Plaintiff and Counter Defendant,*

     v.

PRAYER TABERNACLE CHURCH OF
LOVE, INC.,
     *Defendant and Counter Claimant.*

No. 3:17-cv-00135 (JAM)

## RULING GRANTING IN PART AND DENYING IN PART
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND GRANTING DEFENDANT'S MOTION TO VACATE RECEIVERSHIP ORDER

Plaintiff Foundation Capital Resources, Inc. ("Foundation Capital") is a religiously affiliated financial company that lent millions of dollars for a major church construction project in Bridgeport, Connecticut. Unfortunately, the church entity that received the funds—defendant Prayer Tabernacle Church of Love, Inc. ("the Church")—defaulted on the loans. Foundation Capital has filed this lawsuit to foreclose on the Church, and the Church has responded with defenses and counterclaims alleging in essence that Foundation Capital engaged in predatory lending and fraud. Foundation Capital now moves for summary judgment. I will grant in part and deny in part the motion for summary judgment. I also grant the Church's motion to vacate the receivership order.

### BACKGROUND

The parties in this case tell two very different stories. For Foundation Capital, this is the story of a straightforward foreclosure action due to the Church's failure to pay back loans. For the Church, this is the story of a predatory lending scheme, featuring multiple misrepresentations

and tactics that induced the Church to take on debt it could not pay. I will first recount Foundation Capital's version of events before relating the Church's version.

Foundation Capital describes a sequence of several loans and forbearance agreements from 2007 through 2009. The first loan was executed in December 2007 and provided the Church with $6.1 million in construction financing at an interest rate of 8.375%. Doc. #87-2 at 5–6 (¶¶ 21–22, 26–27). The loan was secured by a mortgage on fifteen parcels of property owned by the Church in Bridgeport, Connecticut. *Id.* at 6–8 (¶ 29).

The construction project incurred numerous cost overruns and change orders, leading to the parties' agreement to enter into a bridge loan for more financing to complete the project. *Id.* at 10 (¶¶ 39, 43). Foundation Capital issued the Church a bridge loan in December 2008 for an additional $1.175 million at an interest rate of 10.5%. *Id.* at 11 (¶¶ 47–48).

By the spring of 2009, the Church was delinquent in repaying its loans, and the parties negotiated forbearance agreements and other arrangements designed to cure any default. *Id.* at 13–22.  In March and June 2009, the parties entered into forbearance agreements with respect to the 2007 and 2008 loans. *Id.* at 13–14. The June 2009 forbearance agreement provided for a higher interest rate of 13.375% until the arrearage had been cured. *Id.* at 14 (¶ 68).

Just a few months later, the parties executed a third loan, of $850,000 at an interest rate of 11.5% in September 2009. *Id.* at 15 (¶¶ 71–72). They also entered into a separate interest rate agreement in November 2009 stipulating to an interest rate of 11.5%. *Id.* at 16 (¶ 76).

In October 2009, the parties entered into another forbearance agreement with respect to the three prior loan notes of 2007, 2008, and 2009. *Id.* at 16 (¶ 79). This October 2009 forbearance agreement contained a clause acknowledging the validity of the prior notes and disclaiming and waiving any defenses to their enforcement. *Ibid.* (¶ 80). In addition, the October

2009 forbearance agreement provided that "[t]his document contains the entire agreement between the parties hereto and there are not oral representations or agreements which are not set forth herein." *Id.* at 17 (¶ 81).

In September 2010, the Church's leader (Bishop Kenneth Moales, Sr.) passed away. *Id.* at 18 (¶ 88). The parties thereafter agreed in April 2011 that $1.7 million in life insurance for Bishop Moales would be paid to Foundation Capital, such that all three of the outstanding loans from 2007, 2008, and 2009 were made current in payments, and the interest rates on the notes were reset to 6.25%. *Id.* at 18–19 (¶¶ 90–92).

The Church, however, fell behind by about $200,000 in payments again by late February 2012. *Id.* at 19 (¶¶ 95–96). In March 2012, the parties entered into modification agreements for the 2007, 2008, and 2009 notes, with an interest rate of 6.25% and a maturity date of May 1, 2014. *Id.* at 21–22 (¶¶ 102–108). The Church was represented by counsel in connection with these modification agreements. *Id.* at 22 (¶ 109). In anticipation of that agreement, the Church's officers and voting trustees executed a certification and resolution authorizing the Church to enter into these modification agreements. *Id.* at 20 (¶ 98). The certification and resolution acknowledged the Church's cumulative debt of about $7.2 million under the 2007, 2008, and 2009 notes. *Ibid.* (¶ 100).

Once again, the Church fell behind in its payments, and on May 16, 2013, Foundation Capital sent demand letters to the Church and accelerated all amounts due and owing under each loan. *Id.* at 23 (¶¶ 112–13). The Church has not made any payments on the notes since January 2013. *Ibid.* (¶ 115).

The Church does not dispute the foregoing facts. It contends instead that there are additional facts involving fraudulent oral misrepresentations that led to the Church's incurring of

debt and inability to repay its loan obligations. This defense relies in principal part on the deposition testimony of Pastor Kenneth Moales, Jr., who was the son of Bishop Moales and is currently the Senior Pastor and CEO of the Church. Pastor Moales had previously served as the youth pastor for the Church while his father was leading the Church. *Id.* at 23 (¶ 118).

Pastor Moales was involved in the execution of all the notes, mortgages, and forbearance agreements between the parties. *Id.* at 24 (¶ 120). As an advisor at that time to the Church's board of trustees, his role also included "bookkeeping, creating business models, negotiating with vendors and dealing with lawyers, and doing my internal bookkeeping, and review of the [Church's accountant's] audits." *Id.* at 23–24 (¶ 119). Pastor Moales' background includes a college degree in accounting as well as ten years working in the field of accounting for organizations including the New York Times, Deloitte and Touche, and Mercedes Benz; he was also lead tax accountant for Pepperidge Farm for four years. *Ibid.* (¶¶ 121–22).

According to Pastor Moales, the Church first decided to move from its previous location in Bridgeport to build a new, larger church facility, sometime in 2005 or 2006. Doc. #92-3 at 9–10 (deposition transcript). The planned construction project would consist of two phases: Phase One, consisting of a new church building and a new location for the church's affiliated religious school, and Phase Two, consisting of numerous additional amenities including a dining room, gymnasium, four basketball courts, an auditorium, a bowling alley, a swimming pool, and additional classrooms for the school. *Id.* at 11.

The Church initially acquired a mortgage from the Evangelical Christian Credit Union ("ECCU") for a $5 million line of credit at an interest rate of 7.693%. *Id.* at 46–47. But after the architect on the construction project determined that Phase One alone would cost $6.5 million, *id.* at 19–20, and that the entire project combined would cost $13.5 million, *id.* at 64, the Church

realized it would need additional construction financing beyond the mortgage from ECCU. The Church's accountant, Samuel Wilson, then put the church in touch with seven potential lenders, including the Assemblies of God Loan Fund ("AGLF"). *Id.* at 36–37.

AGLF is a part of the Assemblies of God ("AG"), a Protestant Christian denominational group. Doc. #92-14 at 14. AGLF was created in 1994, and then placed under the auspices of the newly-formed Assemblies of God Financial Services Group ("AGFSG") in 1998. *Ibid.*

AGFSG also controls a real estate investment trust called Foundation Capital Resources, Inc., the plaintiff in this case. During the relevant period, from 2007 to 2009, AGFSG owned roughly 99% of Foundation Capital's stock, "either directly or through entities it controls." *Id.* at 36, 53. Foundation Capital paid "dividends quarterly in an amount that approximates its taxable income," and was "consolidated into the financial statements of AGFSG." *Ibid.* AGFSG, AGLF, and Foundation Capital are all in the business of making construction loans to church groups. *Id.* at 15.[1]

Foundation Capital was one of three potential lenders to make the Church a formal loan offer. Doc. #92-3 at 37. According to Pastor Moales, Foundation Capital offered a "verbal commitment" to fund both Phases One and Two in their entirety. *Id.* at 38. Kregg Hood, one of Foundation Capital's officials, stated that "God told him to fund the project." *Ibid.* "He said the Lord had led him to our city and to our church." *Id.* at 40.

According to Pastor Moales, Hood, along with Johnnie Baker and Larry Russell, repeatedly told the Church that the loan from Foundation Capital would take place in several

---

[1] Throughout Pastor Moales's deposition, neither he nor Foundation Capital's counsel drew clear distinctions between Foundation Capital and the various AG entities, and it is not always clear exactly which entity the Church was dealing with at different points; for purposes of setting forth the facts of the case, therefore, I will refer to all of the AG-affiliated entities in this case as Foundation Capital. Insofar as any allegedly fraudulent activities described by Pastor Moales were conducted not by Foundation Capital itself but by officers of the other AG entities, Foundation Capital does not make any argument that the fraud cannot thereby be imputed to Foundation Capital itself, or that the special defenses in this case should fail for this reason.

increments. The Church would receive $6.1 million immediately, and would then receive a second installment based on the pledge totals from a capital campaign to raise funds from church membership that would be supervised by Foundation Capital. *Id.* at 60. Ultimately, both the initial construction loan and the subsequent bridge loan would be converted to a single, "traditional" mortgage, with an interest rate between 4% and 6%. *Id.* at 60, 69–72, 75–76.

Pastor Moales testified that he understood that the Church would receive enough financing from Foundation Capital to conduct the entire construction project, and that the capital campaign would only be intended to pay off the resulting mortgage, not to pay for the construction itself. *Id.* at 69, 99–100. He also testified that part of Foundation Capital's pitch was the guarantee that it would make sure that all of the construction workers and subcontractors were paid on time so that there were no delays in construction. Doc. #92-4 at 49.

This verbal commitment, however, was not reflected in the first loan agreement, which simply provided for a loan of $6.1 million at an interest rate over 8%. Doc. #92-3 at 76. According to Pastor Moales, throughout his dealings with Foundation Capital "80 percent of what they did for us was not in writing." *Ibid.* In fact, Pastor Moales advised the Church's board of trustees not to sign the 2007 loan documents precisely because of these discrepancies. *Id.* at 76–77. But Hood, Russell, and Baker assured Bishop Moales and the board of trustees that the documents were "just a formality." *Id.* at 77. After the closing of the first mortgage, Hood, Russell, and Baker repeatedly represented that the loans would eventually be converted into a traditional mortgage with an interest rate under 6%; these representations spanned from 2007 all the way to 2012. *Id.* at 71–72. This promised lower interest rate never materialized.

According to Pastor Moales, by February 2008 he knew that the project was on pace to run out of money by the summer. *Id.* at 92. He began pressing Foundation Capital for the money

from the bridge loan, which he understood to be a second disbursement from the initial loan, once the pledge total from the capital campaign had come in. *Id.* at 128–33. But Larry Russell responded that the Church would need to fill out certain new forms concerning the capital campaign that had never been presented to the Church. *Id.* at 129–30. Pastor Moales stated that he received an ever-shifting narrative from Kregg Hood and Foundation Capital's other officials about what would be required before the remainder of the money could be disbursed. Doc. #92-4 at 20, 48–49. Ultimately the second loan agreement was not executed until December 2008.

At the same time, Johnnie Baker, the construction manager who had been supervising the construction project on behalf of Foundation Capital since the signing of the first loan agreement, *id.* at 23–24, continued to tell the Church as late as July 2008 that construction was proceeding according to schedule. Doc. #92-3 at 126–27. And in May 2008 Baker and Hood started pressuring the Church to proceed with Phase Two of the construction project as well, with Baker going so far as to tell the architect to begin drawing up plans for Phase Two. The Church had never intended to move so quickly and did not feel that it was ready to do so, but Foundation Capital said that the Lord was with them and that Foundation Capital would fund both phases. *Id.* at 109–11.

The Church also began its capital campaign on May 1, 2008, with Foundation Capital's guidance. *Id.* at 101. As part of this campaign, and as a precondition for receiving the bridge loan, Foundation Capital made the entire church congregation read a book by Kregg Hood about "faithraising." *Id.* at 93–98; Doc. #92-11 (booklet with title "*Take God at His Word: Experience the Power of Giving*" by Dr. Kregg Hood). According to Pastor Moales, this book states that giving is a sign of faith in Jesus Christ, and that people should ignore apparent financial limits on their ability to give to the church because "if you extend your faith and believe in God and

increase your giving, that God will give you more than enough finances in which to take care of the things in the Kingdom of God." Doc. #92-3 at 96–97. Foundation Capital required the Church to purchase a copy of this book for every single one of its members, including children, "so they can give some of their allowance to God." *Id.* at 97–98.

By the summer of 2008, the capital campaign had raised over $1.5 million in pledges, and Pastor Moales asked Foundation Capital to disburse $1.5 million in additional funds to match this figure to keep the construction running on time, *id.* at 134, but was instead made to jump through different hoops, ultimately leading to the second loan agreement in December. At some point during 2008, Pastor Moales sent Foundation Capital a letter stating that the Church had spent $647,000 of its own money, raised chiefly through loans from its membership, to keep the construction going. Doc. #92-4 at 6. Pastor Moales testified that Foundation Capital had stated repeatedly, beginning in the spring of 2008, that if the Church had to do any borrowing to maintain the construction, those funds would be "returned back" to them. *Id.* at 9.

Ultimately, the $1.175 million loan the Church received in December 2008 was too little, too late. The Church had initially wanted to request a loan of $2.4 million, but Kregg Hood told the Church instead to request only $1.3 million. Doc. #92-4 at 18. By this point, the country had entered the Great Recession and markets were in freefall, so the Church could not easily look elsewhere to secure the financing it needed to complete the construction: it was Foundation Capital's terms or nothing. *Id.* at 30.

The construction project dragged on into 2009, despite assurances that it would be finished in 2008. Foundation Capital sought even greater control over the project in 2009, including that it would pay the contractors and subcontractors directly rather than paying the Church and letting the Church pay the construction workers. Doc. #92-3 at 23–27. But, by the

fall of 2009, Foundation Capital had failed to pay the construction company, which walked off the job, told its subcontractors to do likewise, and took with it seventeen boxes of documents that had belonged to the Church, saying that the Church would get them back when the company got its money from Foundation Capital. *Id.* at 22–23, 112.

As Pastor Moales sees things, Foundation Capital gained the Church's trust through their shared religious affiliation and then took advantage of that trust. By repeatedly verbally offering generous terms that were not reflected in the formal legal documents, and stating that the documents were a mere formality, Foundation Capital put the Church in a position where it sunk considerable resources into the construction project but was not able to finish that project and reap the rewards.[2]

According to Pastor Moales, Foundation Capital's management of the construction project likewise dragged things out, increasing the resources required to finish the job and placing the Church ever more at Foundation Capital's mercy. Thus, for example, Foundation Capital "strong-armed" Pastor Moales and his mother into turning over his father's life insurance money to Foundation Capital as part of a restructuring of the loans. Doc. #92-4 at 51. The capital campaign fell apart in late 2011 to early 2012, with church members leaving out of the fear that

---

[2] The main allegedly deceptive verbal representations were those concerning the interest rate and the nature of the second portion of the loan, but Pastor Moales also testified to a wide array of other smaller deceptions of a similar nature. For instance, Foundation Capital stated that certain fees charged at the closing of the original loan (a loan origination fee, a fee for overseeing the capital campaign, the fee for the Church's accountant) would function as lines of credit during the processing of the bridge loan. Doc. #92-3 at 84–85. When the Church received a small loan of $200,000 in November 2008, in anticipation of the larger second loan ultimately executed in December, Foundation Capital represented that the loan would not need to be paid back immediately despite language in the loan agreement stating that it had to be repaid by December 5, 2008. Doc. #92-4 at 12–13. And the October 2009 forbearance agreement provided that the Church would have to make two special payments of $75,000 in addition to its regular (though heightened) weekly payments, despite Foundation Capital's knowledge that the Church would be unable to make those payments. Foundation Capital apparently represented that, if the Church could not raise the entire amount, the remainder would be converted to credit. *Id.* at 41–45.

Foundation Capital would foreclose on the church. *Id.* at 37–38. These fears of foreclosure proceedings ultimately proved true by 2013.

In July 2013, Foundation Capital filed a foreclosure action in Connecticut Superior Court. After three years of litigation in state court, however, the parties suddenly agreed to withdraw all their claims and counterclaims on November 11, 2016, on the very eve of a scheduled jury trial. *See* Doc. #65-1 at 11; *see also Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, 2016 WL 6395284, at *1 (Conn. Super. Ct. Sept. 29, 2016) (state court ruling denying in large part Foundation Capital's motion to strike the Church's special defenses and counterclaims).

Foundation Capital then refiled its foreclosure action in this Court on January 30, 2017, invoking federal diversity jurisdiction. Docs. #1, #25. Initially, the Church failed to respond, and a default judgment entered on September 19, 2017, Doc. #56, but was vacated on November 8, 2017, on the Church's motion for relief from judgment. Doc. #75. The Church has now filed an answer with special defenses and counterclaims. Doc. #77.

Foundation Capital moves for summary judgment. Doc. #87. In opposing summary judgment, the Church does not contest any of the basic facts concerning the financial transactions between the parties. *See* Doc. #92-1. Instead, the Church relies on its special defenses and counterclaims, which mostly attack the validity of the parties' written agreements on the basis of alleged fraud.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury or fact finder to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### Foundation Capital's Foreclosure Action

There is no dispute of material fact concerning Foundation Capital's *prima facie* foreclosure case. The Church admits that Foundation Capital is the owner of certain promissory notes entered into by the Church, that these notes are secured by mortgages on certain parcels of property, and that the Church has not met its obligations under the promissory notes. *See* Doc. #92-1 at 1–8 (¶¶ 1–127). Foundation Capital is therefore entitled to summary judgment as to its *prima facie* case. The only questions remaining are whether the Church has introduced sufficient evidence to maintain at least one of its special defenses and/or its counterclaims.

### Special Defense – Certificate of Authority

The Church alleges as a special defense that Foundation Capital may not maintain this action because it lacks a certificate of authority that is required of foreign corporations doing business in Connecticut in order to maintain a court action. Connecticut law requires any foreign corporation to acquire a certificate of authority from the Secretary of State before it may transact business within the state. *See* Conn. Gen. Stat. § 33-920(a). "A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority." Conn. Gen. Stat. § 33-921(a); *see*

11

*also Armor Bronze & Silver Co. v. Chittick*, 221 F. Supp. 505, 510 (D. Conn. 1963) (applying requirement to federal diversity action). Foundation Capital argues that this rule does not apply to it because it has never transacted business in Connecticut, and because the statute further provides that "securing or collecting debts or enforcing mortgages and security interests in property securing the debts" does not constitute transacting business. Conn. Gen. Stat. § 33-920(b)(8).

The Church responds by noting that the various Assemblies of God entities did far more in Connecticut than just acquire and enforce a mortgage. It supervised both the "faithraising" campaign and the church construction project, and it frequently sent officers to Connecticut to meet with the Church. But there is no indication that Foundation Capital by itself did any of these things. Even if Foundation Capital is effectively a corporate subsidiary of AGFSG, there is nothing in the text of the statute suggesting that a corporation must obtain a certificate and is otherwise barred from maintaining a suit in Connecticut court if its *parent* corporation does business in Connecticut. The Church has cited no authority suggesting that § 33-921 applies to any corporations that do not themselves do business in Connecticut, and the Court is aware of none. At least one case suggests that the opposite is true and that laws such as § 33-920 respect the corporate form. *See, e.g.*, *RMS Residential Props., LLC v. Naaze*, 903 N.Y.S.2d 729, 732 (2010) (corporate subsidiary which itself lacked certificate of authority but whose parent corporation had one could not maintain suit in New York courts). Accordingly, I will grant Foundation Capital's motion for summary judgment as to the Church's first special defense that Foundation Capital may not maintain this action for lack of a certificate of authority.[3]

---

[3] Even if the certificate of authority requirement were to apply to Foundation Capital, a court has discretion to stay an action pending a company's obtaining such a certificate, *see Priority Sales Mgmt., Inc. v. Carla's Pasta, Inc.*, 2011 WL 3819748, at *1 (D. Conn. 2011), and I would grant such a stay here.

*Special Defense – Fraud*

The bulk of the Church's allegations concern the Church's special defense of fraud. "Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on his statement to his detriment." *Reville v. Reville*, 312 Conn. 428, 441 (2014). "Fraud is an equitable defense to a foreclosure action." *Chase Manhattan Mortg. Corp. v. Machado*, 83 Conn. App. 183, 188 (2004).

Here, Pastor Moales has testified to what amounts to a wide-ranging predatory lending scheme on the part of Foundation Capital and its affiliated Assemblies of God entities. This conduct included several specific misrepresentations of fact, for instance that the interest rate in the first loan agreement would be no more than 6%, when in reality it was over 8%. If true, this would establish the elements of a fraud defense: that there was a knowing misrepresentation of fact made for the purpose of inducing the Church's reliance and that the Church did so rely to its detriment. The elements of intent to induce reliance and reliance are arguably shown by Pastor Moales' raising questions about the oral representations and being assured that discrepant terms in the loan documents were mere formalities. *See* Doc. #92-3 at 77.

Foundation Capital advances several arguments in support of summary judgment as to the fraud special defense. First, Foundation Capital argues that Pastor Moales' deposition testimony is insufficient to create a genuine issue of material fact, invoking the rule that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But this principle does not apply broadly to all cases where one party's side of a factual dispute is supported only by the party's own testimony, an extremely common situation. Instead, it applies only in the rare case where "the facts alleged are so contradictory that doubt is cast upon their plausibility." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011). When "the relevant contradiction is not only unequivocal but is left unexplained— indeed, is inexplicable—a district court may determine that a plaintiff has manufactured a sham issue of fact." *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013).

Here, there is nothing unexplained or inexplicable about the inconsistencies between Pastor Moales's testimony and the loan documents. Indeed, the Church's version of events is not internally contradictory at all. The explanation for the discrepancy between Pastor Moales' testimony and the loan documents, according to that same testimony, is that officials made oral representations not in keeping with the terms of the loan documents, and the Church was told that the oral, rather than written, terms would apply. The Church's allegations, in other words, include the very discrepancy upon which Foundation Capital would rely to discredit those allegations. And the Church's tale of manipulation and predation is not supported solely by Pastor Moales's testimony, but is also corroborated by the documents the Church has introduced pertaining to the "faithraising" campaign. I conclude, therefore, that the Church has established genuine issues of fact as to the fraud defense.

This does not necessarily mean that there is a genuine issue of *material* fact, of course, because Foundation Capital next argues that, even if these misrepresentations were made and even if the Church relied on them, this reliance was not reasonable. In support of this contention Foundation Capital cites the "general rule . . . that where a person of mature years and who can

read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is that person's duty to read it and notice of its contents will be imputed to that person if he negligently fails to do so . . ." *CIT Small Bus. Lending Corp. v. Sayers*, 2014 WL 4802235, at *8 (D. Conn. 2014) (quoting *First Charter Nat'l Bank v. Ross*, 29 Conn. App. 667, 671 (1992)). The remainder of that sentence then cautions that "this rule is subject to qualifications, including intervention of fraud or artifice, or mistake not due to negligence, and applies only if nothing has been said or done to mislead the person sought to be charged or to put a person of reasonable business prudence off guard in the matter." *Ibid.*

On the Church's version of the facts, the issue is not that the Church negligently failed to read or understand the contract. Indeed, Pastor Moales maintains that he specifically brought up the discrepancies between the written documents and the oral representations prior to the signing. Instead, the Church alleges precisely the "intervention of fraud [and] artifice" that is calculated to put a person of reasonable prudence off their guard: Foundation Capital's repeated oral misrepresentations, including when Pastor Moales brought up the discrepancy. Based on these allegations, no matter if I might think Pastor Moales' account to be questionable, I cannot say as a matter of law that the Church's reliance was unreasonable.

Foundation Capital further argues that the Church's fraud defense is barred by the provisions of the various agreements between the parties. Each of the agreements contained a so-called "merger" clause, stating that "the Agreement supersedes all prior discussions" and that "there are no oral representations or agreements which are not set forth herein." Doc. #87-2 at 6, 11, 14, 15, 17 (¶¶ 28, 49, 63, 72, 81). In addition, the forbearance agreements likewise contained waiver provisions stating that "[t]he Note is hereby confirmed and ratified in all respects . . . Debtor acknowledges and represents that no defenses, offsets, deductions, counterclaims or other

claims . . . exist to the enforcement of the Note . . . and to the extent that any such defenses . . . exist, they are hereby forever waived and released by the Debtor." Doc. #87-2 at 13, 16 (¶¶ 61, 80).

I will consider the merger agreements first. Foundation Capital cites to a rule of the Delaware chancery court that, while a standard integration clause will not bar a fraudulent inducement claim, a "clear anti-reliance clause" expressly stating that no oral representations have been relied upon will. *See Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004). This is a sensible rule. Where the parties expressly agree in writing that they are not relying on any oral representations, it is hard to see why that agreement should not be honored. It is unreasonable for one party to come back years later and claim that it relied on fraudulent oral representations, having opted to sign an express disclaimer of such reliance and having been on notice of that disclaimer.

However sensible this rule may be, it does not appear to be the law in Connecticut. Instead, in a case involving a very similar merger clause with language disclaiming any oral representations, the Connecticut Supreme Court has held that "a merger clause, of course, will not operate as a bar to the introduction of evidence of fraud by one of the contracting parties." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 505 (2000); *see also Alstom Power, Inc. v. Balcke-Durr, Inc*., 269 Conn. 599, 610 (2004) (same); *see also FIH, LLC v. Found. Capital Partners LLC*, 2018 WL 638997, at *14 n.5 (D. Conn. 2018) (acknowledging Connecticut rule as stated in *Tallmadge* that "a merger clause . . . will not operate as a bar to the introduction of evidence of fraud" but noting that this "background rule of state contract interpretation may stand in some tension with the Second Circuit's" approach in federal law cases). In similar fashion, the Connecticut Appellate Court has observed that "[i]t has

16

long been held in this state that fraud vitiates all contracts, written or otherwise, . . . Accordingly, fraud cannot be contracted against." *Martinez v. Zovich*, 87 Conn. App. 766, 778 (2005).

Foundation Capital has not cited Connecticut Supreme Court authority to the contrary.[4] As a federal court sitting in diversity jurisdiction, I must of course apply substantive state law (here, the law of Connecticut). *See Principal Nat'l Life Ins. Co. v. Coassin*, 884 F.3d 130, 134 (2d Cir. 2018); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). My job is not to say what I think the law should be or what rule I find most enlightened, but rather to predict how the highest state court of the relevant jurisdiction would rule. *See Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 449 (2d Cir. 2013).

The Connecticut Supreme Court has spoken clearly, and I am bound here to follow its rule. Accordingly, I cannot say that the merger provisions of the various loan agreements bar the Church's fraud defense as a matter of law, although Foundation Capital will surely be entitled at trial to rely on the merger provisions in order to rebut the Church's claim that any oral misrepresentations were made or that the Church reasonably relied on any such oral misrepresentations.

The waiver provisions of the 2009 forbearance agreements pose a different question. Under Connecticut law, "waiver is the intentional relinquishment or abandonment of a known right or privilege." *Pereira v. State Bd. of Educ.*, 304 Conn. 1, 39 (2012). "A waiver occurs, therefore, only if there is both knowledge of the existence of the right and intent to relinquish it." *Heyman Assocs. No. 1 v. Ins. Co. of the State of Pa.*, 231 Conn. 756, 777 (1995). The Church

---

[4] Foundation Capital cites a District of Connecticut decision enforcing a merger clause against a claim of contrary oral representations. *See Aviamax Aviation, Ltd. v. Bombardier Aerospace Corp.*, 2010 WL 1882316 (D. Conn. 2010) (noting that because of "explicit anti-reliance language" in a merger clause, plaintiff "contracted away its ability to rely on any oral representations"). I decline to follow this ruling because it does not specifically discuss *Tallmadge* or other Connecticut case law in this specific context.

argues that the language of the waiver agreements is not sufficient to constitute such a knowing and intentional waiver. It is difficult to imagine what language could convey more strongly the intention to waive any and all defenses or counterclaims. Depending on how the Connecticut courts would construe the requirement that a waiver be *knowing*, however, this may not have been enough. It is not entirely clear, for example, that the Church had full knowledge of all of the facts giving rise to the fraud defense in 2009, if Foundation Capital had not yet revealed its (alleged) duplicity. It may also be that Connecticut would not recognize this kind of *general* waiver, but would instead require a party to waive a *specific* known right. Unfortunately, there is little or no guidance from Connecticut case law on this issue. *See Fremont Riverview, LLC v. State*, 2010 WL 4515630, at *13 (Conn. Super. Ct. 2010) ("Connecticut appellate courts have not explicitly stated what the standard is for determining whether a person or entity has relinquished a *known* right.").

In any event, I need not resolve whether the language from the 2009 forbearance agreements would constitute an effective waiver under Connecticut law, because those agreements are themselves implicated by the Church's fraud allegations. Pastor Moales testified that the Assemblies of God officials repeated their false statements about the interest rate on these loans in "2007, 2008, 2009, 2010, all the way to 2012." Doc. #92-3 at 72. If this is so, then when the Church entered into the 2009 forbearance agreements, it was arguably still acting in reliance on these misrepresentations. At least, the Church has introduced sufficient evidence as a matter of law from which a factfinder at trial could so find (even if it may seem dubious that Pastor Moales—in light of his substantial business experience and with the assistance of legal counsel—relied on any misrepresentations as late as 2009).

And if the waiver provisions themselves were fraudulently induced, then they cannot serve to bar the Church's claim of fraud as to the original loan agreements. Because the Church alleges an *ongoing* fraud campaign, this respects the rule that "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release," since otherwise "no party could ever settle a fraud claim with any finality." *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011). As far as I know, Connecticut courts have not expressly considered the question of whether the releasing party must allege a *separate* fraud from the subject of the release. I think it likely that the Connecticut courts would reach the same conclusion as New York courts, in view that the rule of *Centro Empresarial* is necessary in order for any fraud litigation to be settled with finality.

It may well be that the Church at trial cannot prove that the forbearance agreements were fraudulently induced, and that therefore the waiver provisions will operate to bar all of the special defenses and counterclaims. The Church, however, has adduced barely enough evidence to maintain its special defense of fraud for resolution at trial. Accordingly, I will deny Foundation Capital's motion for summary judgment as to the special defense of fraud.

### Special Defense – Unconscionability

The Church alleges a special defense of unconscionability. Under Connecticut law, "the purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. As applied to real estate mortgages . . . the basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. The determination of unconscionability is to be made on a case-by-case basis,

taking into account all of the relevant facts and circumstances." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 88–89 (1992) (internal citations omitted). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other. The doctrine of unconscionability, as a defense to contract enforcement, generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Bender v. Bender*, 292 Conn. 696, 731–32 (2009) (internal citations and quotation marks omitted).

Foundation Capital is correct that the loans at issue in this case were not unconscionable merely because the interest rate exceeded the 12% maximum of the Connecticut usury statute for a few months pursuant to the June 2009 forbearance agreement. *See* Doc. #87-2 at 14 (¶ 68). Connecticut law (Conn. Gen. Stat. § 37-4) does prohibit loans with an interest rate of greater than 12%, but another provision (Conn. Gen. Stat. § 37-9(3)) exempts from this prohibition "any bona fide mortgage of real property for a sum in excess of five thousand dollars." And the Connecticut Appellate Court has held that interest rates as high as 38% or 45% might not be unconscionable, under certain extreme circumstances. *See Iamartino v. Avallone*, 2 Conn. App. 119, 126 (1984).

Still, the fact that a loan was not usurious does not mean it cannot have been unconscionable. *See Hamm v. Taylor*, 180 Conn. 491, 494–95 (1980). And language from leading cases on unconscionability tends to suggest that, if the Church's allegations are true, they would suffice to establish both substantive and procedural unconscionability. As the Connecticut Superior Court held at the pleading stage of this case, because of Foundation Capital's (alleged)

misrepresentations, the Church "was unfairly surprised by the interest rate and . . . lacked meaningful choice in entering into the agreement." *Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, 2016 WL 6395284, at *5 (Conn. Super. Ct. 2016). The Connecticut Supreme Court has suggested that substantive unconscionability could be shown if a plaintiff lender "intended simply to reap the the defendants' equity in the [property] by making a loan to them that the plaintiff knew they could not repay." *Cheshire Mortgage*, 223 Conn. at 92. That is what Pastor Moales has testified happened here. Accordingly, I will deny summary judgment as to the third special defense of unconscionability.

### Special Defense – Unclean Hands

The Church alleges a special defense of unclean hands. "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." *Thompson v. Orcutt*, 257 Conn. 301, 310 (2001). "It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands . . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court." *Ibid.* (internal citations omitted).

Because foreclosure is an equitable proceeding, *see ibid.*, the doctrine of unclean hands acts as a defense to a foreclosure action. And the Connecticut Supreme Court has held that, under this doctrine, "where a plaintiff's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief." *Ibid.* (internal quotation marks and alterations omitted). Indeed, unlike this case, the fraud in the *Orcutt* case did not concern the "making, enforcement, or validity of the mortgage note." *Id.* at 10 (internal quotation marks omitted). Nevertheless, the Connecticut Supreme Court held that the

unclean hands doctrine applied in that case. Similarly, the pattern of misconduct, deception, manipulation, and predatory lending alleged by the Church is, if true, enough to support application of the unclean hands doctrine. Therefore, I will deny summary judgment as to the special defense of unclean hands.

### *Counterclaims*

Foundation Capital also moves for summary judgment as to the Church's nine counterclaims. The Church has abandoned all but two of them, leaving at issue only one counterclaim for fraud and one counterclaim for a violation of the Connecticut Unfair Trade Practices Act (CUTPA). Foundation Capital argues that both of these claims are barred by the applicable statute of limitations, that there is not sufficient evidence to support the factual contentions behind both counterclaims, and that the CUTPA counterclaim is insufficient because the Church alleges no ascertainable loss and is barred by the waiver provision of the October 2009 forbearance agreement. Doc. #87-1 at 58–62. Some of these arguments mirror those regarding the special defenses, and fail for the same reasons discussed above: Pastor Moales's deposition testimony is sufficient to establish a factual basis for the Church's allegations of fraud, and the merger and waiver provisions do not as a matter of law bar the Church's fraud or CUTPA claims.

The CUTPA and fraud claims are each subject to a three-year statute of limitations. *See* Conn. Gen. Stat. § 42-110g(f); § 52-577. The Church does not contest that the counterclaims were not filed within the statute of limitations period. Doc. #92 at 12. Instead, the Church argues that the counterclaims need not have been filed within the limitations period if they are construed merely as claims for set-off or recoupment, *i.e.*, if they are limited to no more than the amount of Foundation Capital's recovery on the primary foreclosure action. "The defense of recoupment

has two characteristics: (1) the defense arises out of the transaction constituting the plaintiff's cause of action; and (2) it is purely defensive, used to diminish or defeat the plaintiff's cause, but not as the basis for an affirmative recovery," and "[i]t rests on the principle that both sides of a transaction should be settled at one time in order to prevent circuity of actions." *Genovese v. J.N. Clapp Co., Inc.*, 4 Conn. App. 443, 445–46 (1985) (citing *Beecher v. Baldwin*, 55 Conn. 419, 432 (1887)). "Recoupment is available defensively as long as the plaintiff's cause of action exists," and "[i]t may be asserted even though the the defendant's claim, as an independent suit, is barred by the statute of limitations." *Id.* at 446.

Foundation Capital notes that *Genovese* was decided in the probate context, but does nothing to explain why the rule concerning recoupment should be limited to probate cases. Other Connecticut cases applying the recoupment theory, all the way back to *Beecher v. Baldwin* itself, were not confined to the probate context. *See, e.g.*, *Fadner v. Comm'r of Revenue Servs.*, 281 Conn. 719, 731 (2007) (observing that "recoupment has been employed by our courts as a tool of equity despite statutes of limitations since at least the nineteenth century, particularly in contract and probate disputes"). Recoupment has also been considered in the specific context of foreclosure actions. *See Loricco v. Pantani*, 67 Conn. App. 681, 686 (2002) (considering recoupment but deciding it was not applicable where claim for recoupment was based on events unrelated to the foreclosure action).

It is clear that the first requirement for recoupment is satisfied: the counterclaims arise from the same matter as Foundation Capital's primary foreclosure case. The second requirement is satisfied because the Church now represents that it does not seek an affirmative recovery by its counterclaims. I will therefore deny summary judgment as to the CUTPA and fraud

counterclaims subject to the understanding that they may allow for offsetting recovery only so far as recoupment allows.

Foundation Capital further argues that there is no "ascertainable loss" to support the Church's CUTPA claim. In order to bring a claim under CUTPA, a party must be able to show that it has suffered "any ascertainable loss of money or property, real or personal." Conn. Gen. Stat. § 42-110g(a). It seems clear to me that the Church has raised at least a genuine fact issue to show an ascertainable loss. CUTPA "is not limited to providing redress only for consumers who can put a precise dollars and cents figure on their loss," and "does not require a plaintiff to prove a specific amount of actual damages in order to make out a *prima facie* case." *Marinos v. Poirot*, 308 Conn. 706, 713 (2013) (internal quotation marks and alterations omitted). Rather, "an ascertainable loss is a deprivation, detriment or injury that is capable of being discovered, observed, or established," and "[a] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Id.* at 714 (internal alterations and ellipses omitted). Here, the Church has documented that it incurred significant debts as a result of Foundation Capital's allegedly predatory practices, and also that Foundation Capital undermined the progress of the Church's construction project. The Church has therefore adequately shown a genuine fact issue of ascertainable loss to support its CUTPA counterclaim.

## CONCLUSION

For the foregoing reasons, Foundation Capital's motion for summary judgment (Doc. #87) is GRANTED in part and DENIED in part. The motion is GRANTED as to Foundation Capital's *prima facie* case, as to the Church's special defense under Conn. Gen. Stat. § 33-921, and as to all counterclaims except for the CUTPA and fraud counterclaims. The motion is otherwise DENIED as to the special defenses of fraud, unconscionability, and unclean hands, as

well as to the Church's counterclaims for CUTPA and fraud as subject to the limits of recoupment. In view of this ruling that allows the case to proceed to trial, the Court GRANTS without prejudice the Church's motion to vacate the receivership order (Doc. #81).

It is so ordered.

Dated at New Haven this 30th day of September 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge