# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| FOUNDATION CAPITAL RESOURCES, INC., *Plaintiff*, | |
| v. | No. 3:17-cv-00135 (JAM) |
| PRAYER TABERNACLE CHURCH OF LOVE, INC., *Defendant*. | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Foundation Capital Resources, Inc. ("FCR") is a real estate investment trust, affiliated with the Assemblies of God, that lent millions of dollars to the Prayer Tabernacle Church of Love, Inc. ("the Church") for a major church construction project in Bridgeport, Connecticut. The Church defaulted on the loans. FCR filed this federal diversity lawsuit to foreclose, and the Church has responded with defenses and counterclaims alleging in essence that FCR engaged in predatory lending and fraud.

I have already granted summary judgment on FCR's affirmative case; it is entitled to foreclose on Prayer Tabernacle subject to certain affirmative defenses and counterclaims. *See Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, 2018 WL 4697281, at *6 (D. Conn. 2018). Those affirmative defenses and counterclaims present genuine disputes of material fact that required a bench trial. *Id*. at *7-12. I accordingly held a four-day bench trial from June 24 to June 27, 2019. For reasons set forth below, I conclude that the Church has not proven any of its special defenses of fraud, unconscionability, or unclean hands. Nor has the Church proved its counterclaim under the Connecticut Unfair Trade Practices Act (CUTPA). Accordingly, I will grant judgment on all counts to FCR.

**FINDINGS OF FACT**

In my initial ruling on summary judgment, I described the parties in this case as "tell[ing] two very different stories: For Foundation Capital, this is the story of a straightforward foreclosure action due to the Church's failure to pay back loans. For the Church, this is the story of a predatory lending scheme, featuring multiple misrepresentations and tactics that induced the Church to take on debt it could not pay." *Foundation Capital*, 2018 WL 4697281, at *1.

Because FCR has proved its affirmative case, the burden in this bench trial is on the Church: it must prove the facts of each of its special defenses and counterclaims by what the law describes as "a preponderance of the evidence."[1] By this, I mean that the Church must prove that its story—of Foundation Capital's predatory lending scheme—was more likely true than not true. To decide whether the Church has met its evidentiary burden, I considered all of the testimony of the witnesses as well as the exhibits submitted by each of the parties.

### *Prayer Tabernacle Seeks to Build a New Cathedral*

The story properly begins in 2003 when the Church, founded in the living room of Kenneth Moales Sr., having now grown to a congregation nearly 600 strong, began looking for a new and larger home. *See* Tr. at 7-8, 141 (testimony of Kenneth Moales Jr.).[2] By late 2003 the

---

[1] The Church's defense and counterclaim of fraud places a heavier evidentiary burden on the Church: the Church can establish fraud only if it presents "clear and convincing" evidence of each element of the claim of fraud. *See, e.g.*, *Stuart v. Freiberg*, 316 Conn. 809, 821 (2015). Because I conclude that the Church has failed to prove the key facts underlying any of its defenses or counterclaims by the lesser, preponderance-of-the-evidence standard, it necessarily follows that the Church failed to meet its burden of providing clear and convincing evidence of fraud.

[2] Citations to "Tr." are to the transcript of the bench trial. Page references when citing to the trial transcript are to its internal pagination, rather than its presentation on the docket where it is separated into four volumes. Parentheticals denote the witness testifying. The correspondence of internal page numbers to docket numbers are as follows: Doc. #138 contains Tr. 1-222 (testimony of Kenneth Moales Jr.); Doc. #139 contains Tr. 223-429 (testimony of Joshua Barlotti and Jason Gibbons); Doc. #140 contains Tr. 430-647 (testimony of Jason Gibbons, Kregg Hood, Larry Russell, and Larry Stewart); and Doc. #141 contains Tr. 648-740 (testimony of Stanley Arrington, Raymond Weiner, and Larry Russell, followed by closing arguments).

Church decided to situate all its activities, which by this time incorporated a successful Christian school, on a single parcel of land with entirely new, purpose-built facilities. *Ibid*. Providence supplied just such an opportunity between 2004 and 2005, when the owners of various contiguous parcels along Stratford Avenue, Bridgeport, opted to sell their holdings to the Church. *Ibid*.; *see also* Tr. at 148 (Moales). It remained now to clear the parcels, design the buildings, and—bringing us to the present controversy—secure sufficient funds to start construction.

On one point both parties agree: Kenneth Moales Sr., the bishop and founder of the Prayer Tabernacle Church of Love ("Bishop Moales") and now deceased, was a man of extraordinary faith, charisma, and vision. The parties also agree that it was not in Bishop Moales's nature to dream small. His plans for the site included not only a sanctuary for religious services and the Church's Christian school (referred to as "Phase I"), but also a community center with a formal dining room with seating for up to 500 people, a gymnasium, a bowling alley, a conference center, 15 additional classrooms, and a swimming pool (referred to as "Phase II"). *See* Tr. at 14 (Moales). The plans for the sanctuary alone called for it to accommodate over 1,000 people. *See* Pl's Ex. 4 at 2 (2007 loan application). It was obvious at the outset that loan financing would be needed to complete construction.

Bishop Moales charged his son, Kenneth Moales Jr., whom the witnesses and lawyers at trial uniformly referred to as "Pastor Moales" to distinguish him from his father, with securing the funding for the construction project. *See* Tr. at 8, 12, 93 (Moales). Pastor Moales has a degree in accounting and religion from Morehouse College, *see* Tr. at 6, and, before becoming the youth pastor of the church in 1995, had a successful career as an accountant, auditor, and tax specialist, working for companies including *The New York Times*, Deloitte, Mercedes-Benz, and

Pepperidge Farm. *See* Tr. at 143-46 (Moales). In light of his extensive financial experience, Pastor Moales served as a financial advisor to the Church's trustee board, helped with the bookkeeping, and oversaw the preparation of the annual financial statements for the Church by Samuel Wilson Jr., CPA, the Church's outside accountant. *See* Tr. at 146-47 (Moales).

Wilson, who did not testify at trial, was not merely the Church's accountant; he was also a loan broker. *See* Tr. at 147 (Moales). When it became clear that the Church's long-time banker, People's Bank, would not extend the Church more than $3 million in credit, *see* Tr. at 8-9 (Moales), Pastor Moales approached Wilson in his brokerage capacity to seek out financing for Phase I of the Church's ambitious building project, *see* Tr. at 12, 93 (Moales). Wilson was initially able to broker a loan in 2005 from the Evangelical Christian Credit Union ("ECCU") for $1.2 million with a variable interest rate starting at 6 percent, secured by mortgages on most of the Church's landholdings. *See* Tr. at 149-50 (Moales); *see also* Pl's Ex. 264, 265 (ECCU mortgage documentation).

The $1.2 million loan from ECCU, Pastor Moales explained, was the first tranche of what the Church expected to be a $5 million loan. *See* Tr. at 9, 151 (Moales). But although Pastor Moales alluded to an "award letter" from ECCU promising "a little over $5 million," *see* Tr. at 152 (Moales), that letter was never entered into evidence.

Indeed, the evidence submitted at trial supports FCR's claim that the Church never secured more than $1.2 million of funding from ECCU and that the ECCU loan was, essentially, payment for various preliminaries to construction, including title searches, payoffs of older mortgages, and demolition. *See* Pl's Ex. 266 (ECCU loan closing statement); Pl's Ex. 10 at 21

(Church financial statements to June 30, 2007, stating that ECCU note is only approximately $1.2 million).[3]

Having secured the ECCU line of credit, the Church began preparations for construction. *See* Tr. at 9-10 (Moales). Although the Church had a property manager (Sigmund Morriar, who did not testify at trial), no one in the Church leadership had experience with construction on this scale, so the Church hired Tri-Con Construction to serve as construction manager in 2006. *See* Tr. at 10-12 (Moales).

As Tri-Con and the Church's architect began to firm up the Church's plans, it became clear the building would cost "in excess of $7.2 million." Tr. at 10 (Moales). It appears that the Church may have harbored a hope, as late as June 2007, that ECCU could provide sufficient funding to see the project through—that is, ECCU would make the Church an additional loan of $7.5 million on top of the $1.2 million loaned for land acquisition and construction preliminaries—but by July it was clear that ECCU was either unable or unwilling to provide the Church with sufficient credit to complete the project. *See* Pl's Ex. 177 at 5 (Minutes of Church-Tri-Con Meeting held June 12, 2007); *see also* Tr. at 112-13 (Moales) (insufficient funds from ECCU was "the only reason why we ever sent anyone out for additional funding").

Wilson was charged with redoubling his efforts to find another lender. *Ibid*. In short order, he reported that he had contacted "a larger Christian organization that loaned even more money." Tr. at 12, 93 (Moales). That organization was FCR.

---

[3] Pastor Moales testified that the Church acquired all of its property in cash, Tr. at 11 (Moales), but the closing statement for the ECCU note indicates that at least some of the Church's properties (although perhaps not the properties purchased for this specific project) were secured with mortgages, *see* Pl's Ex. 266 (ECCU closing statement), and the ECCU $1.2 million loan itself was secured with most of the Church's property portfolio, *see* Pl's Ex. 265 (ECCU mortgage note).

(continued…)

### *FCR Enters the Picture*

FCR is one of the real-estate-investing arms of AG Financial, the principal financial services entity of the Assemblies of God, a Pentecostal Christian denomination.[4] As described by Joshua Barlotti, FCR's Vice President with responsibility for lending, FCR principally invests the assets of a defined contribution retirement plan, contributed to by over 40,000 Pentecostal pastors, missionaries, and church-affiliated workers, in construction and real estate projects that (ideally) simultaneously grow the faith and provide a good rate of return for its retirees. *See* Tr. at 227-28 (testimony of Joshua Barlotti). On paper, Prayer Tabernacle's project was a paradigm of FCR's usual loan project: a Christian church seeking to build a new, larger sanctuary for a burgeoning congregation. *See* Tr. at 229-30 (Barlotti).

For Prayer Tabernacle, the FCR loan application process began when Wilson, the Church's broker-accountant, reached out to Jason Gibbons, an independent contractor who worked primarily as a loan consultant for FCR (as well as other entities affiliated with AG Financial). *See* Tr. at 371 (testimony of Jason Gibbons). Gibbons's function was to assist potential FCR borrowers with the preliminary application process, serving both as an initial screen of borrower suitability and a liaison to the officials at FCR who would make the ultimate loan determinations. *See* Tr. at 370 (Gibbons).

---

[4] As I noted in my summary judgment ruling, the relationship between FCR and AG Financial is mediated through a complex daisy-chain of management agreements and shared ownership arrangements. *See Foundation Capital*, 2018 WL 4697281, at *3; Tr. at 244-47 (testimony of Joshua Barlotti). As a practical matter, however, AG Financial and FCR are one and the same at least as far as this proceeding is concerned. Indeed, most FCR witnesses identified themselves as working, first and foremost, for AG Financial. *See, e.g.*, Tr. at 241, 243, 246-47 (Barlotti, describing himself and various FCR officials as employed by or working at "AG Financial"); *see also* Tr. at 110 (Moales, describing his impression that FCR and AG Financial were the same entity). Although the parties often referred to the combined entities as "AG Financial" at trial, I will follow my practice from my summary judgment ruling and refer to all of the related entities in this ruling as "FCR."

If a proposed church construction project looked good on paper, Gibbons would send the project to Johnie Baker, FCR's in-house construction expert, for a more in-depth evaluation of the project's feasibility, including site visits. *See* Tr. at 240 (Gibbons). FCR officials would also be dispatched to meet and get the measure of the applicant church's leadership as well as to pitch the portfolio of services that accompanied FCR loans. *See* Tr. at 235-36 (Barlotti). These various evaluations would then be consolidated into a recommendation to FCR's loan committee, which made the ultimate decision whether to extend financing and on what terms. *See* Tr. at 391 (Gibbons).

Part and parcel of FCR's approach to many of its church construction loan projects— including the one at issue here—was the planning and execution of a "faith raising" capital campaign by the recipient church, which FCR refers to as a "MasterPlan" capital campaign. *See* Tr. at 448 (testimony of Kregg Hood). The purpose of the capital campaign, in the words of Dr. Kregg Hood, the head of the FCR stewardship division, was to increase the giving of congregants to improve the Church's solvency and reduce its debt load in a manner that, FCR believed, deepened the religious commitment of the Church's membership. *See* Tr. at 448-49 (Hood). This capital campaign would be organized by church leaders but closely advised by FCR consultants, who were paid out of the church's loan from FCR. *See* Tr. at 466-67 (Hood).

### *The Initial Meeting Between FCR and the Church*

Gibbons did not recall when Wilson first contacted him about the potential for FCR financing the Prayer Tabernacle construction, *see* Tr. at 372 (Gibbons), but it appears that contacts between the Church and FCR were sufficiently advanced by the late summer or early fall of 2007 that FCR officials conducted a site visit and a sit-down meeting with the Church's

leadership. *See* Tr. at 13 (Moales); Tr. at 447 (Hood). Because this meeting is central to the Church's allegations of fraud, I will describe it in some detail.

The parties agree on the broad outline of what took place at this meeting. Kregg Hood (a Senior Vice President of FCR), Jason Gibbons (the FCR loan consultant), Johnie Baker (the FCR construction expert), and Larry Russell (one of the FCR MasterPlan capital campaign consultants) attended for FCR. Tr. at 13 (Moales); Tr. at 447-48 (Hood). Both Pastor and Bishop Moales as well as a few Church trustees attended for the Church. *Ibid*.

The meeting was a mutual introduction and a chance for each party to evaluate the other. *See* Tr. at 12 (Moales); Tr. at 235-36 (Barlotti); Tr. at 448-49 (Hood). At this meeting, Bishop Moales explained to FCR his vision not only for Phase I (the sanctuary and school) but for Phase II (the community center), with additional, still more ambitious projects for senior citizen housing forming a putative third phase of the Church's plans. Tr. at 14 (Moales). Dr. Hood, as the senior FCR representative, found the plans "visionary" and "exciting" and declared that FCR would be an ideal partner for the project—both Phase I and Phase II. *See* Tr. at 449 (Hood); Tr. at 13 (Moales). Dr. Hood also expressed his satisfaction that Bishop Moales had designated his son, Pastor Moales, as his successor, and suggested that Pastor Moales would be part of "the deal" with FCR. *See* Tr. at 14 (Moales).

Dr. Hood went on to explain FCR's approach to financing, its capabilities, and its approach to capital campaigns. *See* Tr. at 451-52 (Hood). He did so with the aid of a PowerPoint presentation, which is the only document presented at trial indicating what was discussed at the meeting. *See* Pl's Ex. 123 (Hood PowerPoint presentation). As relevant to the Church's special defenses and counterclaims, the presentation stressed that FCR was "better than a typical bank" for a host of reasons. Prominent among these reasons were "church-friendly terms" including

"no balloon notes, no personal guarantees, and up to 30-year amortization," as well as "competitive rates not tied to 'Wall Street'" and FCR-supported "stewardship campaigns to pay off the debt ASAP." Pl's Ex. 123 at 4 (Hood PowerPoint Presentation). *See generally* Tr. at 451-65, 521-34 (Hood). Although the slides do not discuss the ECCU note, it seems clear that even at this early stage both FCR and the Church assumed that FCR would refinance the ECCU note, making FCR the sole lender for the project. *See* Tr. at 16 (Moales); Tr. at 236 (Barlotti).

Much of the rest of Dr. Hood's presentation was given over to pitching an FCR capital campaign, which both parties understood to be a component of any FCR loan for the project. Dr. Hood explained that the Bishop Moales would need to incorporate principles on "faith raising" derived, in part, from Dr. Hood's books—books that the entire congregation should be encouraged to read. *See* Def's Ex. 507 (*Take God At His Word*, by Kregg Hood); *see also* Tr. at 33 (Moales, referring to another book, not entered into evidence, also by Dr. Hood). The presentation indicated that FCR "anticipate[d]" that use of this program would lead to both "tithe income increases (10% to 20+%)," that is, the amount of money parishoners routinely gave to the Church, that would complement still more "campaign giving [from parishoners] 'over and above' the tithe [coming] in over three years" with campaign "commitments [collectively] rang[ing] from 1 to 2½ times annual general income." Pl's Ex. 123 at 6.

Bishop Moales reluctantly integrated these books and their associated teachings into his preaching and the Church's programming; Pastor Moales, by contrast, complimented the books and the "faith raising" process, explaining that, in his view, the books and the campaign they initiated were "tremendous in raising the faith of our congregation and raising the funds of our congregation." Tr. at 32-34 (Moales). Larry Russell was introduced as the consultant who would work with the Church's leadership to plan the nuts and bolts of the capital campaign built on the

teachings of these books. *See* Tr. at 13, 25 (Moales); *see also* Def's Ex. 508 (MasterPlan campaign guide from FCR, entitled "Continue the Journey").

Finally, both parties agree that this meeting, which ended on an upbeat note, was suffused with emotion and a sense of religious confraternity. Dr. Hood and Bishop Moales "hit it off," Tr. at 449-50 (Hood), connecting over their histories as pastors, so much so that Dr. Hood referred to Bishop Moales as his "black covenant brother," while Bishop Moales, after praying with Dr. Hood at the site of the project, burst into tears for the second time in his life, *see* Tr. at 15-16 (Moales).

Many of the other details of this meeting—and the loan application process that was occurring around it—are disputed. In particular, Pastor Moales testified that Dr. Hood did not merely say FCR had the *capacity* to fund both Phase I and Phase II of the project, but promised on FCR's behalf to actually fund both phases of the project. *See* Tr. at 14 (Moales). Pastor Moales also testified that Dr. Hood promised the Church not only that FCR would provide more money than ECCU (that is, more than the $5 million or so the Church claims ECCU promised), but "beat their interest" of approximately 6 percent. Tr. at 52-53 (Moales). Finally, Pastor Moales testified that Johnie Baker, FCR's construction expert, affirmatively promised that he would personally supervise and oversee the project and that the Church would have its certificate of occupancy and be in the building by some time in 2008. *See* Tr. at 17-18 (Moales, testifying Baker promised occupancy by "Christmas" 2008); *see also* Tr. at 123-24 (Moales, testifying that Baker promised occupancy of at least the sanctuary by "July" 2008).

Dr. Hood, for his part, denied that he ever affirmatively promised that FCR would actually fund the entirety of the Church's vision, *see* Tr. at 449-50 (Hood), or that FCR would lend the Church a specific sum, or at a specific interest rate, *ibid*. He likewise denied that he

made any promises that the campaign would in fact generate either the 10 to 20 percent increase in tithes promised, or that campaign pledges would double the Church's annual general income, instead insisting that he merely suggested he "anticipated" these results based on past experience. *See* Tr. at 460-61 (Hood). Dr. Hood claimed he merely said FCR had the capacity and interest in doing both these things without making any commitments to fund the entire project, or to secure a particular interest rate, and that all involved did not understand the PowerPoint presentation to make any such guarantees. *See generally* Tr. at 459-64 (Hood). There was no testimony from an FCR witness addressing Pastor Moales's allegation that Baker promised he would take over construction, but both Dr. Hood and Joshua Barlotti staunchly denied that any FCR persons ever represented, or would represent, that FCR would take over construction. *See* Tr. 313-14 (Gibbons); Tr. 518-19 (Hood).

I credit Dr. Hood's version of events and find that it is better supported by the evidence. Both the PowerPoint presentation and the account of the meeting on which the parties agree indicate that this meeting was in the nature of a mutual pitch—both from the Church to FCR, persuading FCR leaders that the Church was a good investment, and from FCR to the Church, persuading the Church that FCR could provide them the loan capital and support ECCU could not. I do not doubt that Dr. Hood claimed that FCR *could* finance the entire extent of the Church's ambitious vision, or that FCR *could* provide better interest rates than ECCU, or that FCR *anticipated* the capital campaign would be as successful as they projected, but I do not believe that Hood made such affirmative promises described by Pastor Moales that the Church could or did reasonably rely upon. Instead, I find that both parties understood at that meeting that Hood (and the Church) were at the negotiation phase of their arrangement, with critical terms to

be refined and settled later, with no commitment from the Church or FCR until final numbers were provided.

Much the same can be said of Johnie Baker's alleged representations about the pending date of construction, when the Church would get a certificate of occupancy, and his personal role in the construction process. Baker did not testify at trial. But the record indicates that Baker reviewed the construction plans in some detail with Church officials, *see, e.g.*, Pl's Ex. 13 (Baker report to FCR loan committee describing his review); Pl's Ex. 14 (same). I do not doubt that Baker told Pastor Moales and other Church officials with whom he met the same things he told his bosses at FCR: "I like the project and like what I have seen and heard about Tri-Con. I think the price is right . . . My only real concern at this point is parking." Pl's Ex. 13 at 1. But although I think it likely that he expressed optimism about the project—perhaps even in terms of making optimistic predictions—I do not think it more likely than not that Baker affirmatively promised that he, Baker, could deliver things like a certificate of occupancy that were not his to give (the certificate is a government document), or that he personally would oversee the very same construction managers he judged competent enough to *not* require supervision in his reports to FCR. *See* Pl's Ex. 13 ("I like the project and like what I have seen and heard about Tri-Con").

Instead, I conclude that Baker, prior to the execution of the loan, promised only what he would ultimately deliver: periodic check-ins with the Church on the status of the project and advice on any construction issues if the Church asked for it. *See* Tr. at 46-47 (Moales describing advice provided by Baker); Tr. at 67 (Moales describing some of Baker's remediation work).

### *The 2007 Loan Application*

Turning to these specific loan application negotiations, there is a sharp divergence in the record between two sets of documents. The first set of documents, dated prior to September 25,

2007, suggests that the Church sought to apply for a loan of at least $7.5 million from FCR, comprising approximately $6.3 million in construction funding and $1.2 million in refinancing (the loan itself would be somewhat larger to accommodate broker fees and the like). For example, on September 13, 2007, Wilson sent Gibbons a fax which stated, on the coversheet, that the Church is "requesting $7,500,000 to be used to pay off existing mortgage [presumably the $1.2 million ECCU note] and complete construction. Please advise the maximum amount they qualify for." Pl's Ex. 1 (fax coversheet). A MasterPlan Stewardship Services Stewardship Campaign Church Information Survey dated the same day, and received by Gibbons, also indicated that the estimated cost to complete the proposed projects was $7,500,000. *See* Pl's Ex. 6 at 4.[5]

This first set of documents bears little resemblance, however, to a second set of documents: the materials the Church actually used to apply for its first loan with FCR. *See* Pl's Ex. 3 (coversheet to application); Pl's Ex. 4 (application). The Church's application was based on a schedule of values sent to Gibbons by Wilson on September 25, 2007, that set the funds needed to complete construction at $4.5 million—at least $1.5 million dollars less than the true amount. *See* Pl's Ex. 12 (the schedule in question). This lower figure was the basis for FCR's internal deliberations on the Church's initial loan. *See* Pl's Ex. 11 (loan qualification worksheet, employing $4.5 million figure); Pl's Ex. 13 (Johnie Baker evaluation of construction feasibility,

---

[5] This first set of documents, which was sent to FCR, is broadly consistent with a number of statements of values, set forth on an FCR template, that were found in the files of the Church and TriCon and appear to be drafts made in anticipation of the loan application, or while the Church was considering the loan application. *See* Pl's Ex. 16, 17 (statements of values, produced by Tri-Con and dated between July and November 2007, listing projected costs to finish construction at between $6.26 million and $6.97 million); *see also* Pl's Ex. 18 (schedule of values dated August 15, 2007, listing projected cost of completion at $5.993 million). FCR's witnesses indicated, without persuasive contradiction from the Church, that they had never received these documents prior to the closing of the first loan. *See* Tr. at 247-49 (Barlotti); Tr. at 399-401 (Gibbons).

employing $4.5 million figure); Pl's Ex. 25 (loan committee worksheets listing construction costs at $4.5 million); Tr. at 239-40 (Barlotti). This lower figure was obtained, in part, by a side agreement with Tri-Con to conceal the true cost of the construction management fee in order to procure a sufficiently deflated schedule of values and conceal a key indicium used to evaluate potential project cost. *See* Tr. at 701, 703 (testimony of Larry Stewart); *see also Tri-Con Const. Mgrs., LLC v. Prayer Tabernacle Church of Love, Inc*., 2010 WL 5573760, at *1 (Conn. Super. Ct. 2010).

Pastor Moales himself described this $4.5 million schedule of values, Pl's Ex. 12, as containing a "fictitious number," but claims he submitted it at FCR's behest to "adjust your schedule value number so that we can qualify you for the first loan," Tr. at 40 (Moales); *see also* Tr. at 158-59 (Moales, explaining that these documents were the "second" application; the first, with an accurate statement of construction needs, was rejected).

To the Church, FCR's alleged instruction to manipulate the schedule of values was the "classic definition of predatory lending" where FCR knew "going in . . . that [the loan] was not sufficient to meet the needs of the church" but agreed to it anyway to drive the Church even more deeply into debt with the end goal of foreclosing on its property. Tr. at 728-29 (closing argument for the Church). But this description of FCR's actions is not supported by the evidence. Instead, I agree with FCR's account of this manipulated schedule of values: the Church learned that it would get a maximum of $6 million and so that is how much it applied for, knowing that this amount was inadequate to fund the project. *See* Doc. #134 at 12-21 (FCR Post-Trial Brief).

Although Pastor Moales made much at trial of his repeated efforts to communicate what he termed as the "correct" figure to FCR before the loan closed, *see* Tr. at 39-40, 111-12, 159 (Moales), there is no evidence that FCR itself was ever advised, before closing, that the $6.123

million it awarded the Church would be inadequate to finish construction. Quite the reverse: multiple FCR officials testified, credibly, that they never received these documents, *see* Tr. at 247-250 (Barlotti), Tr. at 379, 385, 399 (Gibbons); Tr. at 603 (testimony of Larry Russell). FCR officials also credibly testified that they would never approve any loan that did not have enough money to complete construction; they approved this loan, they explained, because they thought that $4.5 million would be sufficient to finish construction—albeit, perhaps, not as expansive a building as Bishop Moales initially proposed. *See* Tr. at 238-40 (Barlotti); Tr. at 396-98 (Gibbons).

Using the Church's understated figure for cost of completion, FCR approved a loan for the Church in the amount of $6.123 million, at 8.375 percent, with a 30-year amortization/20-year balloon. *See* Pl's Ex. 27 (Commitment Letter). I will describe this $6.123 million loan as the "2007 loan." The approved loan tracked the Church's application: it allocated approximately $4.6 million to subsequent construction costs, with the balance of the loan going to refinance the $1.2 million ECCU note, pay for the capital campaign consulting, and cover loan origination fees and the like. *Compare* Pl's Ex. 25 (FCR Loan Committee sheets), *with* Pl's Ex. 4 (Church loan application).

Although Pastor Moales testified that the "documents did not come up until closing," which was held on December 12, 2007, Tr. at 24 (Moales); Pl's Ex. 291 (Church attorney bill indicating closing took place on December 12, 2007), FCR's commitment letter was sent to the Church on October 23, 2007, and made it perfectly plain that FCR was agreeing to extend credit of only $6.123 million at an initial rate of 8.375 percent, leaving only $4.6 million, at most, for construction. *See* Pl's Ex. 27 (commitment letter). This commitment letter was reviewed by Attorney Paul Sobel, who advised the Church throughout the loan application process, *see* Tr. at

136 (Moales), and who wrote an attorney opinion letter setting forth his conclusion that the loan was valid, enforceable, and would bind the Church in accordance with its terms. *See* Pl's Ex. 31 (Sobel opinion).

In other words, two months before closing, the Church knew the loan it was receiving did not contain enough money to finish even Phase I of the building and that it was based on the Church's understated schedule of values. Yet there is no document in the record to indicate the Church ever raised concerns about under-financing with FCR after the commitment letter was sent. Instead, the Church agreed to the commitment letter's terms a week later, and proceeded to closing on December 12, 2007, on precisely those terms. *Ibid. See also* Pl's Ex. 28, 29, 30, 31, 32, 33, 34 (collected loan documentation).

FCR's proposed loan was above the ECCU interest rate, provided financing well below the amount needed to complete construction, encumbered property the Church did not wish to encumber with mortgages, *see* Tr. at 24 (Moales), and included a penalty of 10 percent for late payments and 4 percent if the loan was refinanced with borrowed money, *see* Tr. at 135-36 (Moales), all terms to which Pastor Moales allegedly objected, *ibid*. Why, then, did the Church sign this obviously inadequate loan? The Church alleges it agreed to the loan after receiving the commitment letter's terms because FCR promised that these terms were not the real terms of the deal; instead, these were legal boilerplate that allegedly gave form to a much larger and more generous unwritten agreement with the Church. *See* Tr. at 135-36, 163-64 (Moales).

Specifically, the Church alleges that there were numerous telephone conversations between the Church's application in September 2007 and the closing in December 2007 in which Dr. Hood, Larry Russell, Johnie Baker, or Jason Gibbons, building on their alleged misrepresentations at the first meeting with the Church, promised that (1) the "entire" loan was

actually for approximately $9 million rather than $6.123 million, *see* Tr. at 24-25 (Moales), with the initial $1.23 million in refinancing and $4.6 million in construction funds from the 2007 loan serving as an initial payment with a subsequent $3.1 million in construction funds coming in a bridge loan based on campaign pledges (for a total of $7.7 million in construction funds), *ibid.*; (2) the 8.725 percent initial rate was the "construction rate" that would be lowered once construction was complete, with the initial and bridge loan being consolidated into a single fixed-rate mortgage at 4 to 6 percent, *see* Tr. at 97 (Moales); (3) any late payment penalties would be waived, *see* Tr. at 135 (Moales); and (4) all the terms of the loan agreement that contradicted the above assurances, or otherwise inured to FCR's benefit, were government-mandated or lawyer-mandated boilerplate that FCR would not enforce, *see* Tr. at 136 (Moales).

Every FCR witness staunchly denied they, or anyone in their presence, either would or did make some or all of these promises. *See* Tr. at 240, 260-61 (Barlotti); Tr. at 397-98 (Gibbons); Tr. at 463-66 (Hood); Tr. at 602-03 (Russell). FCR's position is that these promises were never made. *Ibid.*

I agree with FCR for two reasons. First, the Church's own documents indicate that, at the time the loan closed, the Church believed that the loan agreement meant what it said, rather than what the Church now alleges FCR represented. In the Church's own financial statements for year ending December 30, 2007, there appears a note ("Note C") that reads, in relevant part, that the FCR loan the Church received was only "$6,123,000" with the "balance of $4,566,400.60 [to] be drawn down" during construction, "interest only payments at the rate of 8.375% will be assessed against the outstanding loan balance" for the first eighteen months, and thereafter "the mortgage will be amortized over 30 years at the rate of 8.375%." Pl's Ex. 269 at 8 (consolidated financial

statements); *see also* Tr. at 161 (Moales). Note C accurately summarizes the written loan agreement, and makes no reference to any oral representations on FCR's part.

Pastor Moales dismissed Note C as solely recapitulating FCR's paperwork at FCR's request, rather than Pastor Moales's "very bigger understanding" of FCR's representations. *See* Tr. at 160-64 (Moales). But this compilation—although prepared in this form at FCR's behest—was an internal document, presented at the Church's own annual business meeting for its members and trustees, and personally reviewed by Pastor Moales for accuracy. *See* Tr. at 159-61, 208 (Moales).

Given Bishop Moales's insistence on full financial transparency at every level of the Church's leadership, *see* Tr. at 203 (Moales), it is puzzling why the Church's internal documents would tell the membership a financial position that, if Pastor Moales's account is to be believed, the Church's leadership thought was false, *see* Tr. at 207-10 (Moales). If, as Pastor Moales alleges, FCR had told the Church that the text of the loan agreements was not "the real deal" between the Church and FCR, this would be all the more reason for Note C to reflect what the Church *thought* the loan entailed. Nor could Pastor Moales, an accomplished tax accountant himself, point to any generally accepted accounting principle that would have prevented the Church from stating in Note C at least its optimism that better terms (more money or a lower interest rate) were forthcoming—even though it would have been in the Church's interests to represent its debt as being lower than it was. *See* Tr. at 209-10 (Moales).

I find that Note C reflects the Church's true understanding, both before and after the closing of the 2007 loan, that FCR was to loan only $6.123 million at a 8.375 percent variable rate, with only $4.6 million at most set aside for construction, and that the Church knew no further loans were guaranteed—in other words, that the signed 2007 loan agreement was the

entirety of the parties' agreement. My finding is bolstered by the dearth of evidence supporting the Church's claims about FCR's alleged misrepresentations other than the uncorroborated testimony of Pastor Moales recollecting events of ten years prior. The Church did not introduce any document contemporaneously dated between 2007 and 2008 describing what Pastor Moales claims the Church thought the terms of the FCR loan were—not a trustee board report, not an email to an absent member to catch them up on a meeting, not even a personal memory jogger scrawled in a margin somewhere.[6]

Indeed, on the critical question of what promises FCR made prior to the closing of the 2007 loan, no other Church official testified: not Sigmund Morriar, who was in attendance at the first meeting, nor Sam Wilson, who brokered the loan, nor Attorney Sobel, who advised the Church on its terms, nor any of the many trustees and other church members Pastor Moales placed at every significant meeting. That the Church could produce neither witnesses in its control or evidence in its possession to contradict the statements of Note C (statements that were, then and now, against the Church's interest) renders these statements even more probative and particularly damaging to the Church's case.

Second, I find that the testimony of the FCR officials, particularly Dr. Hood, was credible. I do not think the FCR personnel set out to entrap the Church in an impossible mortgage. Instead, I believe FCR personnel were motivated by a sincere desire to finance and support what was thought to be not merely a profitable construction project, but a spiritually

---

[6] It is striking that although Pastor Moales frequently referenced emails he had allegedly sent to FCR demanding clarification of these alleged promises between 2007 and 2009, not one of these emails was entered into evidence in this case even though the emails would, presumably, be in the Church's possession. *See, e.g.*, Tr. at 48-49 (Moales: in July 2008, "I sent a very intense email to Kregg Hood and to Johnie Baker that we were running out of money. . . . In June and July [2008], the emails I was sending to Kregg[ ]Hood was all about money now. 'Where is the money you promised my dad? Where is the money you promised the church?'"); Tr. at 97 (Moales: "[O]n multiple occasions with all the emails that you'll see . . . I kept asking, 'Where is my special Jesus Christ interest rate?'").

worthy ministry. *See* Tr. at 254 (Barlotti); Tr. at 449-62 (Hood); *see also* Pl's Ex. 123 (Hood

presentation describing FCR as "a ministry partner for growing churches" and describing the

benefits of FCR's programs as "increased trust and faith in God" and "New Momentum for

Ministry!"). It would not advance those purposes to entrap a church into mortgages it could not

pay; FCR's purpose was to build God's Kingdom, not acquire the land underneath it through

predatory lending schemes, leaving devastated and faith-questioning congregations in its wake.

*Cf.* Tr. at 87 (Moales, describing the loss of faith the Church experienced as a result of the

construction project fiasco). Even leaving aside any spiritual purposes, the evidence does not

show how or why FCR could have thought it to be in its strictly financial interests to enmesh the

Church with a loan that it could not pay and to be saddled with the ownership of a partially

completed construction project in Bridgeport.

　　　FCR's position is also more consistent with the documentary evidence. Essentially every

relevant document admitted at trial dated prior to the closing of the 2007 loan indicates that all

parties understood that the terms of the loan were what the signed loan documents said they

were; nothing more, and nothing less. To be clear, as with the initial meeting between FCR and

the Church, I do not doubt that FCR presented an optimistic picture of the loan terms during the

pre-closing negotiation phase from September to December 2007. What I do not find supported

by the evidence is the claim that Dr. Hood, or any other FCR official, crossed the line from blithe

optimism or sincere statements about their faith in God's providence to making specific

representations that the documents presented to the Church for approval were a sham or anything

other than the precise terms to which the Church was legally required to adhere.

　　　To sum up: at the time that the Church's 2007 loan with FCR closed, FCR did not make

any representations to the Church that the terms of the loan—its interest rate, its repayment

terms, or any of its conditions, and above all the total amount of money the Church would be loaned, then or in the future—were anything other than what appeared on the documents presented at closing. Nor was the Church ever guaranteed by FCR that its putative capital campaign would raise a certain sum of money, or that Johnie Baker would provide any more construction management assistance than informal advice if asked. All that said, the Church knew what FCR did not: the amount loaned was well short of what the Church thought would be required to finish construction. This shortfall would set the stage for much of what happened next.

### The 2008 Bridge Loan

The construction of the sanctuary leaped forward after the December 2007 loan closing, but thereafter rapidly ran into difficulties. Although many of these difficulties related to complexities arising out of construction, the inadequacy of loan capital rapidly and unsurprisingly became the most serious issue.[7] Pastor Moales recalled that by May 2008—that is, only three months after the loan closed—he knew the Church would run out of money by July. *See* Tr. at 41 (Moales).[8]

---

[7] It is not necessary for me to determine the nonfinancial sources of the construction problems, which appear to be multifarious. *Compare* Pl's Ex. 199 (Tri-Con letter, dated September 2008, recapitulating years of difficulties) *and* Pl's Ex. 183 (Tri-Con letter, dated November 2007, complaining about Pastor Moales's personal interference with the project), *with* Tr. at 46 (Moales, complaining of Tri-Con's inefficiencies) *and* Tr. at 667-69 (Raymond Weiner, head of one of the steel subcontractors on the project, describing difficulties with Tri-Con).

[8] Pastor Moales had by this time began to insert, in the construction draw requests, higher figures for the total cost of construction: where the understated schedule of values submitted with the loan application had stated the total construction cost was $5.67 million, *see* Pl's Ex. 12 (schedule of values), the construction draws stated that the total schedule of values including additions was $6.38 million, or about $0.71 million more than what the Church had projected in its loan application, *see* Pl's Ex. 35 (construction draw, dated Jan. 30, 2008). *See* Tr. at 111-12, 127-28 (Moales). This figure was, however, merely *less* inaccurate than the one the Church put in its loan application; as Pastor Moales himself explained, the true cost of the project was $7.7 million, or $1.31 million more than even the amount put in the construction draw request. This discrepancy contradicts Pastor Moales's claim that he put the "real" figure in the construction draws, Tr. at 127-28 (Moales). Indeed, it supports FCR's account that, having secured what it knew to be an inadequate sum, the Church began steadily to inflate its cost needs in order to set the stage for it to demand still more money.

The Church attempted to address the financing gap by borrowing funds from its members, *see* Tr. at 48-49, 51 (Moales), while seeking the additional capital in several ways. First, in July 2008, Pastor Moales sought to make a $1,029,135 construction draw from FCR in a fax message that stated "these funds are being drawn down from the capital campaign pledges!" Pl's Ex. 42. This request was not approved, *see* Tr. at 273-74 (Barlotti), but seems to have set the stage for earnest negotiations for the extension of a bridge loan—particularly in light of soon-to-be-realized threats from unpaid subcontractors to place liens on the incomplete structure. *See* Tr. at 48 (Moales), *see also* Pl's Ex. 46 (letter from Pastor Moales to FCR personnel).

A bridge loan was a special loan product FCR offered to churches that took up its offer to organize a capital campaign. *See* Tr. at 279-81 (Barlotti). It functioned as an interest-bearing advance: because "funds raised" in a capital campaign were chiefly pledges, not cash, and were pledged with an expectation of payment within three years, the bridge loan allowed a church to make the pledge money available up front instead of waiting over the three-year period for the pledges to come in; thus, the loan "bridged" the gap between the time the pledges were made and when the pledges came in. *See* Tr. at 408 (Gibbons).

FCR's policy when extending bridge loans was to loan the requesting church anywhere from between 50 to 75 percent of the pledge advance rate. *See* Tr. at 280 (Barlotti); Pl's Ex. 20 (email from Dr. Hood dated August 25, 2009, describing the amount of the bridge loan as "up to" 75 percent of pledges). FCR did not lend churches 100 percent of campaign pledges, because the loans were solely secured on pledges for which there was always a risk that certain pledges would not be fulfilled. *Ibid.* This risk was especially pronounced for the kind of capital campaign the Church and FCR ran, which relied not on conventional campaign pledges but on unenforceable "faith promises" where the promisors pledged merely that they would find it

within themselves to give the pledged amount within three years of filling out the card. *See* Tr. at 459-60 (Hood).

As Pastor Moales predicted, right in the middle of the time the capital campaign reached its climax—with two "Commitment Sundays" in June and August—the entirety of the Church's construction loan had been exhausted. *See* Pl's Ex. 43 (summary of funding draws); Def's Ex. 506 (capital campaign memo from July 2008). But FCR's need to ascertain exactly how many pledges were received, and how likely each pledger was to ultimately give the stated amount at the end of the three-year pledge period, as well as how much money was actually needed to finish construction, held up approval of the bridge loan for some months.[9] Nonetheless, the delay troubled Pastor Moales, who thought that "once the campaign had started and we had numbers in [*i.e.* in July, when the rest of the loan money ran out] we would start the new loan or the loan would be in place or money would come." Tr. at 48 (Moales).

Not until early October 2008 did the FCR loan committee approve a bridge loan of $1.175 million at a 10.5 percent adjustable rate per annum with a 5-year amortization/3-year balloon. Pl's Ex. 50 (FCR loan committee minutes). Details of the 2008 bridge loan took another month to resolve, with a commitment letter sent on November 3, 2008. *See* Pl's Ex. 57

---

[9] The delays appear to have been caused by FCR's difficulty in ascertaining just what pledges were received, and how "firm" specific pledges were. This investigation was not aided by the Church's continued pattern of reporting a stream of varying figures, with some top-line figures provided by the Church indicating that it had raised $1.7 million, *see, e.g.*, Pl's Ex. 141 (campaign commitment report), and other figures suggesting it raised $3.76 million, *see, e.g.*, Pl's Ex. 144, 146 (campaign commitment reports dated October 1, 2008). It appears that the Church could not, for at least some time, provide FCR with sufficiently detailed assurances about which pledges would be paid and which would not, *see* Pl's Ex. 143 (email of September 10, 2008, from Larry Russell to Pastor Moales requesting further information, receiving in response clear details only for $1.58 million of the allegedly $1.7 million or $3.7 million pledged); *see also* Tr. at 484-86 (Hood testimony that he found the $3.7 million figure implausible). FCR likewise found itself unable to confirm precisely "what the real costs are to finish this [construction] project." Pl's Ex. 147 at 2; *see also* Pl's Ex. 148 (email chain discussing discrepancies). *See generally* Tr. at 58-59 (Moales testimony discussing difficulties in communicating pledge and construction costs); Tr. at 415-22 (Gibbons testimony discussing the same process).

(commitment letter). Of this amount, $200,000 was closed immediately as an unsecured note, essentially an advance on the bridge loan, in order to pay some of the most pressing subcontractor bills. *See* Pl's Ex. 53 ($200,000 mortgage note). The remainder of the bridge loan was closed a month later on December 19, 2008. *See* Pl's Ex. 61, 62 (bridge mortgage loan and note). As with the 2007 loan, the Church reviewed the 2008 loan with Attorney Sobel, who produced an opinion duly affirming its validity. *See* Pl's Ex. 64 (Sobel letter).

The Church claims that its assent to this bridge loan was based on various oral promises by FCR. Specifically, Pastor Moales testified (1) that in March 2008, Johnie Baker promised that FCR would lend the Church additional money immediately if funds were exhausted—although whether as a bridge loan, discussed above, or in a separate loan is unclear, *see* Tr. at 41 (Moales); (2) that Dr. Hood promised FCR would lend the Church money "without documents being signed" if "the problem [*i.e.* construction] gets really bad or really intense," Tr. at 49 (Moales); (3) that Dr. Hood promised the bridge loan's interest rate was, like the interest rate of the mortgage that preceded it, ultimately to be lowered once construction was complete to a 4 to 6 percent interest rate, *see* Tr. at 54-55 (Moales); and, most importantly, (4) that Dr. Hood promised that the bridge loan would be in an amount corresponding to 100 percent of the pledges, or, at a "minimum, 75 cents to a dollar," Tr. at 58-59 (Moales). FCR's witnesses uniformly denied that any of these specific representations were made, either before the 2007 loan or before the 2008 loan. *See* Tr. at 280 (Barlotti); Tr. at 427 (Gibbons); Tr. at 480 (Hood); Tr. at 602 (Russell).

I agree with FCR for much the same reason as I have credited its account with respect to the initial 2007 loan. Once again, the Church has no contemporaneous documentation to support its version of FCR's representations. What documents there are support FCR's account: for

example, in August 2008 an email from Dr. Hood described the still-under-review bridge loan as needing to "reflect both wisdom and faith[, which is] why the [FCR loan] committee talks about loaning 'up to' 75% of the outstanding pledges." Pl's Ex. 20 (email from Dr. Hood dated August 25, 2009, quotes in original). In other words, FCR made it perfectly clear that 75 percent of pledges offered was a ceiling, not a floor. And, once again, the only Church witness to testify about any of these alleged misrepresentations—despite the presence of sundry others at all relevant meetings and exchanges—was Pastor Moales, recollecting oral conversations from a remove of ten years. The Church has not proved, by a preponderance of the evidence, that FCR represented that the terms of the bridge loan would be, or were, anything other than what they turned out to be.

Accordingly, I find that, as it did when agreeing to the 2007 loan, the Church agreed to the 2008 loan with no assurances or representations that the bridge loan paperwork was anything other than what was set down in writing, with no guarantee of future financial support, and with no guarantee of FCR assistance with the completion of construction beyond the informal advice and assistance of Johnie Baker.

### The Church Defaults and the First Forbearance Agreements

The closing of the bridge loan served to alleviate the most acute problems on the Church's construction site—the imposition of construction liens and contractors who had downed tools—but unsurprisingly did so only temporarily. *See* Tr. at 66-67 (Moales). By March 2009, Tri-Con had quit the job, *see* Pl's Ex. 212 (Tri-Con letter terminating services), and construction continued to be bedeviled by cost overruns, delays, regulatory issues, and unhappy subcontractors, *see, e.g.*, Tr. at 66-67 (Moales). Most pertinently to the present dispute, the Church began to fall behind in its payments on both the 2007 mortgage and the 2008 bridge loan,

resulting in what would be a series of forbearance agreements with FCR. *See* Pl's Ex. 68 (letter from Church's attorney concerning forbearance agreements dated March 13, 2009); Pl's Ex. 69 (forbearance agreement, signed April 1, 2009).[10]

To address the Church's delinquency on both the principal loan and the bridge loan, an in-person meeting was held between FCR's representatives and the leadership of the Church in June 2009, including both Bishop and Pastor Moales, as well as Stanley Arrington, a church trustee who testified at trial. *See* Tr. at 60-61 (Moales); Tr. at 493-95 (Hood); Tr. at 657-58 (testimony of Stanley Arrington); Pl's Ex. 158 (May 2009 email from Hood requesting this meeting). It appears that at this meeting the Church and FCR discussed a forbearance agreement, executed on June 9, 2009, setting the interest rate of each loan somewhat higher and requiring an accelerated tempo of payments to bring the Church back into compliance with the loan terms. *See* Pl's Ex. 70, 71 (loan forbearance agreements).

Pastor Moales testified that at this meeting he raised serious concerns with the forbearance agreement and FCR's course of dealing. Tr. at 61-62 (Moales). But, according to Pastor Moales, Dr. Hood told Bishop Moales to ignore his son and to sign the forbearance agreements, promising that if the Church made up for late payments so as to make its mortgage account current, FCR would "give [the Church] the rest of the money." Tr. at 61 (Moales).

As with prior meetings, Pastor Moales claimed that Dr. Hood made a host of promises in this 2009 meeting in addition to his promise to deliver "the rest of the money." Pastor Moales

---

[10] This forbearance agreement contained the following language: "Debtor acknowledges and represents that no defenses, offsets, deductions, counterclaims or other claims, legal or equitable, exist to the enforcement of the Note or any such obligation due the Lender in accordance with the terms of the Note, for the full amount due as set forth herein, and to the extent that any such defenses, offsets, deductions, counterclaims or other claims exist, they are hereby forever waived and released by the Debtor." Pl's Ex. 69 at 2 (¶ 3[a]). Substantially similar language would appear in the subsequent forbearance agreement signed in 2009. *See* Pl's Ex. 72 at 3 (forbearance agreement date Nov. 16, 2009).

claimed that Dr. Hood promised: (1) that if the Church could not pay its combined mortgage debts, Hood would "freeze the whole note to 0 percent interest [and] put whatever balance you owe on the back end of the note," Tr. at 62 (Moales); (2) that FCR would release all of the Church's assets to permit it to find additional financing, *see* Tr. at 63 (Moales); and, as before, (3) that all of the loans would be bundled into one mortgage at a low interest rate, *ibid*. Pastor Moales testified that in response to these promises, and Dr. Hood's remonstrances about Pastor Moales's objections, Bishop Moales told his son to "shut up" (in Pastor Moales's words) and agreed to a forbearance plan involving paying "$15,000 a Sunday." Tr. at 62 (Moales).

When questioned, Dr. Hood did not recollect the details of this meeting, but denied that he ever made these promises. Tr. at 494-96 (Moales). He did testify, in response to a question about whether this June 2009 meeting was acrimonious, that he "never had an acrimonious meeting," Tr. at 494 (Hood). This assertion is belied somewhat by the testimony of Stanley Arrington, one of the Church trustees in attendance, who identified the disagreement between Bishop and Pastor Moales as a "big conflict" and corroborated Pastor Moales's statement that he had argued against signing the forbearance agreement. Tr. at 657-58 (Moales).

But this discrepancy is readily explained by placing Dr. Hood's testimony in context, which is that whatever acrimony there was between the Bishop Moales and Pastor Moales, there was never a meeting up to this point where Bishop Moales was acrimonious with Dr. Hood. *See* Tr. at 494 (Hood). And Arrington's testimony is otherwise striking for its *consistency* with Dr. Hood's account of the meeting: Arrington recollected that at most Dr. Hood "alluded to" consolidation of the Church's loans with FCR, Tr. at 662-63 (Arrington); stated merely the "possibility" of a certificate of occupancy being issued, *ibid*.; and that Dr. Hood's promises amounted to nothing more than a claim that the forbearance agreement "was fair and

equitable . . . and they [the Church] would see in the future that [signing the agreement] was the right thing to do." Tr. at 658 (Arrington). I agree with FCR that, at most, Dr. Hood promised what Arrington recollected he promised: that is, nothing beyond FCR's willingness to abide by the terms of the written forbearance agreements.

### The 2009 Loan

To a certain extent Dr. Hood's June 2009 assurances are academic because, as Pastor Moales himself testified, all of Dr. Hood's alleged promises made in that meeting were contingent on the Church keeping up with its payments, *see* Tr. at 63 (Moales). The Church almost immediately failed to do so. By August 2009, Attorney Sobel reported the Church's decision to stop paying FCR in preference to paying subcontractors who had by now resumed liens on the property—the $1.17 million FCR bridge loan being inadequate to settle outstanding subcontractor accounts. *See* Pl's Ex. 159 (email from Sobel to Dr. Hood).

The email from Attorney Sobel, Pl's Ex. 159, succinctly set out the dilemma FCR found itself in by the middle of 2009. Even if FCR were to foreclose immediately upon the Church's default, whatever title FCR had to the Church's land would be threatened, or at least deeply complicated, by liens or foreclosure actions undertaken by the Church's unpaid subcontractors. *See* Tr. at 312-14 (Barlotti). And even assuming FCR could acquire title to the land free and clear after foreclosing on the Church, the land was worth little if the only thing on it was the shell of an unfinished and uninhabitable cathedral—a cathedral that may cost millions to finish but would surely cost millions more to tear down and replace with another building that could earn back FCR's loan capital. *Ibid*. In short, FCR was in too deep to quit.

FCR responded with several initiatives aimed at resuming payments, finishing the cathedral, and putting the Church back on its financial feet. First, Dr. Hood met with Bishop

Moales at LaGuardia airport on August 28, 2009. *See* Tr. at 500-02 (Hood); Pl's Ex. 160 (letter from Bishop Moales to Dr. Hood). Dr. Hood testified that he sought to coach Bishop Moales, making suggestions about how to rearrange the Church's finances so the Church could in fact make its mortgage payments as required. *See* Tr. at 501 (Hood). Bishop Moales sent Dr. Hood a letter the following Monday proposing a brief delay in payments, followed by a resumption of $15,000 per week payments until the 2008 and 2009 loans were current, "after which time an adjustment will be made to lower our interest of both loans." Pl's Ex. 160.

Bishop Moales's proposal was ultimately integrated into a larger and more comprehensive forbearance agreement that included FCR's extension of another $850,000 in loan financing at 11.5 percent interest, *see* Pl's Ex. 72 (Nov. 16, 2009 forbearance agreement); *see also* Pl's Ex. 73, 74 (2009 mortgage agreements). I will refer to this $850,000 loan as "the 2009 loan." The purpose of this loan was both to extricate the Church's land from subcontractor liens and to get a working sanctuary in place to set the Church back on the road to financial and spiritual health. *See* Tr. at 320-22 (Barlotti). Accordingly, the 2009 loan was extended not only on the condition of continued payments in accordance with the forbearance agreement that Bishop Moales had negotiated with Dr. Hood, but also on the express condition that the $850,000 be distributed by FCR itself, rather than the Church, directly to subcontractors in exchange for lien waivers. *See* Pl's Ex. 72 (comprehensive forbearance and settlement agreement, executed November 16, 2009); *see also* Tr. at 66-70 (Moales discussing the $850,000 loan); Tr. at 314-19 (Barlotti discussing the arrangement more broadly).

As he did with respect to the 2007 loan and the 2008 bridge loan, Pastor Moales testified that FCR made a series of oral representations to induce the Church to sign the 2009 loan of $850,000 at 11.5 percent interest. Specifically, Pastor Moales testified that during a

teleconference with Church leaders that occurred after the LaGuardia meeting but before the Church agreed to the 2009 loan, Dr. Hood said: "Because you agreed [to make payments] in June in our meeting [at La Guardia] and you've been making your payments, I am now going to give you the money [*i.e.* the $850,000 loan] like I told you. I'm going to help you finish the building. You will finish the building. Johnie Baker is going to take over. You guys fired Tri-Con. Johnie Baker could get it done. He's a hard negotiator. He can talk the subcontractors down to 40 to 50 cents on the dollar. We're going to unleash Johnie Baker on this project, and you guys will be in the building with a certificate of occupancy by January, maybe February. Johnie has assured me of this." Tr. at 77 (Moales).

Although Dr. Hood denied in general terms that he made the Church a guarantee that they would receive a certificate of occupancy—understandably, since Hood was an executive for a religious/financial institution in Missouri and not a building inspector with the City of Bridgeport—he did not deny making the substance of these remarks, and I have no reason to doubt that something much like what Pastor Moales described took place. Indeed, Pastor Moales testified that, as promised, Johnie Baker was "unleashed" on the project within three days of that call, Tr. at 66-70, 78-79 (Moales), for the specific and limited purpose of negotiating with the subcontractors with a view to finishing the essentials of construction and, above all, removing construction liens or the prospect thereof from the project. No admissible testimony was elicited indicating that Baker did anything more or less than what Hood promised at this teleconference. *See generally* Tr. at 664-65 (testimony of Raymond Weiner); *see also* Pl's Ex. 78 (recapping Baker's work with subcontractors up to January 2010).

Unfortunately, but unsurprisingly, the 2009 infusion of $850,000 in new loan capital, while adequate to clear away most of the liens, was not enough money to complete the cathedral

to the point where the Church could acquire a certificate of occupancy. *See* Tr. at 80 (Moales). In November 2009, Bishop Moales "illegally mov[ed] into the building," which was still unfinished. *Ibid*. But slow and painful progress was being made.

In January 2010, Bishop Moales sent a letter to Dr. Hood thanking him "and the AG Financial Solutions for your continued confidence, patience, and support of the Cathedral Project . . . we love you all." Pl's Ex. 161; *see also* Tr. at 505-07 (Hood, discussing this letter). A few weeks later, Johnie Baker wrote a long letter to Bishop Moales declaring that in his opinion the Church was "nearing completion of [the initial] phase of the project," optimistically projecting a temporary certificate of occupancy in early February, but noting that there were many unfinished areas and work left to be done. Pl's Ex. 78 (letter from Johnie Baker); *see also* Tr. at 325 (Barlotti, discussing this letter).

Construction continued to inch along through the spring and summer of 2010, although important features—carpeting, doors, toilet partitions, paint in key areas—had yet to be completed. *See* Tr. at 86 (Moales). On the financial side, Pastor Moales testified that between June and September 2010, Dr. Hood called to say that a "brand new mortgage" integrating the 2007, 2008, and 2009 loans would be in place before September 21, 2010 (Bishop Moales's birthday), with an interest rate "below the ECCU" which Pastor Moales took to mean below 6.2 percent. Tr. at 82-83 (Moales); *see also* Pl's Ex. 166 (Moales email recalling these promises).[11]

There was other good news. Although Tri-Con had sued the Church in early 2010 for non-payment, the suit ended somewhat favorably for the Church, with the Connecticut Superior

---

[11] In an aside, Pastor Moales alleged that Dr. Hood, or another FCR official, promised that FCR would pay off a second mortgage Bishop Moales took out on his private property (to pay for still more construction bills). *See* Tr. at 83 (Moales). There is no other evidence of this promise (or, indeed, the mortgage on Bishop Moales's house), and therefore I do not find the Church to have established the existence of such a promise by a preponderance of the evidence.

Court finding that, although Tri-Con and the Church had agreed verbally to a much higher construction management fee than provided in the Church-Tri-Con written agreements, this parole evidence was inadmissible, and the Church was obligated only to pay the lower written contract rate. *See Tri-Con*, 2010 WL 5573760, at *1.

In addition, FCR agreed to a new and still more generous forbearance agreement with the Church in August 2010 reducing the Church's payments to $8,000 per week, with the hope of freeing up more capital to pay for the remainder of construction—an agreement that nonetheless made it very clear that FCR would not loan the Church any additional funds. *See* Pl's Ex. 162 (letter from Pastor and Bishop Moales detailing terms of forbearance agreement and understanding that no more money was forthcoming); *see also* Tr. at 507-09 (Hood discussing this letter).

Unfortunately, these efforts took place against a backdrop of worsening financial and emotional strain on both Bishop Moales and the Church. Liens were still not entirely lifted. *See* Tr. at 83 (Moales). The Church found itself unable to make payroll, or pay payroll taxes. *Ibid*. Bishop Moales "called a special meeting [of the Church] and told the entire congregation [that he was] overwhelmed, too much stress . . . [h]e couldn't handle it." *Ibid*. And on September 20, 2010, Bishop Moales suddenly died.

### The Death of Bishop Moales and the Dispute Over His Life Insurance Proceeds

Although relations between the Church and FCR were sufficiently close at the time of Bishop Moales' passing that Dr. Hood spoke at his funeral, *see* Tr. at 511 (Hood), matters went downhill when the parties began to dispute the proceeds of the Bishop's life insurance policy.

At the very beginning of the FCR-Church relationship, FCR insisted, as a condition of the 2007 loan, that it be named as a beneficiary on a key-employee life insurance policy for both

Bishop Moales and Pastor Moales. This condition was repeated for the 2008 bridge loan. *See generally* Pl's Ex. 27 (2007 loan commitment letter); Pl's Ex. 57 (2008 loan commitment letter). Pastor Moales, who had never been the subject of a key-employee life insurance policy, was obligated to take out a fresh $2 million life insurance policy with AG Financial's insurer; that policy does not appear to be disputed. *See* Tr. at 21-23 (Moales).

The Bishop's life insurance policy was substantially more complicated. Long prior to its first contact with FCR, the Church maintained a key-employee life insurance policy on Bishop Moales, and this policy was worth approximately $2.5 million to $3 million with two beneficiaries: in the event of Bishop Moales's death, 75 percent of the proceeds would go to his wife, Peggy Moales ("Lady Moales"), and the remainder of the proceeds would go to the Church.[12]

FCR's requirements for the Bishop's life insurance policy were unclear. In the FCR loan commitment letter dated October 23, 2007, FCR "require[d] existing Key-Man Life policy on Bishop Moales," that is, the $2.5 million policy, "to include [FCR] as Primary Beneficiary with the church as secondary or contingent beneficiary." Pl's Ex. 27 at 5. But the agreement the Church ultimately signed at closing provided, with respect to Bishop Moales, that the Church was obliged to "maintain" only "a One Million Dollar ($1,000,000.00) Key Man Life Insurance policy on Kenneth Moales, Sr. to include [FCR] as primary beneficiary with the church as secondary or contingent beneficiary." Pl's Ex. 29 at 4.

There is evidence to suggest the Church understood FCR's condition as requiring it to sign over to FCR the entirety of Bishop Moales's key-man life insurance policy, rather than

---

[12] *See* Tr. at 20 (Moales), Tr. at 716 (FCR closing argument). The amount of the payout of Bishop Moales's policy was approximate because it contained both a defined benefit and a benefit linked to certain investments. *See* Pl's Ex. 82 (email from Paul Sobel discussing the policy).

merely $1 million. On December 10, 2007 (shortly before the 2007 loan closed), the Church sent a change in beneficiary form to Prudential (the insurer) that instructed it to change the beneficiary on the entirety of Bishop Moales's policy to FCR with the Church as a contingent beneficiary. *See* Pl's Ex. 83 at 4-5 (reproduction of change in beneficiary form). But Prudential rejected the form on technical grounds. *Id*. at 7 (reproduction of Prudential letter). Although Prudential proposed a slightly revised form that would accomplish the same result, this revised form was never executed, and so at the time of Bishop Moales's death the policy was still designated to pay out, 75/25, to Lady Moales and the Church. *See* Pl's Ex. 82 (email of October 5, 2010, from Church attorney Paul Sobel explaining the situation).

The dispute over the insurance proceeds embittered the Church-FCR relationship. Initially, the Church took the position that FCR was entitled only to the Church's original 25 percent share of the policy; that is, approximately $600,000, with the balance going to Lady Moales. *See* Pl's Ex. 164 (email from Sobel to Hood dated October 14, 2010). The Church proposed that the $600,000 be divided such that $450,000 be paid to service existing FCR debt, with $150,000 used to complete construction of the cathedral. *Id*. William Hunt, FCR's attorney, countered that from FCR's perspective it was entitled to the entirety of the insurance proceeds, not to mention its various rights triggered by the Church's delinquency on its existing mortgages. *See* Pl's Ex. 84 (Hunt email to Sobel). Meanwhile Prudential, having become aware of a dispute over the proceeds, threatened to hale both parties into court in an interpleader action unless the dispute was rapidly resolved. Pl's Ex. 85 (correspondence from Prudential).

Pastor Moales testified that at this point, Hunt "began to strong-arm my mother and told Attorney Sobel that [FCR] would fight for every dollar of the money . . . and told my mother and I that she didn't need $700,000 [and] if she didn't give up her personal money . . . he would

fight, tie it up in probate . . . and at the end of the day he'll close the church down. . . . foreclose on the church and [] take the church from your son." Tr. at 87 (Moales). In reaction to this "strong-arm[ing]" from Hunt as well as broken promises from FCR, Pastor Moales wrote Dr. Hood an email in March 2011 accusing FCR of failing to live up to its promises of getting the Church a certificate of occupancy by "the year end of 2009," failing to adjust the interest rates of the mortgages and to create a combined mortgage at that lower rate, and failing to credit interest and late fees in exchange for the Church's compliance with the loan forbearance terms. *See* Pl's Ex. 166 (Moales). "You all have left me to suffer and our ministry to die while you try to negotiate to take my mother's insurance money!" the email continued, "Billy Hunt's approach to handling this matter is evil and not Christian . . . how unfortunate and hurtful these last six months have been!" *Ibid*. Similar sentiments were expressed in an emotional email sent by Lady Moales to Dr. Hood a few days later. *See* Pl's Ex. 167 (email from Lady Moales).[13]

Notwithstanding the passionate denunciations of FCR from both Pastor and Lady Moales, the Church and FCR successfully negotiated what promised to be a global settlement of both the insurance dispute and the outstanding delinquencies in the Church's mortgages. The parties' agreement, memorialized in a late March 2011 letter, was that FCR would receive $1.7 million in the insurance proceeds, "to be applied to the loan indebtedness," in exchange for which FCR would refinance all of the loans into the promised single conventional loan of $7.367 million at 6.25% interest "subject to an appropriate title examination." *See* Pl's Ex. 91 (commitment letter).

---

[13] Dr. Hood testified that he did not respond to this email, Pl's Ex. 166, and a similarly angry email from Lady Moales, Pl's Ex. 167, even though he recalled feeling "shocked . . . surprised . . . taken aback" at what he characterized as "harsh" and "mean spirited" emails, Tr. at 514 (Hood). The Church proposed that this was because he knew the content of the emails to be true. *See* Tr. at 729-30 (Church's closing argument). I do not agree. It was clear from Dr. Hood's testimony that he understood that these emails had serious legal implications (given that the Church and FCR were at this point on the verge of being sucked into an interpleader action over the life insurance policy) and prudently refrained from responding.

As respects this agreement, the Church alleges that FCR made three promises it did not keep. First, Pastor Moales testified that FCR promised to apply the $1.7 million in insurance proceeds to the Church's outstanding loans in such a way that the Church's indebtedness was minimized (in particular, by completely discharging the entire principal and interest of the 2009 loan, with the highest interest rate). Tr. at 90-92 (Moales). Instead, the $1.7 million was applied evenly across all three notes. *Ibid*; *see also* Tr. at 338-40 (Barlotti); Pl's Ex. 95 (FCR internal breakdown of how the insurance proceeds were applied).

FCR denies that the parties ever agreed about the application of the proceeds across the loans, and argues that the division question was academic in any event because all three loans were reset at 6.25 percent interest. *See* Tr. at 340 (Barlotti). I agree with FCR. Its own internal financing documents indicate that the interest rate of all three loans was reset, *see* Pl's Ex. 95, belying Pastor Moales's testimony that the proceeds were applied to maximize interest charges, *see* Tr. at 90-92 (Moales). Moreover, in no document entered into evidence did the Church express a preference as to the application of the insurance funds between the three loans. Although it may have been advantageous to the Church to distribute the insurance proceeds differently (even though the same interest rate was now applied to each loan), I find that there is insufficient evidence to show even that the Church sought to have the proceeds distributed in this way, much less that FCR promised such a distribution structure would be employed.

Second, Pastor Moales testified that, as the documents indicated and as Dr. Hood had promised the Church back in 2009 and 2010, the loans were to be consolidated into a single loan at a lower interest rate. FCR does not deny that this promise was made, at least in its March 2011 commitment letter; nor does it deny that the loans were never formally consolidated, although the three loans were reset at 6.25 percent, *see* Tr. at 338-40 (Barlotti); Pl's Ex. 95 (FCR internal

loan breakdown). But, it argues, the key condition precedent for the loan consolidation was never fulfilled, because the subsequent title examination revealed a new and insuperable obstacle to consolidation: a $250,000 IRS tax lien on the Church's property. *See* Tr. at 340-41 (Barlotti). *See also* Pl's Ex 91 at 4 (conditions of consolidation loan).

### *The IRS Liens, the Church's Default, and Subsequent Legal Proceedings*

The IRS tax lien created "multiple problems" for FCR because it believed the lien could be a "superior lien position to our loan." Tr. at 341 (Barlotti). The payoff of this tax lien would require still more loan capital from FCR, capital FCR had little choice but to provide, because otherwise it might lose its remaining collateral to the IRS. Therefore, in March 2012 it ultimately agreed to modify the three loans—all of which remained at 6.25 percent interest, but which remained unconsolidated to preserve FCR's lien priority—to extend still more credit to the Church in exchange for another loan forbearance workout. *See* Pl's Ex. 104, 105, 106 (loan modification agreements); Tr. at 350-53 (Barlotti).

Once again, the Church fell behind in its payments. On May 16, 2013, FCR sent demand letters to the Church and accelerated all amounts due and owing under each loan. Pl's Ex. 117. In July 2013, FCR filed a foreclosure action in Connecticut Superior Court, which, after its sudden withdrawal on the eve of trial in November 2016, *see* Doc. #65-1 at 11, led to the instant federal court action, Docs. #1, #25, and, following my denial of summary judgment, *Foundation Capital*, 2018 WL 4697281, to the instant trial.

### CONCLUSIONS OF LAW

As I have already granted summary judgment to FCR as to its *prima facie* case, *Foundation Capital*, 2018 WL 4697281 at *6, the remaining question is whether, given my findings of fact, the Church has established any of its special defenses and counterclaims. In my prior ruling, I held that the Church had identified a genuine dispute of material fact as to four

special defenses and counterclaims: fraud, unconscionability, unclean hands, and CUTPA. I will consider each in turn.

### *Special Defense and Counterclaim—Fraud*

The bulk of the Church's allegations concern the Church's special defense of fraud.[14] "Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on his statement to his detriment." *Reville v. Reville*, 312 Conn. 428, 441 (2014). "Fraud is an equitable defense to a foreclosure action." *Chase Manhattan Mortg. Corp. v. Machado*, 83 Conn. App. 183, 188 (2004).

At the outset, I underscore that any misrepresentations made by FCR are relevant to the Church's fraud special defense only insofar as they induced the Church to agree to the 2007, 2008, and 2009 loans—the loans FCR is attempting to foreclose in the present action. The essence of the Church's fraud defense is that it relied on FCR's oral misrepresentations to disregard the terms of these three loan documents, which on their face otherwise require judgment in FCR's favor. *See Foundation Capital*, 2018 WL 4697281, at *7-10.[15] FCR's

---

[14] The Church separately advanced a counterclaim of fraud, but in my ruling for summary judgment I held that the fraud claim could proceed to trial "subject to the understanding that [the counterclaim] may allow for offsetting recovery only so far as recoupment allows." *Foundation Capital*, 2018 WL 4697281, at *12. For practical purposes, then, my determination of the fraud counterclaim and special defense turns on the same questions, at least at this merits stage.

[15] I discussed in my prior summary judgment ruling the possibility that the waiver provisions of the forbearance agreements executed in 2009, introduced at trial as Pl's Ex. 69 and 72, might operate to bar all of the special defenses and counterclaims if they were not procured either by the same campaign of fraud that procured the original three loans or by a separate fraud, although the question is complicated by the dearth of authority in Connecticut on the precise interaction between fraud allegations and contractual waivers of fraud claims. *See Foundation Capital*, 2018 WL 4697281, at *10. In light of my determination that the facts do not support the (continued…)

dealings subsequent to the execution of the three loans at issue in this case are relevant to certain of the Church's other equitable defenses and counterclaims, but are only tangentially relevant to its special defense of fraud.

As I have discussed at length above, I have concluded that, far from making fraudulent misrepresentations, FCR did not make *any* misrepresentations to the Church that would lead the Church to believe that the terms of the notes it signed, with the advice of counsel, were anything other than the sole and exclusive terms of the parties' agreement. The evidence does not support the Church's claim that FCR promised, prior to the execution of either the 2007, 2008, or 2009 loans, that it would loan the Church any more money than stated on the face of the loans or their accompanying commitment letters, or that these loans would be consolidated into a single long-term mortgage at a lower interest rate, or that Johnie Baker would take over construction except to provide the support he ultimately provided, or, most importantly, that any of the loan documents the Church agreed to were subject to any oral modifications at all.

Even if it is true that FCR's loans did not live up to the promises Dr. Hood made about them in his initial PowerPoint presentation back in fall 2007: "no balloon notes, no personal guarantees, [and] up to 30 year amortization," or "competitive rates not tied to 'Wall Street,'" *see* Pl's Ex. 123, the fact remains that the Church was never told that these "PowerPoint terms" superseded the terms of the loan commitment letter it received in October 2007, months before closing, reviewed with its attorney, and signed. The Church had no basis to believe the offer it received was not the offer it would get and be required to abide by if accepted.

---

Church's claims on their merits, it is unnecessary for me to decide whether the waiver provisions of these forbearance agreements would serve as a separate basis for rejection of the Church's counterclaims and special defenses.

Likewise, insofar as the Church claims it was fraudulently induced to sign the 2007 loan because of promises about what would become the 2008 bridge loan, I conclude that the Church has not shown, by a preponderance of the evidence, that FCR ever represented, before the 2007 loan was signed, that the terms of the bridge loan would be any more favorable to the Church than the terms the Church ultimately received. Nor can I conclude that the Church has shown by a preponderance of the evidence that FCR ever made misrepresentations about the content of the 2008 bridge loan after the 2007 loan was signed such that the Church had any grounds to believe the written terms of that bridge loan would not be the sole and exclusive terms of the loan.

As for the 2009 loan, I conclude that to the extent that the 2009 loan was procured with a promise that Johnie Baker would be "unleashed" on the project, he fulfilled the limited task both Church and FCR understood him to be charged with doing. The remaining alleged misrepresentations surrounding the 2009 loan were, at most, non-actionable expressions of optimism about the Church's ability to pass a building inspection and acquire a certificate of occupancy, or non-actionable claims that FCR would work with the Church to find a workable payment plan for the outstanding arrearage in the prior two loans. In addition, as with the prior two loans, I find that the Church has not proved that it was ever told by FCR that the written terms of the 2009 loan were anything other than the legally binding and governing terms of the parties' written agreement.

I conclude, therefore, that the Church's special defense and counterclaim of fraud lacks merit. The Church has not proved that FCR made false representations on which it reasonably relied before signing the 2007, 2008, or 2009 mortgage loans.

***Special Defense—Unconscionability***

The Church alleges a special defense of unconscionability. Under Connecticut law, "[t]he purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. As applied to real estate mortgages . . . the basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 88-89 (1992) (internal citations omitted). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other. The doctrine of unconscionability, as a defense to contract enforcement, generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Bender v. Bender*, 292 Conn. 696, 731-32 (2009) (cleaned up).

I have already held that the terms of the loans were not unconscionable as usurious. *See Foundation Capital*, 2018 WL 4697281, at *10. To establish unconscionability, then, the Church must show that the various loan agreements were "both procedurally and substantively unconscionable when made—i.e., [they were entered into with] an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Bender*, 292 Conn. at 732. As I have discussed above, the Church was never "unfairly surprised by the interest rate" of the 2007 loan, *cf. Found. Capital Res., Inc. v. Prayer*

*Tabernacle Church of Love, Inc.*, 2016 WL 6395284, at *5 (Conn. Super. Ct. 2016), because there were never any representations as to what the interest rate would be other than the truthful representations of the commitment letters and loan agreements.

Likewise, I find that the Church never "lacked meaningful choice in entering into the agreement," *Foundation Capital*, 2016 WL 6395284, at *5 (Conn. Super. Ct. 2016). On the contrary: the Church had a deeply meaningful and realistic choice when it was presented with the terms of the 2007 agreement—either decline FCR's offer and keep looking for financing that would provide sufficient funds to complete the project, or sign the mortgage presented even though the interest rate and total amount promised was respectively above and below what the Church believed it should have accepted. The Church elected to take the mortgage despite knowing its inadequacies, and it has not established that this decision was forced on it by FCR.

The defense of unconscionability fails as to the 2008 and 2009 mortgages for much the same reason as the 2007 mortgages. As I have discussed above, FCR never represented that the interest rates of either of these mortgages would be at 6 percent, or any particular percentage, prior to the Church entering the 2007 mortgage. Nor did FCR represent that the bridge loan would provide a particular minimum sum (although it did represent the bridge loan had a maximum payout of 75 percent of total capital campaign pledges), or that subsequent loan capital would be forthcoming if the bridge loan and initial loan were inadequate. *Contrast Prayer Tabernacle*, 2016 WL 6395284 at *5 (Connecticut Superior Court concluding that unconscionability claim could be supported only by allegation that FCR misrepresented the interest rate of the bridge loan before it was offered). Under these circumstances, although the Church had less flexibility to reject FCR's later loan terms, that lack of flexibility was a foreseeable outcome of its initial decision to agree to the underfunded 2007 mortgage.

Nor has the Church shown that FCR "intended simply to reap the defendants' equity in the [property] by making a loan to them that the plaintiff knew they could not repay." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 92 (1992). Indeed, FCR was careful to extend the 2007 loan to the Church for less than what was initially requested because FCR reasonably supposed this was the maximum the Church could repay. In 2008, when the Church presented a dubious sum of alleged pledges as the basis of a desired $3.7 million loan, FCR prudently lent a fraction of what it thought was reasonable to suppose the Church could actually recover in pledges and rapidly repay (given the short term of the note). The 2009 loan, although at a high rate of interest, was set at such a high rate because it was risky—executed in wake of what would become a constant pattern of defaults on the Church's part, and with the understanding, ultimately realized, that FCR would receive a fraction of the principal, let alone interest.

More broadly, taking into account the Church's financial circumstances, its commercial sophistication, and its capacity for generating income, I do not think the Church has established that any of the interest rates set in the 2007, 2008, 2009, or subsequent loan agreements prior to the reset of the loans at 6.25 percent was so high as to be unconscionable. *See Hamm v. Taylor*, 180 Conn. 491, 495 (1980). Accordingly, I conclude that the Church has not proven its unconscionability claim.

### *Special Defense—Unclean Hands*

The Church alleges a special defense of unclean hands. "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue[.]" *Thompson v. Orcutt*, 257 Conn. 301, 310 (2001). "It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes

into court with clean hands . . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court[.]" *Ibid.* (internal citations omitted).

Because foreclosure is an equitable proceeding, *see ibid.*, the doctrine of unclean hands acts as a defense to a foreclosure action. And the Connecticut Supreme Court has held that, under this doctrine, "where a plaintiff's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief[.]" *Ibid.* (internal quotation marks and alterations omitted). Although outright fraud is not necessary to assert an unclean hands defense, the doctrine generally "applies [only] to the particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must . . . be in regard to the matter in litigation[.]" *Id.* at 310-11 (quoting *Samasko v. Davis*, 135 Conn. 377, 383 (1949)). At the same time, "conduct occurring after the origination of the loan, after default, and even after the initiation of the foreclosure action may form a proper basis for defenses in a foreclosure action." *U.S. Bank Nat'l Ass'n v. Blowers*, 332 Conn. 656, 672 (2019).

As I have discussed, the Church has not satisfied its burden to prove either fraud or unconscionability in FCR's dealings leading up to the three loans in question. The Church's unclean hands defense requires, then, that I find that FCR engaged in conduct that, while not founded on fraud or other species of misrepresentations or unconscionability, was nonetheless "of such a character as to be condemned and pronounced wrongful by honest and fair-minded people" and that was directly connected with the loans. *Bauer v. Waste Management of Conn., Inc.*, 239 Conn. 515, 525 (1996).

On reviewing the trial record, however, I cannot conclude that any of FCR's conduct in its long and tortured relationship with the Church meets this demanding standard for wrongfulness. Instead, up until the end of the foreclosure action, FCR behaved well within the bounds of conduct that, even if less than perfect, was not "of such character as to be condemned and pronounced wrongful by honest and fair-minded people." *Bauer*, 239 Conn. at 525. Even FCR's efforts to secure Bishop Moales's life insurance policy, which provoked the largest amount of contemporaneous outcry from the Church, is—to the extent it reflects sharp practices—strongly mitigated by FCR's negotiation of a settlement that not only promised to fulfil Dr. Hood's promises to Bishop Moales of a low interest rate in a consolidated mortgage but went beyond that promise and forgave substantial arrearage and other penalties the Church had accrued owing to its past defaults.[16] The Church has not proven its defense of unclean hands.

### Counterclaim—CUTPA

The Church has advanced a claim for recoupment under the Connecticut Unfair Trade Practices Act (CUTPA), which provides, in relevant part, "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). "In determining whether certain acts constitute a violation of this act, 'we have adopted the criteria set out in the cigarette rule by the federal trade commission . . . (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or

---

[16] In its post-trial briefing, FCR argues that the Church is itself barred from asserting an unclean hands defense, or any of its equitable defenses or counterclaims, by its own wrongful conduct in concealing the true price of its contract with Tri-Con and the overall cost of construction when applying for the 2007 loan, *see* Doc. #134 at 12-21, as well as breaching its obligations to pay FCR since 2013 by "delaying collection efforts on the grounds of untenable defenses based upon a web of untruths," Doc. #134 at 21-27. Because I conclude that the Church's claims fail on their merits, it is not necessary for me to determine whether the Church's defenses or counterclaims are barred by the Church's own alleged misconduct.

otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.'" *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 591 (1995). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy." *Caires v. JP Morgan Chase Bank, N.A.*, 880 F. Supp. 2d 288, 299 (D. Conn. 2012).

For much the same reasons as I have rejected the Church's claims of fraud, unconscionability, and unclean hands, I find that the Church has not proven sufficient facts by a preponderance of the evidence to establish a CUTPA claim. As I have detailed above, FCR did not engage in unfair, immoral, unethical, oppressive, or unscrupulous conduct, or conduct that caused substantial injury to borrowers like the Church. It did not procure the 2007, 2008, or 2009 loans by making misrepresentations on which the Church could or did rely. It worked assiduously to develop a plan with the Church to set a payment schedule that could complete construction while still repaying the ever-growing outlay of FCR loan capital. It did not embark on a campaign to deliberately drive up the Church's debt, but instead attempted from the outset to limit the Church's debt and was frustrated in its efforts to do so by the Church itself, because the Church sought to borrow more money than it could reasonably repay. *Contrast Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 791 (2019); *Blowers*, 332 Conn. at 675.

More broadly, I agree with FCR's arguments, made in its post-trial brief, that neither the loan's prepayment penalties, nor the increases in interest rates on loans subsequent to the 2007 loans—each executed against the background of growing realization of the risk of extending

credit to the Church—were unfair business practices under the circumstances. *See E. Sav. Bank, FSB v. Munson*, 50 Conn. Supp. 374, 377 (Conn. Super. Ct. 2007) (collecting cases enforcing mortgage prepayment clauses). The Church has not proven its CUTPA counterclaim.

### CONCLUSION

On the basis of all of the evidence and arguments, I find in favor of plaintiff Foundation Capital Resources Inc. and against defendant Prayer Tabernacle Church of Love with respect to all issues of liability, defenses, and the counterclaim. A judgment of strict foreclosure shall enter accordingly. Plaintiff may file any proposed orders to the extent necessary to effectuate the findings and conclusions of this ruling. It is so ordered.

Dated at New Haven, Connecticut, this 28th day of February 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge