**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| FOUNDATION CAPITAL RESOURCES, INC., | |
| *Plaintiff,* | Civ. No. 3:17-cv-00135 (JAM) |
| v. | |
| PRAYER TABERNACLE CHURCH OF LOVE, INC., | |
| *Defendant.* | April 30, 2021 |

**REPORT AND RECOMMENDATION ON**
**MOTION FOR ORDER IN AID OF EXECUTION [ECF No. 193]**

**I.     INTRODUCTION**

This is a commercial real estate foreclosure case in which the plaintiff, Foundation Capital Resources, Inc. ("FCR"), obtained a judgment of strict foreclosure and order of possession with respect to several Bridgeport properties formerly owned by the defendant, Prayer Tabernacle Church of Love, Inc. ("PTCLI"). (ECF No. 156.)  When a marshal served writs of execution for ejectment on PTCLI's CEO, Pastor Kenneth Moales, Jr., the pastor resisted, contending that "all of the Properties were leased and therefore, the tenants were not required to vacate the premises." (Aff. of Marshal C. Paoletti, Ex. A to ECF No. 193, ¶ 8.)  FCR then moved for an order in aid of execution pursuant to Rule 70 of the Federal Rules of Civil Procedure.  (ECF No. 193.) Specifically, it seeks an order directing the "purported tenants . . . [to] vacate the premises . . . within ten (10) days." (ECF No. 206, at 3.)

FCR says that its motion should be granted because the purported leases are "obvious sham[s]." (ECF No. 215, at 2.)  It notes that most of the alleged tenants are unincorporated

1

divisions of PTCLI, and thus mere "alter ego[s]" with whom PTCLI "could not have entered into valid arms-length transactions." (*Id.* at 9.) And it contends that the other leases are deeply suspect as well, because (among other reasons) PTCLI failed to disclose them when it filed for bankruptcy protection only a few months before. (*Id.* at 2.) For its part, PTCLI claims that the leases are genuine – and that even if they were not, "occupants without lawful leases may only be dispossessed" through a separate summary process action. (ECF No. 221, at 3.)

The presiding judge, United States District Judge Jeffrey A. Meyer, referred FCR's motion to the undersigned, United States Magistrate Judge Thomas O. Farrish. (ECF No. 210.) For the reasons that follow, I respectfully recommend that FCR's motion be **GRANTED IN PART AND DENIED IN PART**. Specifically, I recommend that FCR's motion be **GRANTED** with respect to the properties known as 729 Union Avenue, 1243 Stratford Avenue, and 1277 Stratford Avenue, but **DENIED** with respect to the properties known as 851 Central Avenue and 1065 Central Avenue.

## II.    FACTUAL BACKGROUND

The Court assumes familiarity with the long history of this case, and will set forth only those background facts necessary to explain the basis for its recommendation. FCR "is a real estate investment trust, affiliated with the Assemblies of God, that lent millions of dollars to [PTCLI] for a major church construction project in Bridgeport, Connecticut." (ECF No. 144, at 1.) PTCLI "defaulted on the loans," and FCR "filed this federal diversity lawsuit to foreclose." (*Id.*) After three years of litigation and a four-day bench trial, Judge Meyer entered a judgment of strict foreclosure in FCR's favor. (*Id.* at 47; ECF No. 156; Joint Stip., ECF No. 228, ¶ 2.) The judgment included an order of possession, directing PTCLI "and all persons claiming possession of the premises through [PTCLI] under any conveyance or instrument executed or recorded subsequent

to the date of the *lis pendens* or whose interest shall have been thereafter obtained by descent or otherwise, [to] deliver up possession of the premises to" FCR. (ECF No. 156, at 3; *see also* Joint Stip., ECF No. 228, ¶ 4.)

The foreclosed properties included five buildings and fifteen parcels of land. (*Id.* at 1-2) (hereinafter the "Properties"). The parties use the street addresses of the buildings as shorthand terms for both the buildings themselves and the parcels associated with them, and the Court will follow their convention. Thus:

- "729 Union" refers to the large, modern cathedral that was the subject of the FCR-financed construction project, together with the following parcels of land: 729 Union Avenue, 715 Union Avenue, 685-695 Union Avenue, 1062-1074 Central Avenue, 1054-1056 Central Avenue, 1044-1046 Central Avenue, and 316 Deacon Street;

- "1243 Stratford" refers to PTCLI's original, 121-year-old brownstone church building, along with the parcels of land at 1209-1211 Stratford Avenue, 1221 Stratford Avenue, and 1231-1243 Stratford Avenue;

- "1277 Stratford" refers to the low-rise, brick-faced commercial building at 1277 Stratford Avenue, together with the parcels at 1259-1263 Stratford Avenue, 1273 Stratford Avenue, and 852 Central Avenue;

- "851 Central" refers to the residence and parcel of land at 851 Central Avenue; and

- "1065 Central" refers to the residence and parcel of land at 1065-1081 Central Avenue.

(*See, e.g.,* ECF No. 30 at Exs. 1-5 (FCR's appraisals); Joint Stip., ECF No. 228, ¶ 1.)

After Judge Meyer entered the judgment of strict foreclosure, PTCLI filed for bankruptcy protection. (ECF No. 1, *In Re Prayer Tabernacle Church of Love, Inc.*, No. 20-50605 (Bankr. D. Conn. June 26, 2020); Joint Stip., ECF No. 228, ¶ 5.) The Bankruptcy Court quickly dismissed the case because PTCLI had failed to obtain insurance to protect the bankruptcy estate and the five buildings. (ECF No. 61, *In Re Prayer Tabernacle Church of Love, Inc.*, No. 20-50605 (Bankr. D. Conn. July 17, 2020).) Before the case closed, however, PTCLI filed a "Schedule G" list of

executory contracts and unexpired leases.  (ECF No. 44, *In Re Prayer Tabernacle Church of Love, Inc.*, No. 20-50605 (Bankr. D. Conn. July 13, 2020).)  The schedule asked PTCLI to list "all contracts and unexpired leases," and to "[s]tate the name and mailing address for all other parties with whom [PTCLI] has an executory contract or unexpired lease." (*Id.* at 16.)  In response, PTCLI identified only two leases – a "[v]erbal lease by Kingdom's Little Ones, child care facility, 729 Union Avenue," and a "[v]erbal lease Naiomi [sic] Ministries, 1065 Central Avenue." (*Id.*)  PTCLI did not list any leases for the other three properties, nor did it list any leases with any entities other than "Kingdom's Little Ones" and "Naiomi Ministries."   On behalf of PTCLI, Pastor Moales "declare[d] under penalty of perjury" that the church's bankruptcy filing was "true and correct." (*Id.* at 26.)

Judge Meyer set PTCLI's law day for August 5, 2020 (ECF No. 161), and when that date went by without a redemption, title and rights of possession passed to FCR.  (ECF No. 156, at 2-3 (title to vest in FCR "in the event the Defendant does not redeem on its law day;" PTCLI "and all persons claiming possession of the premises through" PTCLI to "deliver up possession of the premises to" FCR).)  PTCLI did not, however, vacate the premises and deliver possession.  Two months later, FCR sought permission to serve writs of execution for ejectment.  (ECF No. 170.) Judge Meyer granted FCR's request (ECF No. 171), and the Clerk signed the writs on November 10, 2020.  (ECF Nos. 188-192.)  FCR's counsel conveyed the writs to State Marshal Christopher Paoletti for service.  (Aff. of C. Paoletti, Ex. A to ECF No. 193, ¶ 3.)

Marshal Paoletti served the writs on November 18, 2020, but he did not eject anyone.  (*Id.* ¶¶ 4, 14.)  In his affidavit, he explained that when he served the documents on Pastor Moales, the pastor "indicated that all of the Properties were leased and therefore, the tenants were not required to vacate the premises pursuant to the Writs of Execution for Ejectment." (*Id.* ¶ 8; *see also* Joint

Stip., ECF No. 228, ¶ 18.)  In particular, the pastor told Marshal Paoletti that (i) "there is a daycare, school, and two churches renting the 729 Union Avenue Property pursuant to valid leases" (Aff. of C. Paoletti, Ex. A to ECF No. 193, ¶ 9); (ii) "the 1243 Stratford Avenue Property was rented by a church and a business known as Agape Kitchens pursuant to valid leases" (*id.* ¶ 11); (iii) "the 1263-1277 Stratford Avenue Property had been leased to three (3) different businesses and that each one has a valid lease" (*id.* ¶ 12); and (iv) "the 1065 Central Avenue Property and the 851 Central Avenue Property were both leased pursuant to 'rent-to-own' leases." (*Id.* ¶ 10.)  Marshal Paoletti asked Pastor Moales to provide the names of the tenants and copies of the leases, but the pastor either would not or could not provide them.  (*Id.* ¶ 13.)  In light of the claims of valid tenancies, Marshal Paoletti elected not to proceed with the ejections.  (*Id.* ¶ 14.)

FCR then filed the motion that is presently before the Court.  (ECF No. 193.)  As originally presented, the motion sought three forms of relief: FCR sought orders directing PTCLI to "identify any and all tenants at the foreclosed properties;" to "produce copies of any and all lease agreements with respect to the foreclosed properties;" and "in the absence of any legitimate tenants occupying the foreclosed properties, [to] deliver possession."  (*Id.* at 1.)  Although it had not yet seen the purported leases – because Pastor Moales had declined to provide them to Marshal Paoletti – it nonetheless harbored "grave doubts about the legitimacy of any alleged tenants," in part because "the Defendant's assertions that all of the Properties are fully leased are belied by its own filings in [its] bankruptcy case."  (*Id.* at 4, 6.)

PTCLI responded to FCR's motion on December 4, 2020 (ECF No. 200).  It claimed to have "provided Plaintiff's counsel with a list of all tenants at the five properties" – in other words, it claimed that FCR's first request for relief had been complied with and was therefore moot.  (*Id.*) It added that "[w]ith respect to copies of the leases," it was "currently assembling" them "and,

once assembled, will provide the Plaintiff with an opportunity to review such leases at a mutually convenient time and place." (*Id.*)

PTCLI produced five purported leases to FCR on December 10, 2020. (ECF No. 203-1.) The five were (i) an alleged lease of 851 Central[1] by PTCLI to Jenette Holt, dated August 1, 2019 but not signed by either party (*id.* Ex. B); (ii) an alleged lease of 851 Central by PTCLI to Ronald and Donna Reid, dated October 1, 2020 (*id.* Ex. D); (iii) a fragment of an unsigned, purported lease of 729 Union by PTCLI to Kingdom's Little Ones Daycare (*id.* Ex. E); (iv) an alleged lease of 729 Union by PTCLI to Camp Agape Summer Camp, dated July 1, 2020 (*id.* Ex. G); and (v) a purported lease of 729 Union by PTCLI to Cathedral of the Holy Spirit dated February 1, 2018. (*Id.* Ex. H.) On December 18, 2020, PTCLI produced a sixth document – an alleged lease of 1243 Stratford by PTCLI to Agape Soup Kitchen. (ECF No. 208; *see also* Joint Stip, ECF No. 228, ¶ 24.)

With PTCLI claiming to have produced all of its written leases, the parties' attention turned to FCR's third request for relief – the request for an order directing PTCLI to "deliver possession." (ECF No. 193, at 1.) FCR contended that "absent proof of the existence of any tenants with a leasehold interest," it was entitled to an order "compel[ling] the Defendant to immediately vacate all Properties." (*Id.* at 4.) In reply, PTCLI claimed that "[a]ll five of the foreclosed properties are currently rented to individuals and entities separate and apart from" itself. (ECF No. 207, at 2.) And it added that "[e]ven if the Court is not convinced that some or all of the tenants maintain possession under a lawful rental agreement . . . . Connecticut law contemplates that even those

---

[1]    This document is unclear about the property allegedly leased. The "Premises" clause states that PTCLI "demise[d] . . . that certain building . . . located at 851 Central Avenue," but a "Whereas" clause states that Ms. Holt "desire[d] to rent space . . . located at 1065 Central Avenue." (ECF No. 203-1, Ex. B.)   The Court will discuss this lease in more detail in Section III.B.5 *infra.*

without lawful leases may only be dispossessed after service of a notice to quit and the entry of a summary process eviction execution." (*Id.* at 3 (citing Conn. Gen. Stat. § 47a-23(a)(2).)

Observing that the outcome of the motion "depends on fact and law issues that remain disputed by the parties," Judge Meyer referred it to the undersigned. (ECF No. 210.) The Court received an additional round of briefs (ECF No. 215, 217), and the parties entered into a stipulation as to certain undisputed facts. (ECF No. 228.) The Court then held an evidentiary hearing at which seven witnesses testified and forty-eight exhibits were introduced. (ECF No. 229, 229-1.) The parties were offered an opportunity to submit post-hearing briefs (Tr. of Hrg., Feb. 10, 2021, at 255:19-257:24) (hereinafter "Hrg. Tr."), but have not submitted any. The motion is now ripe for decision.

## III.    DISCUSSION

### A.    Applicable Legal Principles

#### 1.    *Rule 70 of the Federal Rules of Civil Procedure*

FCR seeks relief under Rule 70 of the Federal Rules of Civil Procedure, which is entitled "Enforcing a Judgment for a Specific Act." Fed. R. Civ. P. 70. As its name suggests, the rule "provides for the enforcement of the specific terms of a judgment." *Manway Constr. Co. v. Hous. Auth. of City of Hartford*, 711 F.2d 501, 505 (2d Cir. 1983). It "is intended primarily to prevent recalcitrant parties from frustrating court orders for the performance of specific acts." 13 James Wm. Moore et al., *Moore's Federal Practice* ¶ 70.02[1] (3d ed. 1997).

Rule 70 invests district courts with five specific powers. The first such power is found in Rule 70(a), which provides that "[i]f a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified, the court may order the act to be done – at the disobedient party's expense – by another person appointed by the court." Rule 70(b) adds that "[i]f the real . . . property is within

the district, the court – instead of ordering a conveyance – may enter a judgment divesting any party's title and vesting it in others."  Rule 70(c) provides that "[o]n application by a party entitled to performance of an act, the clerk must issue a writ of attachment or sequestration against the disobedient party's property to compel obedience."  Most relevant here, Rule 70(d) states that "[o]n application by a party who obtains a judgment or order for possession, the clerk must issue a writ of execution or assistance."  And finally, Rule 70(e) provides that "[t]he court may also hold the disobedient party in contempt."

The fourth of these five powers – that is, the power to issue writs of execution or assistance – includes the power to order the expulsion of persons occupying foreclosed property.  In *United States v. Bell*, for example, a California federal court explained that since courts must have the power to enforce their own decrees, they necessarily have "the authority" under Rule 70(d) "to enter an order of ejectment" in a foreclosure case.   No. CIV-F95-5346 OWWSMS, 2002 WL 507579, at *4 (E.D. Cal. Feb. 19, 2002); *see also LNV Corp. v. Hook*, No. 14-cv-00955-RM-SKC, 2019 WL 1505871, at *3 (D. Colo. Apr. 5, 2019) (authorizing Clerk of Court to issue "a writ of assistance . . . pursuant to Rule 70 of the Federal Rules of Civil Procedure to compel delivery of possession");  *U.S. v. Capriotti*, No. 1:11-cv-00847-SAB, 2013 WL 1811806, at *3 (E.D. Cal. Apr. 29, 2013) ("A federal district court . . . has the authority to enter an order of ejectment."); *cf. also U.S. v. Real Prop. & Premises Known as 63-39 Trimble Rd., Woodside, N.Y.*, 860 F. Supp. 72, 76 (E.D.N.Y. 1994) (entering an order, pursuant to the All Writs Act, directing the U.S. Marshal "to enter and take possession of the Premises" and "to evict all occupants and their personal property").

In this case, the parties' briefs assume without explanation that a federal court's authority to issue such an order is subject to state laws governing eviction and ejectment.  (*See generally* ECF Nos. 193, 207.)  That conclusion is not quite as obvious as the parties suggest, because on its

face, Rule 70 "does not provide for conformity to state practice."  *Hamilton v. MacDonald*, 503

F.2d 1138, 1148-49 (9th Cir. 1974) (contrasting Rule 69's rules for orders in aid of execution of

money judgments, which expressly "adopt[] state procedures," with "federal remedies to enforce

equitable decrees," which are "available under the terms of Rule 70, without reference to state

practice"); *cf. Brennan v. Nassau Cnty.*, 352 F.3d 60, 63-64 (2d Cir. 2003) (per curiam) (holding

that a motion to enforce a federal district court's equitable decree was not subject to a state-law

statute of limitations defense).  Yet despite this feature of Rule 70, federal courts have generally

declined to consider relevant state-law principles only in federal-question cases. *E.g., Hamilton*,

503 F.2d at 1149 (disregarding state statute in a federal-question case, but observing that it would

"probably appl[y] . . . in a diversity suit, not through operation of the Federal Rules, but because

of the Rules of Decision Act"); *Bergmann v. Mich. State Transp. Comm'n*, 665 F.3d 681, 683-84

(6th Cir. 2011) (declining to follow state law, but noting that it was a "non-diversity case[]").  This

is a diversity case (Am. Compl., ECF No. 25, ¶ 4), and accordingly the availability of FCR's

requested remedy is informed by Connecticut law.

### 2.    Connecticut Law Governing Expulsion of Occupants After Foreclosure

When a mortgagee forecloses on leased property, Connecticut law provides two – and only

two – routes for expelling a genuine tenant.  "A foreclosing mortgagee has two options for

obtaining possession of premises from a tenant." *Tappin v. Homecomings Fin. Network, Inc.*, 265

Conn. 741, 759 (2003) (brackets and ellipsis omitted) (quoting *Fed. Home Loan Mortg. Corp. v.

Van Sickle*, 52 Conn. App. 37, 42 (1999)).  First, it "can name the tenant as a party in the

foreclosure action and obtain a judgment of ejectment pursuant to" Section 49-22 of the General

Statutes.  *Id.* (quoting *Fed. Home Loan Mortg. Corp.*, 52 Conn. App. at 42).  Second, after

obtaining title, it "can proceed with a summary process action pursuant to General Statutes § 47a-

23."  *Id.* (brackets omitted) (quoting *Fed. Home Loan Mortg. Corp.*, 52 Conn. App. at 42).

FCR concedes that these are the only two options for evicting a true tenant. (ECF No. 193, at 5-6.) And it does not claim to have followed either one. (*See generally* ECF Nos. 193, 215.) It argues, however, that the rule of *Tappin* applies only when the occupants of the foreclosed property are "actual, bona fide tenants with leases executed as part of an arms-length transaction." (ECF No. 215, at 2.) It contends that if the occupants are not genuine tenants, they may be ejected without having been parties to this case and without a separate summary process action. (*Id.* at 3-4, 11.)

PTCLI claims that an occupant of foreclosed property does not need to be a tenant to be entitled to the benefit of the *Tappin* rule. Citing Section 47a-23(a)(2) of the General Statutes, it argues that even non-tenants – including, presumably, squatters and other trespassers – cannot be expelled from the premises unless the mortgagee either made them a party to the foreclosure action or obtained an eviction order in a separate summary process proceeding. (ECF No. 207, at 3.) PTCLI reasons that, because the summary process statute encompasses situations in which the "premises . . . is occupied by one who never had a right or privilege to occupy such premises," Conn. Gen. Stat. § 47a-23(a)(2), "even those without lawful leases may only be dispossessed after service of a notice to quit and the entry of a summary process eviction execution." (ECF No. 207, at 3.)

The Court agrees with FCR that an occupant must be a genuine tenant to invoke the *Tappin* rule against a foreclosing mortgagee. While courts have held that Section 47a-23(a)(2) *permits* a summary process action against a person who never had a right to occupy the premises, *e.g., Urban v. Prims*, 35 Conn. Supp. 233, 234 (Super. Ct. 1979), PTCLI has cited no authority for the proposition that such an action is *required* in the mortgage foreclosure context, and indeed the available authorities are to the contrary. In *Nutmeg Financial Holdings, LLC v. 249 River St.,*

*LLC*, for example, a Superior Court granted an application and execution for ejectment upon finding that the occupants of a foreclosed property were not "bona fide tenants" under the Protecting Tenants at Foreclosure Act of 2009.  No. UWY-CV-18-6039241, 67 Conn. L. Rptr. 117, 2018 WL 4656028, at *4 (Conn. Super. Ct. Sept. 11, 2018).  In that court's view, such persons "are subject to summary ejectment as historically provided by General Statutes § 49-22."  *Id.*  And in *Wachovia Bank v. Hennessey*, a Superior Court held that a mortgagor's son could be expelled from a foreclosed property by execution of ejectment, even though he had not been a party to the foreclosure action.  No. HHD-CV-05-4016481, 44 Conn. L. Rptr. 420, 2007 WL 4105504, at *2 (Conn. Super. Ct. Oct. 25, 2007).  Because his possession was "in privity with" his parents' and did "not arise independent of" theirs, he did not have a "tenant['s] . . . separate, legal right of possession" and was therefore not entitled invoke the *Tappin* principle.  *Id.*; *see also Canales v. Bendett & McHugh, P.C.*, No. FBT-CV-17-6065783-S, slip op. (Conn. Super. Ct. Nov. 18, 2017) (rejecting occupant's claim that his eviction must await "an execution order from a summary process case," because he was "not a bona fide tenant" and "defendant's vested title to the Property is not subject to [his] possessory rights"); *Retained Realty, Inc. v. Tsapari*, No. FST-CV-11-6011951-S, slip op. (Conn. Super. Ct. Oct. 23, 2013) (postcard order allowing foreclosing mortgagee to eject mortgagor's child, without summary process action, because there was "no evidence that the child is a tenant"); *cf. Accredited Home Lenders v. Vossbrinck*, No. CV-08-5007144, 2012 WL 5519424, at *8 (Conn. Super. Ct. Oct. 19, 2012) (holding that occupant could only be expelled by summary process, but only after concluding that he had a genuine leasehold interest).

Having thus concluded that only a true tenancy should stand in the way of the relief that FCR seeks, the Court will set forth some principles for determining whether the alleged occupants

of the Properties are genuine tenants of PTCLI.  Fundamentally, a tenant is a person to whom "an estate in real property" has been transferred, "with a reversion in the owner after the expiration of the lease." *Jo-Mark Sand & Gravel Co. v. Pantanella*, 139 Conn. 598, 601 (1953).  The "distinguishing characteristic" of the landlord-tenant relationship "is the surrender of possession by the landlord to the tenant so that he may occupy the land or tenement leased *to the exclusion of the landlord himself.*" *Id.* (emphasis added) (citing *Carroll v. Cooney*, 116 Conn. 112, 115 (1933)); *accord Murphy, Inc. v. Remodeling, Etc., Inc.*, 62 Conn. App. 517, 523 (2001) (same).  In particular, a tenant is distinct from a licensee in that the latter holds only "a mere privilege to act on the land of another," *Woodhouse v. McKee*, 90 Conn. App. 662, 674 (2005) (quoting *Top of the Town, LLC v. Somers Sportsmen's Assn., Inc.*, 69 Conn. App. 839, 845 (2002), whereas the former has received "a conveyance . . . for life, or years, or at will, in consideration of a return of rent or other recompense." *Murphy, Inc.*, 62 Conn. App. at 523 (quoting *Clean Corp. v. Foston*, 33 Conn. App. 197, 203 (1993)); *accord* Conn. Gen. Stat. § 47a-1(*l*) (residential landlord-tenant statute defining "tenant" as "the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others or as is otherwise defined in law").

A landlord-tenant relationship may be created by an oral as well as a written lease, *see* Conn. Gen. Stat. § 47a-1(i), but either way, the parties must agree on the key terms.  "[A] lease is a contract," and "[w]here there has been no meeting of the minds there is no contract." *Welk v. Bidwell*, 136 Conn. 603, 606-07 (1950).  "So long as any essential matters are left open for further consideration, the contract is not complete." *L & R Realty v. Conn. Nat'l Bank*, 53 Conn. App. 524, 535 (1999) (quoting 17A Am. Jur. 2d, Contracts § 32 (1991)); *see also Platt v. Tilcon Conn., Inc.*, No. CV-15-6030654-S, 2018 WL 2600325, at *12 (Conn. Super. Ct. May 14, 2018) ("[T]here was no mutual understanding between the plaintiff and the defendant as to the contracts' terms,

and the amount of rent owed . . . . The court, therefore, concludes that . . . there is no enforceable contract between the plaintiff and the defendant.").

When a corporation leases property under a trade name, the corporation is the tenant – not the trade name. This principle follows ineluctably from the "well settled" proposition that "the use of a fictitious or assumed business name does not create a separate legal entity," and that "d/b/a['s]" and other trade names are "merely descriptive of the person or corporation who does business under some other name." *Bauer v. Pounds*, 61 Conn. App. 29, 36 (2000) (quotation marks omitted) (quoting *Pinkerton's, Inc. v. Super. Ct.*, 49 Cal. App. 4th 1342, 1348 (1996)). As one court put it, "[d]oing business under another name does not create an entity distinct from the person doing the business," and the person and his "d/b/a" therefore "constitute one person under the law." *Trs. of the Mason Tenders, Dist. Council Welfare Fund v. Faulkner*, 484 F. Supp. 2d 254, 257 (S.D.N.Y. 2007).

Applying the foregoing principles to this case, the Court will recommend that FCR's motion be granted with respect to any foreclosed property that is (i) occupied by entities whose "possession" is "in privity with" and does "not arise independent of" PTCLI, including any property "possessed" by any purported entity that is a mere trade name for PTCLI; and (ii) occupied by a mere licensee. Conversely, it will recommend that FCR's motion be denied with respect to properties in the possession of genuine tenants – that is, natural or legal persons who possessed the property to the exclusion of PTCLI itself. The Court will now consider which of the five Properties are occupied by genuine tenants.

### B.     Application of the Foregoing Legal Principles to the Five Properties

#### 1.     *729 Union*

PTCLI claims to have leased 729 Union to four tenants. First, it says that a summer camp, "Camp Agape," "has operated at 729 Union . . . since at least 2016." (ECF No. 207, at 7.) Second,

it says that the "Cathedral of the Holy Spirit" – which it describes as its "adult church," in contrast to the "youth church" at 1243 Stratford (Hrg. Tr., 151:24 – 152:16) – "has operated at 729 Union . . . since 2014." (ECF No. 207, at 7.) Third, it asserts that "Love Christian Academy," "a faith-based private elementary school," "has operated at 729 Union . . . since 2008." (*Id.* at 8.) Fourth and finally, it says that it rented a portion of the building and the associated parking lot to "Kingdom's Little Ones," a day care center. (Def.'s Hrg. Ex. 4.) PTCLI claims to have had written leases with Camp Agape, Cathedral of the Holy Spirit, and Kingdom's Little Ones. (Def.'s Hrg. Exs. 4, 5, 6.) It produced no written lease for Love Christian Academy, and a longtime teacher, Mr. Stanley Arrington, could not testify with certainty that the academy had entered into one. (Hrg. Tr., 94:22-95:1.)

None of these four organizations were separate legal entities at the time of the alleged leases. The Connecticut Secretary of the State's website contains no listing indicating that Camp Agape or Love Christian Academy were ever separately incorporated, let alone incorporated by the dates on which they claim to have leased 729 Union. *See* Office of the Sec'y of State, *Conn. Bus. Registry Search*, www.concord-sots-ct.gov (last visited Apr. 23, 2021);[2] (*see also* Pl.s' Hrg. Exs. 9, 10 (C.O.N.C.O.R.D. printouts demonstrating that searches for "Camp Agape" and "Love Christian Academy" return no results); Def.'s Hrg. Ex. 5 (purported July 1, 2020 lease between PTCLI and Camp Agape).) No witness credibly testified that Camp Agape or Love Christian Academy were ever separate legal persons.[3] And while Cathedral of the Holy Spirit eventually

---

[2]    The Court may take judicial notice of incorporation records from the Secretary of the State's "C.O.N.C.O.R.D." website. *See, e.g., Varricchio v. Chalecki*, No. 3:14-cv-00937 (MPS), 2016 WL 5422046, at *4 (D. Conn. Sept. 28, 2016); *Cayo v. Stop & Shop Supermarket Co.*, No. 3:12-cv-00638 (WWE), 2012 WL 5818862, at *1 (D. Conn. Nov. 15, 2012) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[3]    Camp Agape's director, Ms. Nefertari Kydd, did testify that the camp was "separately incorporated." (Hrg. Tr., 135:12-14.) Yet the Court construes her as saying not that Camp Agape

incorporated as "Cathedral of the Holy Spirit, Inc.," that did not happen until October 6, 2020 –
over two years after it claims to have rented 729 Union from PTCLI.  (*Compare* Def.'s Hrg. Ex. 6
(lease allegedly "made" on the "1st day of February, 2018") *with* Pl.'s Hrg. Ex. 13 (certificate of
incorporation dated Oct. 6, 2020).)  Kingdom's Little Ones similarly incorporated as "Kingdom's
Little Ones, Inc.," but not until October 6, 2020, over nine years after it allegedly rented a portion
of 729 Union.  (*Compare* Def.'s Hrg. Ex. 4 (lease purportedly "made as of this 1st day of February,
in the year 2011") *with* Pl.'s Hrg. Ex. 12 (certificate of incorporation dated Oct. 6, 2020).)  Since
none of these entities were separate legal persons on the relevant dates – but were instead mere
unincorporated programs or ministries – any possessory interest they might claim to have had in
729 Union would have been "in privity with," and "not . . . independent of," the corporation of
which they were a part.  *Wachovia Bank*, 2007 WL 4105504, at *2.

     At the hearing, PTCLI contended for the first time that even if these entities were merely
unincorporated parts of a corporation, some of them were parts of a *different* corporation.  Pastor
Moales testified that PTCLI's founders incorporated a separate entity called "Prayer Tabernacle
Kingdom's Little Ones in Christ, Inc." ("PTKLOICI") in 1999.  (Hrg. Tr., 150:24-151:9; *see also*
Office of the Sec'y of State, *Conn. Bus. Registry Search*, www.concord-sots-ct.gov (last visited
Apr. 23, 2021) (confirming same).)  The pastor asserted that the church conducts all of its activities
"related to education" – the summer camp, the elementary school, the day care, and so forth –

---

was its own corporation, but rather that it was an unincorporated program operating under the aegis
of yet another corporation, Prayer Tabernacle Kingdom's Little Ones in Christ, Inc.  (Hrg. Tr.,
135:16-18 (Camp Agape is "a program underneath" the other corporation).)  The Court will discuss
this contention in more detail below.

     Mr. Arrington speculated that Love Christian Academy had been separately incorporated
"some time ago."  (Hrg. Tr., 91:14-20.)  But he substantially withdrew that claim when presented
with the C.O.N.C.O.R.D. printout on cross-examination.  (Hrg. Tr., 92:18-2) ("I cannot say yes or
no because I was not privy to that actual follow up or things of that nature.").

through the PTKLOICI corporation, not through PTCLI itself.  (Hrg. Tr. at 151:5-9; 183:17-184:20.)  Thus, PTCLI evidently reasons that even if the entities were merely fictitious names rather than separate legal persons – and, therefore, "merely descriptive of the . . . corporation who does business under some other name," *Bauer*, 61 Conn. App. at 36 – those names were descriptive of PTKLOICI, not of PTCLI.   In other words, PTCLI asks the Court to regard the entities' leases not as non-arm's-length transactions between itself and its own unincorporated programs or ministries, but rather as genuine deals in which it rented those buildings to programs or ministries of the separate PTKLOICI corporation for *bona fide* business reasons.  (*Cf.* Hrg. Tr., 163:18-167:5 (testimony of Pastor Moales, contending that leases were part of a business plan to "monetize the square footage of the building"); *cf. also id.* at 100:7-25 (testimony of Kingdom's Little Ones' director, Ms. Kydd, asserting that the day care "is a program ran under an umbrella of" PTKLOICI).)

The undersigned does not credit this claim, because every relevant piece of documentary evidence contradicts it.  In the case of Kingdom's Little Ones, for example, the documents make clear that the operation was part of PTCLI, not PTKLOICI.  When Kingdom's Little Ones applied for a day care license from the State of Connecticut, and when it submitted documents to maintain that license, it repeatedly identified the relevant corporate entity as PTCLI, not PTKLOICI.[4]  (Pl.'s Ex. 45, at Bates pp. 8, 9, 167, 168, 172; *see also* Pl.'s Ex. 32 (State of Connecticut list of day care

---

[4]    Pastor Moales and Director Kydd both contended that some of these documents had been falsified by Kingdom's Little Ones' prior director, Kenya Moales-Byrd.  (Hrg. Tr., 111:8-14, 143:3-13.)  In Pastor Moales' telling, Ms. Moales-Byrd falsified the documents as part of a fraudulent scheme to reassign the center's license to herself and her daughter.  (Hrg. Tr., 143:3-22.)  Yet even if this were true, it would explain only the latest licensing documents.  It would not explain why Kingdom's Little Ones consistently identified itself to the State of Connecticut as a program of PTCLI, not PTKLOICI, as far back as 2006 when it was founded by Pastor Moales' mother, Lady Peggy Moales.  (*See* Pl.'s Hrg. Ex. 45A, at Bates pp. 8-15 (initial 2006 licensing application identifying Kingdom's Little Ones' legal operator as PTCLI, not PTKLOICI).)

centers, listing Kingdom's Little Ones' "legal operator" as PTCLI).)  A parents' handbook, submitted in connection with its license application, stated that "Kingdom's Little One's [sic] Day Care . . . is a ministry of the Prayer Tabernacle Church of Love, Inc." (Pl.'s Hrg. Ex. 45A, at Bates p. 45.)  PTCLI claimed Kingdom's Little Ones' day care income as its own cash receipts on its financial statements, and it listed the day care's furniture, equipment and building improvements as its own assets – not PTKLOICI's.  (*E.g.,* Pl.'s Hrg. Ex. 20, at Bates pp. 15-16; Pl.'s Hrg. Ex. 21, at Bates p. 4-5; Pl.'s Hrg. Ex. 25, at 3-4.)  Similarly, PTCLI claimed Love Christian Academy's income as its own cash receipts, not PTKLOICI's.  (*E.g.*, Pl.'s Hrg. Ex. 23, at 4; Pl.'s Hrg. Ex. 24, at 4; Pl.'s Hrg. Ex. 25, at 4.)  And a State of Connecticut database lists "Prayer Tabernacle Church of Love," not PTKLOICI, as Camp Agape's sponsor.  (Pl.'s Hrg. Ex. 34, at 2.)  In short, the claim that Kingdom's Little Ones, Camp Agape and Love Christian Academy were programs of PTKLOICI rather than PTCLI is not credible in light of the volume of contradictory documentary evidence.

Even if the four entities had been separate legal persons, distinct from PTCLI, there would still be ample reason not to credit their claims of genuine tenancy.  To begin with, the entities' leases are inconsistent with each other.  The Cathedral of the Holy Spirit lease allegedly demises the entire building to the cathedral (Def.'s Hrg. Ex. 6, § 1 (defining the "premises" as the "three-story commercial building located at 729 Union Avenue"), § 6 ("The Premises will be occupied only by" Cathedral of the Holy Spirit)), but the Camp Agape lease purports to demise the entire building to the summer camp.  (Def.'s Hrg. Ex. 5, § 1 (likewise defining the "premises" as the "three-story commercial building located at 729 Union Avenue"), § 6 ("The Premises will be occupied only by" Camp Agape).)  And both of these leases are inconsistent with the Kingdom's Little Ones lease, which purports to demise an 8,500-square-foot portion of the building to that

entity, along with the basement and parking lot.  (Def.'s Hrg. Ex. 4, § 1.)  Moreover, with the exception of an alleged verbal lease to Kingdom's Little Ones, PTCLI did not include any of these agreements in the list of "unexpired leases" that it submitted to the bankruptcy court.[5]  (Pl.'s Ex. 6, at 16.)

In summary, the evidence supports the conclusion that Camp Agape, Cathedral of the Holy Spirit, Kingdom's Little Ones and Love Christian Academy were not separate legal entities, but instead were mere unincorporated programs and ministries of PTCLI, at the time they entered into the alleged lease transactions.  As such, any possessory interests they might have had in 729 Union were "in privity with," and "not . . . independent of," PTCLI's at the time those interests were created.  The rule of *Tappin* is therefore no impediment to ejecting them, and accordingly the undersigned recommends that FCR's motion be granted with respect to 729 Union.

### 2.    *1243 Stratford*

PTCLI claims to have leased 1243 Stratford to the Agape Soup Kitchen.  (ECF No. 207, at 6.)  Agape Soup Kitchen is a PTCLI ministry that "feed[s] and clothe[s] the hungry and the homeless."  (Hrg. Tr., 71:20-21.)  Initially, PTCLI asserted that there was "no written lease" between itself and this ministry.  (ECF No. 207, at 6.)  Later, however, it submitted a purported four-page, five-year, written lease to the Court.  (ECF No. 208 (attaching alleged lease of 1243 Stratford dated January 1, 2018 "for a term of 60 months . . . ending on December 31, 2022").)

---

[5]    At the hearing, Pastor Moales attempted to explain this omission by stating that PTCLI's bankruptcy lawyers had advised him not to list a lease on the schedule unless he "could put [his] actual hands on the actual lease."  (Hrg. Tr., 236:8-11.)  He indicated that PTCLI did not schedule the Camp Agape, Cathedral of the Holy Spirit and Love Christian Academy leases because it had not yet located those documents in its files.  (*See* Hrg. Tr., 236:14-16.)  Yet this claim should not be credited either, because the bankruptcy filing shows that PTCLI knew that it could list a lease arrangement even though it had not located the physical lease document.  (Pl.'s Ex. 6, at 16 (listing two "[v]erbal lease[s]").)

PTCLI's claim collapsed at the hearing.  Agape's director, Mother Mary Williams, testified that the soup kitchen "never had a lease."  (Hrg. Tr., 76:23-25.)  When presented with the purported written lease, she credibly testified that the signature on the fourth page was not hers.  (Hrg. Tr., 79:7-13.)[6]  She added that the soup kitchen did not pay rent, and had never paid rent.  (Hrg. Tr., 74:7-9.)  She also confirmed that the kitchen was never separately incorporated.  (Hrg. Tr., 75:9-13 (soup kitchen was "not incorporated;" "it's a ministry")); *see also* Office of the Sec'y of State, *Conn. Bus. Registry Search*, www.concord-sots-ct.gov (last visited Apr. 23, 2021) (returning no corporate records for Agape Soup Kitchen).  In short, the evidence confirms that Agape Soup Kitchen is not a genuine tenant of PTCLI, and the undersigned will therefore recommend that FCR's motion be granted with respect to 1243 Stratford.

### 3. *1277 Stratford*

PTCLI claims to have leased 1277 Stratford to the "Light Club Youth Team."  (ECF No. 207, at 6.)  It describes Light Club Youth Team as a "youth club and lounge."  (*Id.*)  PTCLI "provided no lease as to this tenant because there is no written lease" (*id.*), but it attempted to prove the club's tenancy with Defendant's Hearing Exhibit 10, a collection of Internet advertisements listing the club's address as 1277 Stratford.  It also presented hearing testimony from the club's founder, Mr. Richard Gage.

---

[6]    Mother Williams has been a member of Prayer Tabernacle Church for fifty years, and has been running its soup kitchen for over thirty years.  (Hrg. Tr., 72:22, 73:11.)  She is a trustee of the church, and in that capacity she signed two corporate resolutions in the summer of 2020.  (Pl.'s Hrg. Exs. 7, 8.)  The signatures on the corporate resolutions are obviously different from the signature that appears on the purported lease.  (*Compare id with* ECF No. 208, at 5.)  At the hearing, FCR's counsel placed the two resolutions and the purported lease before Mother Williams, and asked her if the signature on the latter was hers.  She testified that it was "not [her] handwriting."  (Hrg. Tr., 79:13.)  The Court found Mother Williams to be entirely credible, and it is therefore constrained to conclude that someone forged her name to the purported lease.

Mr. Gage is an electrician whose company, I-Wire LLC, installed the low-voltage wiring at 729 Union. (Hrg. Tr., 57:2-20.) He is also Pastor Moales' best friend. (Hrg. Tr., 157:17.) Mr. Gage founded Light Club as an organization for "young people," "to help get them off the street." (Hrg. Tr., 49:7-13.) And since he is a tradesman himself, his organization strives to help young people "learn . . . a little bit of a trade." (Hrg. Tr., 49:11-14.)

PTCLI has not fully paid I-Wire for all of its work on 729 Union, so Mr. Gage "worked out a deal" permitting him to use the church's building at 1277 Stratford. (Hrg. Tr., 51:5-10.) For the past "two and a half years or so," he has used 1277 Stratford to "house all [his electrician] materials and things of that nature." (Hrg. Tr, 51:5-24.) And in early 2020, he used the building for three Light Club events. (Hrg. Tr., 68:3-69:2; *see also* Def.'s Ex. 10.)

The evidence establishes that Light Club and Mr. Gage had, at most, a license to use 1277 Stratford. No evidence establishes that Light Club or Mr. Gage were genuine tenants, a tenant being distinguished from a licensee principally by the right to exclude the landlord from the premises. *See Jo-Mark Sand & Gravel Co.*, 139 Conn. at 601. Mr. Gage testified that he "was able to use the building," and "house[d] up [his] gear" there. (Hrg. Tr, 50:1-5.) He explained that PTCLI "allow[ed him] to use the space. And . . . all [his] electrical tools and things of that nature are in the building." (Hrg. Tr. at 50:21-51:1.) He summed up his deal with PTCLI as: "So basically I was like let me just use the property." (Hrg. Tr. at 60:7-13.) And although his testimony differed from Mr. Gage's in some respects, Pastor Moales essentially agreed that the deal was for use of the building; he did not testify that Mr. Gage or Light Club had exclusive possession. The pastor described the deal as: "We'll allow you to use the building and facility in order for you to do all that you're doing." (Hrg. Tr. at 157:8-11.)

Moreover, the Light Club-PTCLI "deal" was too indefinite to qualify as a genuine tenancy. As noted in Section III.A *supra*, a lease is not formed unless and until the parties have agreed on the key terms, including the rent to be paid. *See L & R Realty*, 53 Conn. App. at 535 ("So long as any essential matters are left open for further consideration, the contract is not complete."); *Platt*, 2018 WL 2600325, at *12 (holding that the parties did not have an enforceable contract because there was "no mutual understanding . . . as to the contracts' terms, and the amount of rent owed"). In this case, Mr. Gage testified that PTCLI permitted him to use 1277 Stratford because it had not fully paid him for his wiring work at 729 Union. (*See* Hrg. Tr., 59:13-17 ("And I just said, hey, can I use this property, hey, can I do that. Because . . . they just didn't have the finances to finish paying me.").) But he did not state the amount, if any, by which his use of 1277 Stratford would reduce PTCLI's debt, evidently because he had long since concluded that he would not be able to collect on it. (Hrg. Tr., 59:9-12 (explaining that he had not kept "clear records" of his work at 729 Union, and therefore "never expected to finalize on these payments"); 60:14-24 (adding that he never pursued collection because "[a] lot of other contractors were going after" PTCLI and he "really didn't have a paperwork contract to begin with").)[7] Because no evidence established that Light Club or Mr. Gage was a genuine tenant, as opposed to a licensee, the undersigned recommends that FCR's motion be granted with respect to 1277 Stratford.

---

[7]     Pastor Moales testified to a "gentleman's agreement," in which PTCLI allowed Mr. Gage to use 1277 Stratford as "somewhere to house [his] electrical equipment, somewhere to do work," in return for a $1,000-per-month reduction in the church's debt for electrical work. (Hrg. Tr., 157:22-158:7.) But he also characterized this "agreement" as a "friendly jest or joke" (Hrg. Tr., 158:1-2), and neither he nor Mr. Gage testified that it was a definite deal. Moreover, PTCLI failed to disclose any such deal in its schedule of executory contracts and leases in its bankruptcy case. (Pl.'s Hrg. Ex. 6, at 16.)

###### 4.    *851 Central*

PTCLI claims to have leased 851 Central to Ronald and Donna Reid.  (ECF No. 207, at 5.)
It produced a written lease at the hearing (Def.'s Ex. 2), but that lease is dated October 1, 2020,
and PTCLI acknowledges that it was entered into "after title transferred to the Plaintiff under this
foreclosure action."  (ECF No. 207, at 5.)  It nevertheless claims that the Reids are genuine tenants
entitled to the protection of the *Tappin* rule because, prior to the date on which title passed to FCR,
they "possess[ed]" 851 Central pursuant to an agreement to "perform[] renovations at the property
in lieu of rent."  (*Id.*)  FCR calls these claims "convenient," and in its brief it challenged the Reids
to "provide testimony as to the nature" of their pre-foreclosure interest in 851 Central at an
evidentiary hearing.  (ECF No. 215, at 13.)

Mrs. Reid testified under oath at the hearing, and her testimony supported PTCLI's claims.
She explained that she and her husband reached an oral agreement with Pastor Moales to rent 851
Central for $1,000 per month beginning in March, 2020 (Hrg. Tr., 32:14-20, 34:21-35:9), and she
added that they paid a $1,000 security deposit at that time.  (Hrg. Tr., 44:2-13.)  She related that
her husband "put down new floors on both the first and the second floor," "painted," and
"remodeled the bathrooms . . . on the first and second floor" (Hrg. Tr., 29:3-7), and that PTCLI
treated his labor as an "even exchange" for the rent that otherwise would have been due for the
period from April to September, 2020.  (Hrg. Tr., 36:6-14; *see also* Hrg. Tr., 30:5-6 ("The labor
was basically the payment.").)  She further testified that she and her husband paid the utility bills
for the property (Hrg. Tr., 32:21-22), and PTCLI entered into evidence a United Illuminating bill
addressed to her.  (Def.'s Ex. 8.)

FCR is not without its reasons for being suspicious of Ms. Reid's testimony and of PTCLI's
claims about 851 Central.  PTCLI did not mention any lease of that property in its bankruptcy
filings (Pl.'s Ex. 6, at 16), and the claim of a pre-foreclosure oral lease was indeed curiously late

in surfacing.  And the document that most credibly links the Reids to the property – the United Illuminating bill – is dated December 18, 2020 and therefore arguably says nothing about their tenancy before the date on which title and possession passed to FCR.  (Def.'s Ex. 8.)  Moreover, in an April 15, 2021 deficiency judgment hearing, PTCLI's appraisal expert testified that 851 Central looked "vacant" at the time of his inspection on March 30, 2021, only halfway through the term of the Reids' purported one-year written lease.  (Def.'s Ex. 2, § 4 ("This Lease will be for a term of 12 months beginning October 1, 2020 and ending on October 31, 2021.").

In forming its recommendation about 851 Central, the Court finds *Accredited Home Lenders v. Vossbrinck* instructive.  In *Accredited Home Lenders*, the mortgagor, Vossbrinck, bitterly opposed the mortgagee's foreclosure efforts for over four years.  2012 WL 5519424, at *1. After a judgment of strict foreclosure, an appeal to the Appellate Court, the dismissal of that appeal, and service of a writ of ejectment, an individual named Kozlovich suddenly appeared in the case and claimed to have a leasehold interest in the foreclosed property.  *Id.*  Kozlovich's claims were deeply suspicious, and not only because of their curious timing.  Among other reasons, he had served as Vossbrinck's paralegal throughout the case; he claimed to have paid for his tenancy with "bartered . . . services in lieu of rental payments"; and he had never registered his cars to the address that he claimed to have rented.  *Id.* at *2.  Nevertheless, the court declined to eject him and held that he could be expelled only through summary process.  *Id.* at *8.  In the court's view, the preponderance of the evidence compelled that result because Kozlovich had testified to his rental arrangements under oath and "ha[d] resided at the property for well over one year at the time of the ejectment."  *Id.* at *3.  And the court found it important that, while the mortgagee had raised a "substantial inference of collusion to thwart the plaintiff's right to

23

possession," ultimately there was "insufficient evidence presented to *prove* collusion between Kozlovich" and the mortgagor, Vossbrinck. *Id.* at *3, 8 (emphasis added).

In this case, as in *Accredited Home Lenders*, the person claiming to be a tenant came to court and testified under oath to a rental arrangement that pre-dated the mortgagee's acquisition of title and possession by several months. And while FCR has called the Court's attention to several suspicious circumstances surrounding that arrangement, it has not proven genuine collusion between the Reids and PTCLI. Given the drastic consequences to the Reids of granting FCR's motion – the potential loss of a home on ten days' notice – the Court is disinclined to regard Ms. Reid's sworn testimony as outweighed by FCR's suspicions. The undersigned therefore recommends that FCR's motion be denied with respect to 851 Central.

### 5.    *1065 Central*

PTCLI claims to have leased 1065 Central to Jenette Holt (ECF No. 207, at 5), but as with 851 Central and the Reids, FCR suspects that this lease is a contrivance. (*See* ECF No. 215, at 11-13.) It points out that the lease document has "numerous internal inconsistencies," including: (i) the leased premises are identified as 1065 Central in the second "whereas" paragraph, but as 851 Central in the "Premises" article; (ii) the signature block has no space for Ms. Holt to sign, but does have a space for the Cathedral of the Holy Spirit to sign, leaving it unclear "if the lease is between the Defendant and Jenette Holt of between the Defendant and" the cathedral; and (iii) the lease purports to run through July 31, 2021, contradicting PTCLI's earlier claim that it "expired on July 31, 2020." (*Id.* (citing ECF No. 207, at 5).) It therefore challenged Ms. Holt to come forward with "live testimony . . . regarding the legitimacy of this residential lease." (*Id.* at 13.)

Ms. Holt testified at the hearing, and like Ms. Reid, her testimony supported PTCLI's claims. She testified under oath that she lives at 1065 Central, paying $500 per month in rent to the "Prayer Tabernacle Church." (Hrg. Tr., 8:9-24.) She explained that she had been living there

for "about a year" (*id.* 8:25-9:2), well before the date on which title and possession passed to FCR. She receives her mail at 1065 Central, and indeed PTCLI placed into the record a medical billing statement that had been addressed to her there. (Def.'s Hrg. Ex. 7; Hrg. Tr., 9:9-10:2.)

As with 851 Central, FCR is not without its reasons for being suspicious of this lease. The lease document itself does indeed incorporate a number of inconsistencies, and had Ms. Holt not given clear testimony on the essential terms of her deal with PTCLI, the document alone would likely fail to sustain PTCLI's claim. And the Court is given pause by the fact that Ms. Holt voted in her former hometown of Norwalk in the November, 2020 election. (Hrg. Tr., 22:17-23:7.) With that said, the Court also notes that PTCLI did disclose a lease of 1065 Central in its bankruptcy filing. (Pl.'s Hrg. Ex. 6, at 16.)[8] That, coupled with her sworn testimony, causes the Court to regard the weight of the evidence as supporting her genuine tenancy prior to August 6, 2020. The undersigned therefore recommends that FCR's motion be denied with respect to 1065 Central.

## IV.   CONCLUSION AND RECOMMENDATIONS

For the foregoing reasons, I respectfully recommend to Judge Meyer that the motion of the plaintiff, Foundation Capital Resources, Inc., for an order in aid of execution pursuant to Fed. R. Civ. P. 70 (ECF No. 193) be **GRANTED IN PART AND DENIED IN PART** – granted with respect to 729 Union, 1243 Stratford and 1277 Stratford, but denied with respect to 851 Central and 1065 Central.

This is a recommended ruling pursuant to 28 U.S.C. § 636(b)(3). *See LoSacco v. City of Middletown*, 71 F.3d 88, 91 (2d Cir. 1995) (holding that a Magistrate Judge's authority to finally

---

[8]      To be sure, PTCLI identified 1065 Central as being leased to "Naiomi [sic] Ministries" for $2,000 a month, rather than to Ms. Holt for $500 a month. (Pl.'s Hrg. Ex. 6, at 16.) But Ms. Holt explained that she shared 1065 Central with "four other ladies" (Hrg. Tr., 18:23-25), and Pastor Moales explained that the church refers to 1065 Central as a "Naomi house," "which was a boarding house for just women." (*Id.* 155:16-21.)

determine a motion under 28 U.S.C. § 636(b)(1) is limited to "'pretrial' matter[s]," and that post-trial matters referred to a magistrate judge are "'not subject to final determination by'" him) (quoting *Massey v. City of Ferndale*, 7 F.3d 506, 509-10 (6th Cir. 1993)).  Pursuant to Rule 72.2(a) of the Local Rules for Magistrate Judges, if any party wishes to object to the recommendation, it must file that objection within fourteen days.  "A party may not thereafter assign as error a defect in the Magistrate Judge's order to which objection was not timely made."  *Id.*

*/s/ Thomas O. Farrish*
Thomas O. Farrish, USMJ
