## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FOUNDATION CAPITAL RESOURCES, INC., | Civ. No. 3:17-cv-00135 (JAM) |
| *Plaintiff,* | |
| v. | |
| PRAYER TABERNACLE CHURCH OF LOVE, INC., | September 2, 2021 |
| *Defendant.* | |

## REPORT AND RECOMMENDATION ON
## PLAINTIFF'S MOTION FOR DEFICIENCY JUDGMENT [ECF No. 162]

**I.    INTRODUCTION**

This is a commercial real estate foreclosure case in which the plaintiff, Foundation Capital Resources, Inc. ("FCR"), obtained a judgment of strict foreclosure and order of possession with respect to several Bridgeport properties formerly owned by the defendant, Prayer Tabernacle Church of Love, Inc. ("PTCLI").  (ECF No. 156.)  FCR has moved for a deficiency judgment, contending that the value of the foreclosed properties satisfies barely a third of PTCLI's debt.  (ECF No. 162.)  PTCLI does not dispute that a significant deficiency exists, but it argues that the shortfall is not as large as FCR claims.

The presiding District Judge, the Hon. Jeffrey A. Meyer, referred FCR's motion to me, Magistrate Judge Thomas O. Farrish.  (ECF No. 233.)  I have considered the parties' written submissions, along with the testimony given and exhibits introduced at an evidentiary hearing. For the reasons discussed below, and as detailed more fully in Section IV, I recommend that FCR's

motion be granted and that a deficiency judgment enter in its favor in the amount of **$9,056,859.98**,

plus interest of $42.18 per day from August 6, 2020 to the date of the judgment.

## II.    FACTUAL BACKGROUND

I assume the reader's familiarity with the long history of this case, and will set forth only

those background facts necessary to explain the basis for my recommendation.  FCR "is a real

estate investment trust, affiliated with the Assemblies of God, that lent millions of dollars to

[PTCLI] for a major church construction project in Bridgeport, Connecticut."  (Findings of Fact

& Conclusions of Law, ECF No. 144, at 1.)  The loans were secured by mortgages on five buildings

and fifteen parcels of land.  (*See* Judgment & Order of Strict Foreclosure with Order of Law Days,

ECF No. 156, at 1-2) (together, the "Properties").  Throughout the case, the parties have used the

street addresses of the buildings as shorthand terms for both the buildings themselves and the

various parcels associated with them.  Adopting their convention, I will use the following terms to

refer to the following buildings and parcels:

- "729 Union" will refer to the large, modern cathedral building that was the subject of the FCR-financed construction project, together with the following parcels of land:  729 Union Avenue, 715 Union Avenue, 685-695 Union Avenue, 1062-1074 Central Avenue, 1054-1056 Central Avenue, 1044-1046 Central Avenue, and 316 Deacon Street;

- "1243 Stratford" will refer to PTCLI's original, 121-year-old brownstone church building, along with the parcels of land at 1209-1211 Stratford Avenue, 1221 Stratford Avenue, and 1231-1243 Stratford Avenue;

- "1277 Stratford" will refer to the low-rise, brick-faced commercial building at 1277 Stratford Avenue, together with the parcels at 1259-1263 Stratford Avenue, 1273 Stratford Avenue, and 852 Central Avenue;

- "851 Central" will refer to the residence and parcel of land at 851 Central Avenue; and

- "1065 Central" will refer to the residence and parcel of land at 1065-1081 Central Avenue.

(*See, e.g.,* Aff. of G. Shawah, ECF No. 30; Joint Stipulation, ECF No. 228, ¶ 1.)

PTCLI defaulted on its loans, and FCR filed this federal diversity lawsuit to foreclose. (Findings of Facts and Conclusions of Law, ECF No. 144, at 1.)  After three years of litigation and a four-day bench trial, Judge Meyer entered a judgment of strict foreclosure in FCR's favor on May 29, 2020.  (Judgment and Order of Strict Foreclosure with Order of Law Days, ECF No. 156.) He calculated PTCLI's debt at $15,045.430.74, and after attorneys' fees, costs, and appraisal fees, the total judgment came to $15,543,292.48.  (*Id.*)  For purposes of entering the judgment of strict foreclosure, he reckoned the fair market value of the Properties at $5,405,000.  (*Id.*)

Judge Meyer set PTCLI's law day for July 8, 2020.  (*Id.*).  PTCLI filed for bankruptcy on June 26, 2020 (Notice of Filing, ECF No. 158), and its case was still pending when the law day arrived, so title did not pass on July 8th.  But the Bankruptcy Court dismissed PTCLI's case shortly thereafter (Order, *In re Prayer Tabernacle Church of Love, Inc.*, ECF No. 61, No. 20-50606 (Bankr. D. Conn. July 17, 2020)), and Judge Meyer reset the law day for August 5, 2020.  (Order Granting Mot. to Reset Law Days, ECF No. 161.)  When that date went by without a redemption, title and rights of possession passed to FCR on August 6, 2020.  (*See* Judgment and Order of Strict Foreclosure with Order of Law Days, ECF No. 156, at 2; Order Granting Mot. to Reset Law Days, ECF No. 161; Joint Stipulation, ECF No. 228, ¶ 16.)

FCR then filed a motion for a deficiency judgment.  (ECF No. 162.)  In its motion, it contended that PTCLI's debt had grown from $15,543,292.48 to $15,578,931.79 on account of additional interest and attorneys' fees.  (ECF Nos. 162, 162-1.)  Subtracting the $5,405,000 figure that Judge Meyer had used for the market value of the Properties – because, in FCR's view, the value had "remain[ed] unchanged since that time" – FCR sought a deficiency judgment in the amount of $10,173,931.79.  (*Id.*)

While the motion was pending, another dispute arose between the parties. FCR had attempted to take possession of the Properties, but PTCLI resisted, claiming that all five were "leased . . . [to] tenants [who] were not required to vacate." (*See discussion*, ECF No. 245, at 4-5.) Months of additional litigation ensued, including multiple court conferences, rounds of additional briefing, and a day-long evidentiary hearing. (*See generally id.*) In an effort to recover the attorneys' fees that it incurred in litigating that dispute – and also to recover municipal sewer use fees that had accumulated in the meantime – FCR filed an "updated calculation of deficiency judgment," increasing its total claim to $15,717,650.37. (ECF No. 241; *see also* Pl.'s Hrg. Ex. 20 (attorney fee affidavit with supporting bills).) After subtracting $5,405,000 for the market value of the five Properties, FCR now sought a deficiency judgment in the amount of $10,312,650.37. (ECF No. 241, at 2.)

Judge Meyer referred FCR's motion to me (ECF No. 233), and I held a deficiency judgment hearing. With no objections from either party, I admitted all twenty of the documentary exhibits offered by FCR, and all ten of the exhibits offered by PTCLI. (Tr. of Deficiency J. Hrg., ECF No. 249, at 4-5) (hereinafter "Hrg. Tr."). FCR then presented testimony from a commercial real estate appraiser, George M. Shawah, Jr., about the market value of 729 Union, 1243 Stratford and 1277 Stratford, and from a residential appraiser, Daniel Conte, on the value of 851 Central and 1065 Central. (*Id.* at 14-91.) PTCLI presented testimony from its commercial appraiser, Raymond Miller, and from a residential appraiser named Elliot Morales. (*Id.* at 93-140.) PTCLI's CEO, Pastor Kenneth Moales, also testified on its behalf. (*Id.* at 141-56.)

The witnesses' testimony will be discussed in detail in Section III below, but some aspects deserve to be mentioned at the outset. First, all four appraisers used the "direct sales comparison approach" in evaluating the five Properties, eschewing the "cost-new-less-depreciation" or

"income" approaches to valuation.[1]  (*See* discussion, Section III *infra.*)  The hearing therefore included testimony on whose "comparables" were more truly comparable.  Second, neither party's appraisers could provide firsthand testimony about the condition of the Properties on the date when title passed to FCR.  For their part, FCR's witnesses appraised each Property twice – one in 2016 and again in 2020 – but PTCLI did not grant them interior access the second time; thus, through no fault of their own, they lacked firsthand information on any changes to the interior condition of the property over the intervening four years.  (*See id.*)  As will be shown, however, PTCLI did improve several of the Properties in the meantime, and even kept making improvements after title passed to FCR.  On the other hand, PTCLI's appraisers did not inspect the Properties until months after the passage of title.  (*See id.*)  Particularly in the case of the two residential properties, they could not say which improvements had and had not been performed by August 6, 2020.  In summary, FCR's appraisers' impressions of the interior condition on the Properties were formed in 2016, and PTCLI's appraisers' impressions of both the interior and exterior condition were formed months after title passed.

As noted, FCR's motion sought not only to establish the value of the Properties, but also to adjust the value of its top line claim upward to reflect additional attorneys' fees, interest, and sewer use fees.  To that end, it entered into evidence its legal bills for the period June 28, 2020 to February 22, 2021.  (Pl.'s Hrg. Ex. 20.)  It also submitted sewer use invoices for 729 Union and 1243 Stratford through April 25, 2021.  (Pl.'s Hrg. Ex. 15 (729 Union), 16 (1243 Stratford).)

PTCLI objected to the temporal scope of FCR's claims for sewer use fees and additional interest.  It acknowledged that FCR could recover "[a]ttorneys' fees . . . through [the date of the

---

[1]    As will be discussed, Mr. Shawah used a hybrid cost/sales approach in an earlier appraisal of 729 Union, but he used the direct sales comparison approach exclusively when evaluating it in 2020.  (*See* discussion, Section III.B.1 *infra.*)

deficiency judgment hearing]," but argued that "everything else" – including sewer use fees – "should be through the date of title pass." (Hrg. Tr. at 9:22-10:4.) In a post-hearing submission, FCR conceded that "it is standard practice to include only those unpaid expenses associated with a foreclosed property," such as "utilities," "through the date that title vests in the" foreclosing mortgagee. (Pl.'s Mot. to Supplement Record, ECF No. 243, at 2.) While it asked the Court to depart from the "standard practice" in this case – because PTCLI had refused to surrender possession and, therefore, had been the one who had been using the sewer services – it nevertheless submitted amended exhibits showing the sewer use fees for 729 Union and 1243 Stratford only through August 2020. (*Id.*)

In contrast to the sewer bills, PTCLI did not object to FCR's attorney fee submission. Its counsel did not "dispute the accuracy contained in the exhibits" (Hrg. Tr. at 158:17-19), and he did not "suggest that any of the work was done that shouldn't have been done." (*Id.* at 159:14-18.) Yet because exhibit had been disclosed only the day before, the Court allowed PTCLI additional time to review FCR's claim for attorneys' fees and submit any objections in the form of a post-hearing brief. (*Id.* at 159:23-161:5.) PTCLI did not submit an objection, however, and accordingly the record is closed and FCR's motion is ripe for decision.

## III. DISCUSSION

### A. Applicable Legal Principles

When a mortgagee successfully forecloses on a property, it may "file a motion seeking a deficiency judgment." Conn. Gen. Stat. § 49-14(a). Once it does so, the court then schedules and conducts an evidentiary hearing, at which it "hear[s] the evidence" and "establish[es] a valuation for the mortgaged property." *Id.* The deficiency judgment statute provides that, at or after the

hearing, the court "shall render judgment for the plaintiff for the difference, if any, between such valuation and the plaintiff's claim." *Id.*

In a deficiency judgment proceeding, the relevant value is the value of the foreclosed property on the date that title vested in the foreclosing mortgagee. *Citicorp Mortg., Inc. v. Weinstein*, 52 Conn. App. 348, 352 (1999) ("The deficiency hearing concerns the fair market value of the subject property as of the date title vests in the foreclosing plaintiff."). The burden of proving the value of the property on the date that title passed rests with the party seeking the deficiency judgment. *Eichman v. J & J Bldg. Co., Inc.*, 216 Conn. 443, 445 (1990) ("We hold that implicit in General Statutes § 49-14 is the requirement that the party seeking a deficiency judgment satisfy her burden of proof regarding the fair market value of the property as of the date title vests in her.").

In determining the property's value, the court is typically aided by testimony from expert appraisers. *Brownstein v. Spilke,* 117 Conn. App. 761, 766 (2009) ("In a deficiency judgment proceeding, the determination of a property's value by a court is . . . aided ordinarily by the opinions of expert witnesses.") (brackets and quotation marks omitted). But this does not mean that a deficiency proceeding is a form of "baseball arbitration," in which the court must choose one of the two figures proffered by the parties' experts. To the contrary, the court may consider the experts' opinions "in light of all the circumstances in evidence bearing upon value and its own general knowledge of the elements going to establish it," and may assess "the credibility of the expert witnesses and the weight to be accorded their testimony." *Id.* Put differently, the court is "not bound by the opinion of the expert witnesses," but instead is "privileged to adopt whatever testimony [it] reasonably believes to be credible." *Id.*

Applying these principles, courts often value foreclosed properties at amounts other than those advanced by the parties' experts. In *United of Omaha Life Insurance Co. v. Connecticut Student Loan Foundation*, for example, Judge Smith valued foreclosed property at $4,800,000 even though the plaintiff's and defendant's experts had evaluated it at $2,925,000 and $5,315,000, respectively. 718 F. Supp. 2d 277, 280-85 (D. Conn. 2010). And in *Wells Fargo Bank, N.A. v. High Street Properties, LLC*, Judge Tanzer evaluated a foreclosed building at $550,222.22, even though the appraisers had contended for figures of $480,000 and $650,000. No. CV-10-6007880-S, 2013 WL 5614447, at *1-3 (Conn. Super. Ct. Sept. 17, 2013), *aff'd*, 153 Conn. App. 908 (2014). As the Connecticut Supreme Court has noted, "[w]hen confronted with conflicting evidence as to valuation, the trier may properly conclude that under all the circumstances a compromise figure most accurately reflects fair market value." *New Haven Sav. Bank v. W. Haven Sound Dev.*, 190 Conn. 60, 70 (1983); *accord F.D.I.C. v. 272 Post Rd. Assocs.*, No. 5:91-cv-433 (TFGD) (FOE), 1994 WL 902825, at *7 (D. Conn. Apr. 14, 1994) ("The trier of fact possesses the power to set the value of the property at a compromise figure between competing appraisers.").

Because the purpose of a deficiency judgment hearing is to "establish a valuation for the mortgaged property," Conn. Gen. Stat. § 49-14(a), the court does not ordinarily entertain new evidence about the amount of the mortgagor's debt. In other words, in determining the "difference, if any, between such valuation and the plaintiff's claim," *id.*, the court typically only concerns itself with the bottom number in the subtraction operation – the value of the property – and does not revisit the top number, the amount of the debt as established by the foreclosure judgment. At a deficiency hearing, the court "presumes" the top number "and merely provides for a hearing on the value of the property." *First Bank v. Simpson*, 199 Conn. 368, 373 (1986); *accord United of Omaha Life Ins. Co.*, 718 F. Supp. 2d at 279. "[T]he judgment of foreclosure has already

determined that a debt is owed and the amount of that debt," and "[t]hose issues are not relitigated in the deficiency hearing." *F.D.I.C. v. Voll*, 38 Conn. App. 198, 209-10 (1995). For this reason, claims or defenses that "could have been raised during the foreclosure proceedings may not be raised at the deficiency hearing." *Id.* at 211.

Although a layperson might construe this principle as preventing the foreclosing mortgagee from recovering attorneys' fees and other costs that it incurred while pursuing a deficiency judgment – because to seek such fees and costs is arguably to seek an adjustment in the "top number" in a proceeding directed only at the "bottom number" – courts have held that the mortgagee may do so for certain limited purposes. In *City Savings Bank of Bridgeport v. Miko*, for example, the Connecticut Appellate Court held that a foreclosing mortgagee could obtain an award of attorneys' fees in a deficiency judgment proceeding, so long as the note made the mortgagor liable for such fees, because "attorneys' fees for [a deficiency judgment] proceeding are merely a continuation of the collection process whether it be deemed a proceeding for the collection of the debt or part of the foreclosure of the mortgage or both." 1 Conn. App. 30, 36-37 (1983). Courts have also adjusted the top number upward to reflect interest that accumulated on the deficiency from the date that title passed to the date of the deficiency judgment. *E.g., Wells Fargo Bank,* 2013 WL 5614447, at *3. And courts have also allowed a foreclosing mortgagee to "tack onto the mortgage debt" sums that it advanced to "preserve[] against loss or diminution in value," such as real estate taxes and property insurance premiums, *Desiderio v. Iadonisi*, 115 Conn. 652, 163 A. 254, 255  (1932), but typically only through the date that title passed. *See Am. Mortg. Corp. v. Hope*, 41 Conn. App. 324, 331 (1996) (stating that "the only allowable deductions from [the value of the property] are for prior encumbrances in effect on the date title vests" and, therefore expenses incurred after title passes are not properly chargeable to the mortgagor).

I will say more about FCR's claims for attorneys' fees, interest, and sewer fees in Section III.C below. First, however, I will discuss the value of the Properties.

## B.    The Value of the Properties

### 1.    *729 Union*

The property that the parties refer to as 729 Union includes seven parcels of land. (*See* Site Map, Def.'s Hrg. Ex. 1.) Six of the parcels are contiguous, but the seventh – a parking lot at 316 Deacon Street – is separated from the other six by the residence at 1065 Central. The six contiguous parcels are occupied by the large, modern cathedral building that was the subject of the FCR-financed construction project. (*Id.*)

FCR presented testimony about the value of 729 Union from George M. Shawah, Jr. (Hrg. Tr. at 20-39.) Mr. Shawah is a real estate appraiser and broker who works for the Bridgeport firm of Baldwin Pearson & Co. (*Id.* at 14:20-25.) He is the president of the company, and he has worked there for 39 years. (*Id.* at 15:1-5.) He holds a bachelor's degree in business from Muhlenberg College, and he is licensed and certified as a real estate appraiser in the State of Connecticut. (*Id.* at 15:13-17.) Mr. Shawah holds the MAI designation from the Appraisal Institute, which he characterizes as "the highest level of designation for commercial and industrial appraisers in the United States of America." (*Id.* at 15:22-25.) He has completed thousands of appraisals in his career of nearly forty years, all of them in Connecticut and most of them in New Haven and Fairfield Counties. (*Id.* at 17:7-15.)

In his appraisal report, Mr. Shawah explained three principal approaches that appraisers use when valuing commercial real estate. (Pl.'s Hrg. Ex. 2, at 23-25.) In the first approach – the "cost approach" – the appraiser determines the "cost new of the improvements" on the land, deducts "accrued depreciation," and then adds the depreciated value of the improvements to the

land value to arrive at "the value of the whole property." (Pl.'s Hrg. Ex. 2, at 23.) The second approach is called the "income approach." (*Id.* at 24.) This method "is predicated on the assumption that there is a definite relationship between the income or money a property will generate and its value," and it uses "capitalization" and "discounted cash flow" techniques for "converting net income into value." (*Id.*) The third approach is the "direct sales comparison approach," under which "the appraiser gathers [sales] data on comparable properties, analyzes the nature and condition of each sale, and then makes appropriate adjustments for dissimilar characteristics such as time, size, location, zone and condition." (*Id.* at 25.) "Once these adjustments are made, the value is reduced into a common unit of comparison such as price per square foot." (*Id.*) This adjusted per-square-foot price is then applied to the property being appraised in order to estimate its market value. (*See id.*)

Mr. Shawah first appraised 729 Union in 2016. (Hrg. Tr. at 20:9-11.) In the course of that appraisal, he inspected both the interior and the exterior of the cathedral building. (*Id.* at 21:5-7.) He concluded that the cathedral had been built with "high quality construction" (Pl.'s Hrg. Ex. 1, at 40), and he noted many high-end features, including "custom lighting, skylights, and sound systems," a "granite covered foyer," and a "grand atrium." (*Id.* at 17-18, 40.) Yet he also observed "roof leaks in many areas of the building." (*Id.* at 19; *see also* Hrg. Tr. at 22:9-16.) He therefore considered the building's overall condition to be only "average." (*Id.* at 22:9-11.)

After his inspection, Mr. Shawah completed a report in which he appraised the fair market value of 729 Union at $5,000,000. (Pl.'s Hrg. Ex. 1, at 40.) He reached this figure using both the cost and direct sales comparison approaches, with the former method suggesting a value of $5,580,000 while the latter indicated a value of $4,350,000. (*Id.* at 25-30 (cost approach) and 31-

39 (direct sales comparison approach).)[2]  Placing more weight on the cost approach – because, among other reasons, he had been unable to find any suitable comparators in the Bridgeport market – he opined that "the Market Value of the Fee Simple Estate as of August 30, 2016 [was] $5,000,000." (*Id.* at 40.)

Mr. Shawah appraised 729 Union again in 2020.  (Pl.'s Hrg. Ex. 2.)  This time, he did not inspect the interior of the building.  He acknowledged that he has not been inside the building since 2016, and therefore does not know whether its "condition . . . has changed since 2016." (Hrg. Tr., 59:3-7.)  In particular, he does not know if the "roof issues . . . and water damage and sheetrock issues . . . have been corrected since 2016." (*Id.* at 59:8-12.)  Because he did not perform an interior inspection, he could only "assume[] that the overall condition of the building is the same as it was in 2016." (Pl.'s Hrg. Ex. 2, at 20.)

In his 2020 appraisal, Mr. Shawah calculated the fair market value of 729 Union at $4,200,000.  (*Id.* at 35.)  This time, he used only one appraisal method – the direct sales comparison approach.  (*Id.* at 25 ) ("Only the Direct Sales Comparison Approach will be used in estimating the Market Value of this large church property.").  Although he had used the cost approach in conjunction with the sales comparison method in his 2016 appraisal, in 2020 he wrote that "[t]he Cost Approach to Value and the Income Approach are not considered to be strong indicators of Market Value for this owner occupied church property, which is now 12 years old." (*Id.*)

In reaching his $4,200,000 figure, Mr. Shawah identified four properties that he regarded as comparable to 729 Union.  The first of the four was the former St. Bridget of Sweden Parish

---

[2]      In the "Reconciliation and Conclusion" section of his report, he says that he used an income approach rather than a cost approach, and that the resulting figure was $5,560,000 rather than $5,580,000.  (*Id.* at 40.)  But these are clearly typographical errors, because pages 25-30 plainly show a cost approach calculation with a $5,580,000 result.  (*Id.* at 25-30.)

church of Cheshire, a 12,900-square-foot building on 20.5 acres of land that sold for $850,000 – or $66 per square foot – in 2019.  (*Id.* at 27.)  The second was the 36,478-square-foot United Congregational Church of Christ at 877 Park Ave. in Bridgeport, which was purchased by an Islamic community center in 2017 for $1,000,000, or $27.50 per square foot.  (*Id.* at 28) ("877 Park").  The third was a 28,406-square-foot chapel in Hamden that sold for $1,650,000, or $58 per square foot, in 2020.  (*Id.* at 29.)  And the fourth was a 15,600-square-foot church building located at 130 Gregory St. in Bridgeport's South End neighborhood.  A Methodist group purchased this building in 2019 for $1,700,000, or $109 per square foot.  (*Id.* at 30-31) ("130 Gregory").

Mr. Shawah explained how he translated the sales prices of these four properties into a value for 729 Union.  He started with the per-square-foot prices at which the four buildings sold, and then "ma[de] adjustments" for differences in the physical condition and location.  (*Id.* at 32; Hrg. Tr. at 36:15-21.)  He also "made some upward adjustments for the two sales that were outside of our area" – that is, the Cheshire and Hamden properties – because "rural properties, New Haven County properties are less expensive than Fairfield County properties."  (*Id.* at 36:23 – 37:2.)  He "then made some adjustments for land area [and] amenities because the subject church has a school and some great amenities to it."  (*Id.* at 37:3-5.)  He "came up with a range of per-square-foot adjusted prices between $71 and $102 a square foot."  Although the average of these per-square-foot figures was $93, he used a figure of $100 because he felt that the lowest of the four – 877 Park – deserved less weight than the other three.  (Pl.'s Hrg. Ex. 2, at 35.)  Multiplying $100 per square foot times 729 Union's 41,398 square feet, and rounding up, he arrived at a value of $4,200,000.00 "as of August 6, 2020."  (*Id.*; *see also* Hrg. Tr. at 39:2-6.)

PTCLI presented testimony about the value of 729 Union from Raymond Miller.  Mr. Miller is a certified real estate appraiser who has been licensed as such by the State of Connecticut

since 1998.  (*Id.* at 93:20 – 94:3.)  He holds a bachelor's degree in business administration from Fairfield University (*id.* at 94:9-10), and he received his commercial real estate appraiser's license in 2003.  (*Id.* at 94:21-23.)

Mr. Miller inspected both the interior and exterior of 729 Union on November 14, 2020. (*Id.* at 96:19-25.)  He described the property as "an extremely large cathedral building, built in 2008 of very high-caliber materials with all amenities, including video surveillance cameras, elevators," and marble and granite finishes.  He added that the building is "really well laid out," with "a very functional environment."  (*Id.* at 97:11-16.)  He testified that the interior of the building was "in very good condition" at the time of his inspection.  (*Id.* at 97:19.)  Later in his testimony, he referred to the building as being "in move-in condition" and "in excellent shape." (*Id.* at 105:4-5.)

As Mr. Shawah had done in his 2020 appraisal, Mr. Miller used only the sales comparison approach in evaluating 729 Union.  (*Id.* at 97:20-22.)  In selecting comparable properties, he "look[ed] for church sales that had occurred over the last few years to determine . . . some of the churches that were larger in size than normal."  (*Id.* at 102:3-6.)  He chose two that Mr. Shawah had also chosen, 877 Park and 130 Gregory.  (Def.'s Hrg. Ex. 1, at 46.)  He also used three other buildings – a Congregational church property in downtown Stamford (*id.* at 42); a former Lutheran church, also in downtown Stamford (*id.* at 43); and an 11,510-square-foot former church in Norwalk.  (*Id.* at 45.)

After selecting the five comparators, Mr. Miller made adjustments to translate their sale prices into an indicated per-square-foot value for 729 Union.  Specifically, he "adjust[ed] for the time [and] market condition," and also for other considerations including "location, building area, age condition, land/building ratio, and amenities."  (Hrg. Tr. at 103:16-20.)  He conceded that the

fact that some of the comparators were in Stamford and Norwalk "affect[ed] the value," but he felt that he had adequately accounted for this with a fifteen percent location adjustment. (*Id.* at 102:9-21; *see also* Def.'s Hrg. Ex. 1, at 46.)  Taking a variety of adjustments into account, he concluded that it would be "reasonable" to "estimate[]" the value of 729 Union "at $134 a square foot." (*Id.* at 104:2-9.)  Multiplying that figure times the building's 41,398 square feet yielded "a value of $5,547,332," which he "rounded off to $5,600,000." (*Id.*)[3]

Although their appraisals differ by $1,400,000, Messrs. Shawah and Miller agree on many things.  To begin with, they agree that the direct sales comparison approach is an appropriate approach for appraising 729 Union.  (*Id.* at 32:12-13 (Shawah), 97:20-22 (Miller).)  They also essentially agree on the type of adjustments to be made when translating the sale price of one property into an appraised value for another.  Both appraisers say that, when using the sale price of a comparator to estimate a value for 729 Union, it is appropriate to adjust for intervening changes in market conditions; unusual financial conditions attendant to the sale of the comparator, such as an "all-cash" transaction; the property's location; the building's age and condition; the ratio of land area to building area; the property's amenities, and so on.  (*Compare* Pl.'s Hrg. Ex. 2, at 32, *with* Def.'s Hrg. Ex. 1, at 46.)  Moreover, both appraisers agree that 877 Park and 130 Gregory are proper comparators.  (Pl.'s Hrg. Ex. 2, at 32; Def.'s Hrg. Ex. 1, at 46.)

Had Messrs. Shawah and Miller limited their sales comparisons to those two properties, the difference in their appraisals would not be nearly as large as it is.  Mr. Shawah calculated the

---

[3]     PTCLI also presented testimony about 729 Union from Pastor Moales.  The pastor testified that PTCLI had spent "roughly about 1.3, 1.4 million" in "renovation as well as construction" since 2016 (*id.* at 146:14-23), but the only specific renovation he identified was the installation of "low-frequency wiring." (*Id.* at 146:22-25.)  He did not produce any receipts or building permits for the alleged renovations (*id.* at 153:8-18), nor did he offer any testimony about how these alleged repairs affected the value of the property.

adjusted per-square-foot values of 877 Park and 130 Gregory at $71 and $101, respectively, or an average of $85.50/ft$^2$. (Pl.'s Hrg. Ex. 2, at 32.) Mr. Miller calculated those two figures at $64.75 and $124.66, for an average of $94.71/ft$^2$. (Def.'s Hrg. Ex. 1, at 46.) Thus, when it comes to translating the sales prices of 877 Park and 130 Gregory into indicated values for 729 Union, the two appraisers would seem to be only $9.21/ft$^2$ apart – or $381,275.58 for a 41,398 square foot building.

The remaining $1,018,724.42 difference is attributable to the additional comparators that each appraiser selected. As noted, Mr. Shawah chose two properties in New Haven County, and after adjusting for differences in location, land area, amenities and so forth, he concluded that the Cheshire and Hamden properties respectively suggested per-square-foot values of $99 and $102 for 729 Union. (Pl.'s Hrg. Ex. 2, at 32.) Conversely, Mr. Miller selected three properties in Stamford and Norwalk. After making similar adjustments, he concluded that the $5,000,000 sale of the 35,002-square-foot Stamford Congregational church building indicated a value of $148.56/ft$^2$ for 729 Union; that the $3,176,000 sale of the Stamford Lutheran church suggested a value of $164.02/ft$^2$, and that the $1,650,000 sale of the 11,510-square-foot Norwalk property suggested a value of $168.58/ft$^2$. (Def.'s Hrg. Ex. 1, at 46.) Using these additional comparators caused the gap between the two appraisals to grow from $9.21/ft$^2$ to $34/ft$^2$. (*Compare* Pl.'s Hrg. Ex. 2, at 35 (indicating that, before rounding, Mr. Shawah used a per-square-foot figure of $100 to evaluate 729 Union) *with* Def.'s Hrg. Ex. 1, at 48 (using pre-rounding per-square-foot figure of $134).)

At the hearing, neither appraiser came forward with persuasive support for his choice of out-of-town comparators. Mr. Shawah claims to have chosen his "because of their size," explaining that "[t]rying to find comparables for a 42,000-square-foot cathedral is not easy." (Hrg.

Tr. at 32:15-17, 33:13-25.)  But at only 12,900 square feet, the Cheshire church is less than a third of the size of 729 Union, and less than half the size of the Stamford Congregational church. (*Compare* Pl.'s Hrg. Ex. 2, at 27, *with* Def.'s Hrg. Ex. 1, at 42.)  Mr. Miller likewise claims to have been looking for "churches that were larger in size than normal" (Hrg. Tr. at 102:3-6), but his Norwalk comparator is also less than a third of the size of 729 Union, and less than half the size of the Hamden property.  (*Compare* Def.'s Hrg. Ex. 1, at 45, *with* Pl.'s Hrg. Ex. 2, at 29.)  In other words, both appraisers claim to have been looking for large churches, but each one bypassed a larger church within 25 miles of 729 Union in favor of a smaller one with a sale price more congenial to his client's position.

There are additional reasons for declining to adopt either appraisal.  For his part, Mr. Shawah has not adequately explained why his appraisal went *down* by $800,000 between 2016 and 2020.  He did not testify that Bridgeport commercial real estate values dropped during that time, and the portion of his appraisal report devoted to market conditions remained essentially unchanged from 2016 to 2020.  (*Compare* Pl.'s Hrg. Ex. 1, at 10-14, *with* Pl.'s Hrg. Ex. 2, at 10-15.)  He opined that the value of the older, poorer-condition 1243 Stratford property *increased* by 44% in the same time period (*compare* Pl.'s Hrg. Ex. 4, at 28, *with* Pl.'s Hrg. Ex. 5, at 32; *see also* discussion, Section III.B.2 *infra*), yet he never sufficiently explained why 729 Union would not benefit from the same price trends.[4]  Conversely, Mr. Miller never adequately supported his claim that the location differential between the Bridgeport and Stamford/Norwalk markets is only 15% (*see* Def.'s Hrg. Ex. 1, at 46), and indeed his own data suggests that the differential is much larger.

---

[4]    The difference between his two appraisals appears to be largely attributable to the fact that, whereas he used both the cost and direct sales comparison approaches in 2016, he used only the latter in 2020.  But he never satisfactorily explained why he jettisoned the cost approach in the second appraisal.

The Stamford Congregational church and 877 Park were almost identical in size and age, and according to Mr. Miller, the differences in their physical condition accounted for only a 50% per-square-foot price differential.  (*See id.*)  Yet the Stamford property sold for 500% more than 877 Park.  (*Id.*)

Where, as here, most of the parties' comparators are not truly comparable, courts often resolve the dispute by identifying the single most comparable property and extrapolating its value onto the foreclosed property.  In *United of Omaha Life*, for example, Judge Smith disregarded several proffered comparators, identified the single property that he thought was most comparable, and multiplied its per-square-foot sales price times the square footage of the foreclosed building to arrive at a value.  718 F. Supp. 2d at 284-85.  Similarly, in *Wells Fargo Bank*, Judge Tanzer identified the "closest and most appropriate comparable" sale, adjusted for differences between that property and the subject property, and arrived at a fair market value between the parties' appraisers' figures.  2013 WL 5614447, at *2-3.

Following that approach, I conclude that 130 Gregory is the property most comparable to 729 Union.  The two properties are in the same city, and although they are in different neighborhoods, the appraisers agree that no location adjustment needs to be made.  (*See* Pl.'s Hrg. Ex. 2, at 32; Def.'s Hrg. Ex. 1, at 46.)  And while 130 Gregory is thirty-five years older than 729 Union, it is nevertheless a "modern" church built with contemporary construction methods and central air conditioning.  (Pl.'s Hrg. Ex. 2, at 31, 35.)  For the most part, the other comparators are early-20[th] century buildings that were constructed with different methods and presumably lack the full range of modern climate controls.  To be sure, 729 Union is a much newer building with a much higher level of finishes and amenities than 130 Gregory, but the appraisers agree that those

differences can be adjusted for.  And there are fewer differences between 729 Union and 130 Gregory than there are between 729 Union and any other of the proffered comparators.

Mr. Shawah says that 130 Gregory Street's $109/ft$^2$ sale price indicates a $101/ft$^2$ value for 729 Union, principally because 729 Union is a much larger building.  (*See* Pl.'s Hrg. Ex. 2, at 32 (adjusting value of 729 Union downward by $11/ft$^2$ for "building size"); *see also* Hrg. Tr. at 36:17-19 ("Normally, smaller buildings will sell on a higher per-square-foot basis than a larger building.").)  By contrast, Mr. Miller says that 130 Gregory Street's sale price indicates a $124.66/ft$^2$ value for 729 Union, chiefly because it is in better condition and has better amenities. (*See* Def.'s Hrg. Ex. 1, at 46.)

Having carefully considered all of the testimony and documentary exhibits, I conclude that Mr. Miller has given the more credible statement of how the sale price of 130 Gregory Street translates into a value for 729 Union.  Unlike Mr. Shawah, who has not been inside the building since 2016, Mr. Miller physically inspected 729 Union in 2020.  (Hrg. Tr. at 96:19-25.)  His testimony that the building was then "in move-in condition" is supported by the photographs in his appraisal report (Def.'s Hrg. Ex. 1, at 6-19), whereas neither of Mr. Shawah's two appraisal reports include photographs documenting his claim that the building had been damaged by water. (*See generally* Pl.'s Hrg. Exs. 1, 2.)  By extension, Mr. Miller's 10% upward adjustment for condition is more credible than Mr. Shawah's 0% adjustment.  (*Compare* Def.'s Hrg. Ex. 1, at 46 *with* Pl.'s Hrg. Ex. 2, at 32.)

Moreover, Mr. Miller's 15% adjustment for amenities is likewise more credible than Mr. Shawah's $6/ft$^2$ adjustment.  (*Id.*)  Mr. Miller's photographs depict an attractive cathedral with marble floors in a soaring central atrium; high-end finishes in the office spaces and bathrooms; a full range of modern accommodations for the disabled (*e.g.*, elevators, hand rails in restrooms,

*etc.*); and modern lighting and sound systems.  (Def.'s Hrg. Ex. 1, at 6-19.)  And Mr. Miller adequately accounted for the principle that, all other things being equal, "smaller buildings will sell on a higher per-square-foot basis than a larger building."  His $124.66/ft$^2$ figure includes a 10% deduction for "building area" because "[s]ales with less building area than the subject property require minus adjustments to the sale price per [square foot]."  (Def.'s Hrg. Ex. 1, at 46-47.)  Applying the $124.66/ft$^2$ figure that Mr. Miller derived from the sale of 130 Gregory to 729 Union's 41,398 square feet, I conclude that it should be valued at **$5,160,674.68** for purposes of the deficiency judgment.

### 2.     *1243 Stratford*

The property that the parties refer to as 1243 Stratford includes three contiguous parcels on the north side of Stratford Avenue, between Central Avenue and Bunnell Street.  Two of the parcels are parking lots, but the parcel at 1231-1243 Stratford is occupied by PTCLI's original, 121-year-old brownstone church building.  (*See* Def.'s Hrg. Ex. 2, at 24.)

FCR presented testimony about the value of 1243 Stratford from Mr. Shawah.  As he had done with 729 Union, Mr. Shawah first appraised 1243 Stratford in 2016.  (Hrg. Tr. at 39:11-13.)  He did both an interior and exterior inspection (*see id.* at 40:3-4), and found the building's condition to be only "fair," "basically due to a serious roof problem."  (*Id.* at 40:8-9.)  He explained that "the roof appeared to be at the end of its useful life and was peeling off; and the water was getting in behind the walls and was damaging the beautiful stained-glass windows and possibly the flooring."  (*Id.* at 40:10-13.)  Using the sales comparison approach, he appraised 1243 Stratford as having a fair market value of $345,000 at that time.  (Pl.'s Hrg. Ex. 4, at 28.)

Mr. Shawah returned to 1243 Stratford in 2020.  (*See* Pl.'s Hrg. Ex. 5.)  This time, he only performed an exterior inspection.  (Hrg. Tr. at 43:12-15.)  He testified that the building "was either

in the same or worse condition" than it had been in 2016, "as a number of the windows appeared to be boarded up." (*Id.* at 43:18-20.) His exterior photographs captured an asphalt roof in exceptionally poor condition with many missing shingles, particularly in the area of the bell tower. (Pl.'s Hrg. Ex. 5.) Nevertheless he concluded that 1243 Stratford's value had risen by $155,000 since 2016. Again using the sales comparison method, he appraised its value at $500,000 as of August 6, 2020. (Pl.'s Hrg. Ex. 5, at 32; Hrg. Tr. at 47:2-5.)

PTCLI presented testimony about the value of 1243 Stratford from Mr. Miller, who inspected both the interior and the exterior of the property on November 14, 2020. (Hrg. Tr. at 105:20 – 106:6.) Mr. Miller acknowledged that "some roof repairs [were] needed," but he nonetheless concluded that "the building is in above average condition in the interior and average condition on the exterior." (Def.'s Hrg. Ex. 2, at 26.) His photographs did not capture the condition of the roof in any detail, but they did depict recent renovations in some portions of the interior. (*Id.* at 6-11.) Using the sales comparison method, Mr. Miller appraised 1243 Stratford's value at $717,000 as of August 6, 2020, in part because he evaluated its condition as "average plus." (Def.'s Hrg. Ex. 2, at 31, 38, 41.)

In contrast to 729 Union – the size of which compelled them to resort to other towns – both appraisers found sufficient comparators for the smaller 1243 Stratford property within the City of Bridgeport. In performing their sales comparisons, both Messrs. Shawah and Miller considered the former House of Prayer and Deliverance at 68-86 Wallace Street, and the former Holy Rosary Church at 365-383 East Washington Avenue. (Pl.'s Hrg. Ex. 5, at 22-28; Def.'s Hrg. Ex. 2, at 33-38.) Both appraisers also considered 877 Park and 130 Gregory (*id.*), while Mr. Miller added a fifth comparator, the former Congregation Mita at 591 Arctic Street. (Def.'s Hrg. Ex. 2, at 37-38.) Mr. Shawah says that his four comparators suggest a value of $55/ft$^2$ for 1243 Stratford (Pl.'s Hrg.

Ex. 5, at 31), whereas Mr. Miller says that his five comparators suggest a value of $63.01/\text{ft}^2$. (Def.'s Hrg. Ex. 2, at 38.)

The $217,000 difference between the two appraisals is partly explained by the fact that Messrs. Shawah and Miller calculate the building's square footage differently. Working off the assessor's card, Mr. Shawah says that the second floor is only 169 square feet (Hrg. Tr. at 40:19-20), and he therefore says that the entire building has only 9,873 square feet of "gross building area." (Pl.'s Hrg. Ex. 5, at 14.) Mr. Miller testified that he actually measured the second floor, and that it "came out almost 1,669 square feet." (Hrg. Tr. at 106:11-17.) He says, in substance, that the assessor's card is mistaken, and that the building actually has 11,373 square feet of "gross living area." (Def.'s Hrg. Ex. 2, at 38.)

Having considered the testimony and documentary exhibits, including the photographs taken by both appraisers, I conclude that 1243 Stratford should be valued at **$671,007** for purposes of the deficiency judgment. I credit Mr. Miller's testimony that the building has 11,373 of gross area, because (in contrast to Mr. Shawah) he actually measured the space, and because his photographs appear to confirm that the second floor is larger than 169 square feet. (*See* Def.'s Hrg. Ex. 2, at 8 (photographs); Hrg. Tr. at 107:7-22 (confirming that those photographs are of second floor).) I do not, however, credit his testimony that the building was in "average plus" condition. Mr. Shawah's photographs confirm that large pieces of the roof are missing (Pl.'s Hrg. Ex. 5), and even Mr. Miller's photographs document Mr. Shawah's claims about damage to the stained glass windows. (Def.'s Hrg. Ex. 2, at 6 (depicting large, missing pane).) While PTCLI has evidently elected to freshen up the interior by, among other things, painting bathrooms and putting down new tile and laminate flooring (*see id.* at 7), Mr. Miller did not adequately explain

how these cosmetic fixes transform a leaking building with a failed roof into an "average plus"-condition property.

At the same time, I also conclude that Mr. Shawah has not adequately explained or supported his location adjustments. He says that 1243 Stratford is worth $8/ft$^2$ less than 877 Park, and $10/ft$^2$ less than 130 Gregory, because those two properties are "superior in location." (Pl.'s Hrg. Ex. 5, at 28, 31.) But he made no such adjustments when using those two properties as comparators for 729 Union, even though 729 Union and 1243 Stratford Avenue are within yards of each other. Declining to credit both Mr. Miller's claim of "average plus" condition and Mr. Shawah's claim that 1243 Stratford is meaningfully inferior in location to the other Bridgeport church sales, I conclude that it would be appropriate to evaluate the property at the midpoint of their per-square-foot figures – that is, $59/ft$^2$. Multiplying that figure times 11,373 square feet yields a value of **$671,007** for 1243 Stratford.

### 3. 1277 Stratford

The property that the parties refer to as 1277 Stratford is composed of three parcels, two of which are on the north side of Stratford Avenue and one of which is on the west side of Central Avenue. The Central Avenue parcel and the smaller of the two Stratford Avenue parcels are parking lots, but the larger Stratford Avenue parcel is occupied by a one-story, brick-faced commercial building. The building was constructed in 1912 and has been remodeled several times since. (*See* Def.'s Hrg. Ex. 3.)

Mr. Shawah and Mr. Miller both used the sales comparison approach in evaluating 1277 Stratford. (Pl.'s Hrg. Ex. 7, at 20; Def.'s Hrg. Ex. 3, at 28.) Moreover, they used the same four comparators, all in Bridgeport – 2936-2938 Fairfield Avenue, 3853 Main Street, 1379 Boston Avenue, and 1722 Boston Avenue. (Pl.'s Hrg. Ex. 7, at 22-25; Def.'s Hrg. Ex. 3, at 30-34.) While

Mr. Miller also used 1549 Barnum Avenue as a fifth comparator (Def.'s Hrg. Ex. 3, at 33), the two appraisals are more alike than not. For example, both appraisers essentially agree that 1277 Stratford is inferior to the comparators in location, but superior in land area and parking space. (*Compare* Pl.'s Hrg. Ex. 7, at 26, *with* Def.'s Hrg. Ex. 3, at 36.)

Mr. Shawah appraised 1277 Stratford at $385,000. (Pl.'s Hrg. Ex. 7, at 29.) After reviewing his four comparators and making adjustments for condition, location, and other factors, he concluded that those properties suggested a value for 1277 Stratford of $85/ft$^2$. (*Id.*) In the "Description of Improvements" section of his report, he had described 1277 Stratford as a 4,704-square-foot building, with 4,504 square feet on the main floor and 200 square feet of finished basement space. (*Id.* at 13.) When performing his final calculation, however, the 200 square feet of finished basement dropped out. (*Id.* at 29.) He therefore multiplied his $85/ft$^2$ figure by 4,500 square feet rather than 4,700 square feet, arriving at a figure of $382,500, which he then rounded up to $385,000. (*Id.*) If he had a reason for omitting the finished basement, other than a simple mistake, he did not explain it in his report or at the hearing.

Mr. Miller appraised 1277 Stratford at $424,000. (Def.'s Hrg. Ex. 3, at 38.) He concluded that his five comparators suggested a value of $87.71/ft$^2$ for the property, which he rounded up to $90/ft$^2$ for unexplained reasons. (*Id.* at 39; *see also* Hrg. Tr. at 113:4-7.) Multiplying $90/ft$^2$ times 4,704 square feet yielded a figure of $423,360. (Def.'s Hrg. Ex. 3, at 38.) Rounding again, Mr. Miller arrived at his final figure of $424,000. (*Id.*)

Aside from his unexplained rounding-up from $87.71 to $90, the difference between Mr. Miller's per-square-foot figure and Mr. Shawah's competing figure is principally due to their different evaluations of the building's condition. Mr. Shawah evaluated the exterior and interior condition of the building as "average" (Pl.'s Hrg. Ex. 7, at 13-14), but he acknowledged that he

had not been inside the building since 2016. (Hrg. Tr. at 60:13-16.) Mr. Miller inspected 1277 Stratford in 2020. He concluded that it was in "above average" condition (Def.'s Hrg. Ex. 3, at 23), and that it should benefit from a condition adjustment of as much as 50% over some of its comparators (*id.* at 36), because it had been "remodeled and updated approximately over the past 2-10 years." (*Id.* at 23.) While his interior pictures depict a building in disarray from remodeling activity (*id.* at 6-8), he asserts that it is in "above average" condition because those repairs are nearly complete. (*Id.* at 23) (stating that only "minor repairs are needed to make the interior remodeling complete"). In substance, he says that theoretical purchaser would have to do only minor cosmetic work to put the interior into excellent condition.

I decline to accept Mr. Shawah's $85/ft$^2$ figure because it does not account for the remodeling activity that has evidently taken place since he last inspected the interior in 2016. At the same time, I also decline to accept Mr. Miller's $90/ft$^2$ figure because he has not explained the appropriateness of rounding up from the $87.71/ft$^2$ figure suggested by his own sales comparison analysis. I therefore conclude that it is appropriate to evaluate 1277 Stratford for deficiency judgment purposes at $87.71/ft$^2$. And because Mr. Shawah has come forward with no reason to omit the building's finished basement from the square footage calculation,[5] I multiply that per-square-foot figure times 4,704 square feet – rather than 4,500 square feet – to reach a total of **$412,587.84.**

### 4.    851 Central

851 Central is an 1,872-square-foot residential property located on the same city block as 1243 Stratford. (Def.'s Hrg. Ex. 5.) It has five bedrooms and two full baths. (*Id.*) It was built in

---

[5]    Notably, Mr. Shawah included the finished basement when he appraised 1277 Stratford in 2016. (Pl.'s Hrg. Ex. 6, at 36) (multiplying $80/ft$^2$ times 4,700, rather than 4,500, square feet).

1887 (Pl.'s Hrg. Ex. 11), and PTCLI formerly used it as a parsonage.  (Hrg. Tr. at 151:9-13.)  Pastor Moales once lived there (*id.*), and PTCLI claims to have been renting it to two of its parishioners since March 2020.  (*See* discussion, ECF No. 245, at 22-24.)

FCR presented hearing testimony about the value of 851 Central from Daniel Conte.  Mr. Conte is a certified residential real estate appraiser licensed by the State of Connecticut.  (Hrg. Tr., 66:15-16.)  He is the owner and CEO of the Huntington Appraisal Company of Shelton, Connecticut, and has been for "[a]pproximately 35 years."  (Hrg. Tr., 66:19 – 67:1.)  He holds an undergraduate degree in business from Sacred Heart University and a master's degree in urban studies with a concentration in planning and development from Southern Connecticut State University.  (Hrg. Tr., 67:6-9.)  He has taught residential real estate appraisal courses at Fairfield University, Sacred Heart University, and Naugatuck Community College.  (Hrg. Tr., 67:21-24.)  He has conducted at least three thousand residential real estate appraisals over the past thirty years, all of them in the State of Connecticut and most of them in New Haven and Fairfield Counties.  (Hrg. Tr., 68:17 – 69:1.)

Mr. Conte appraised 851 Central twice.  In 2016 he inspected both the interior and exterior of the property, and he assessed its value at $77,000.  (Hrg. Tr. at 72:8-10, 73:18-20; Pl.'s Hrg. Ex. 10.)  He appraised the property again in 2020, but was unable to access the interior.  (Hrg. Tr. at 75:4-8.)  He therefore did not know whether the home had been "improved or renovated since 2016" (*id.* at 90:4:11), but he nonetheless reckoned its value at $150,000 as of April 25, 2020.  (Pl.'s Hrg. Ex. 11.)  At the hearing, he testified that the value did not change between "May 2020 [and] the date the title vested in the plaintiff on August 6, 2020."  (Hrg. Tr. at 79:12-19.)

PTCLI presented testimony about the value of 851 Central from Elliott Morales.  Mr. Morales has been a state-certified residential appraiser for thirty-four years (*id.* at 125:12-14), and

he currently owns and operates Morales Real Estate Associates.  (*Id.* at 125:16-17.)  He attended

the University of Puerto Rico and Norwalk Community College.  (*Id.* at 125:20-22.)  He has

testified in court "hundreds of times," and each time his testimony related to residential real estate

appraisals.  (*Id.* at 126:19-25.)

Mr. Morales appraised 851 Central in March 2021.  (Def.'s Hrg. Ex. 5.)  The property was

being renovated at the time (Hrg. Tr. at 132:14-17), and his photographs document a freshly

painted interior, recently refinished hardwood floors, and new kitchen cabinets.  (Def.'s Hrg. Ex.

5, at 9-10.)  But they also show a home in considerable disarray, with construction materials strewn

about and plumbing fixtures yet to be installed in one bathroom.  (*Id.* at 10.)  At the hearing, Mr.

Morales conceded that he did not know when the renovations had been done (Hrg. Tr. at 138:9-

21), and by extension he could not say whether they had been done before or after the August 6,

2020 passage of title.  (*Id.* at 138:19-21.)

Both appraisers used the sales comparison approach.  (Pl.'s Hrg. Ex. 11; Def.'s Hrg. Ex.

5.)  Mr. Conte compared 851 Central – which is north of Interstate 95 – to three colonial-style

single-family homes south of the highway, and after making adjustments for dissimilar

characteristics, he assessed its value at $150,000 as noted above.  (Pl.'s Hrg. Ex. 11.)  Mr. Morales

compared 851 Central to five two-family homes, all less than a quarter mile away.  (Def.'s Hrg.

Ex. 5.)  He likewise adjusted for dissimilar characteristics in reaching his value of $180,000.  (*Id.*)

The $30,000 difference between the two appraisals is principally the result of three factors.

First, Mr. Conte appraised the home as a single-family home, but Mr. Morales appraised it as a

more valuable two-family.  (*Compare* Pl.'s Hrg. Ex. 11 *with* Def.'s Hrg. Ex. 5; *see also* Hrg. Tr.

at 74:9-23, 134:13-16.)  Second, Mr. Conte evaluated the house as being in average condition (Hrg.

Tr. at 74:1-2), but Mr. Morales rated it as "average plus" on account of the renovations.  (*Id.* at

132:13-25.)  Third, because he had not been "instructed to do an appraisal as of August" 2020 (*id.* at 137:15-18), Mr. Morales included one comparator that sold three months after that date.  (Def.'s Hrg. Ex. 5) (including November 2020 sale of 275 Carroll Avenue).

Having consider the hearing testimony and the documentary exhibits, I conclude that it would be appropriate to evaluate 851 Central for deficiency judgment purposes at the midpoint of the two appraisals.  On the one hand, I credit Mr. Morales's testimony that the home should be evaluated as a two-family.  Although it has been occupied by a single family for some time – first by Pastor Moales and his family, and then by the parishioners – Mr. Morales explained that the home is listed as a two-family in the City assessor's records (Hrg. Tr. at 139:10-12), and is set up as two-family with "[t]wo kitchens, two bathrooms."  (*Id.* at 139:18-19.)  On the other hand, I do not credit the claim that the home was in "average plus" condition on August 6, 2020.  Mr. Morales testified that the "average plus" rating was due to the renovations that he observed when he inspected the property in March 2021, but PTCLI submitted no evidence that those renovations had been done before title passed.[6]  And Mr. Morales's use of a post-August 2020 comparator provides an additional reason to place less weight on his appraisal.  For these reasons, I conclude that it is appropriate to evaluate 851 Central for deficiency judgment purposes at **$165,000**.

### 5.    1065 Central

1065 Central is a 2,492-square-foot residential property that was built in 1920.  (Pl.'s Hrg. Ex. 13.)  It sits on a 0.29-acre parcel, and it is across the street from the back side of 729 Union.

---

[6]    Pastor Moales testified that "there ha[d] been additional renovations since [he] moved out" of the home in 2018, but he did not explain whether those renovations occurred before or after August 6, 2020.  (Hrg. Tr. at 151-52.)  At a February 10, 2021 hearing, one of the parishioner-tenants testified that the renovations have been ongoing on a room-by-room basis, but she likewise failed to explain which renovations occurred before and after the passage of title.  (Testimony of D. Reid, Tr. of Feb. 10, 2021 Hrg., ECF No. 230, at 27:5-10.)

Pastor Moales previously testified that PTCLI uses 1065 Central as a "Naomi house," that is, "a boarding house just for women." (Tr. of Feb. 10, 2021 Hrg., ECF No. 230, at 155:16-21.)

Like 851 Central, Mr. Conte appraised 1065 Central twice, once in 2016 and again in 2020. (Pl.'s Hrg. Exs. 12, 13.) In 2016 he inspected both the interior and exterior of the property (Hrg. Tr. at 80:20-23), and he used the sales comparison method to arrive at a value of $90,000. (Pl.'s Hrg. Ex. 12.) In 2020 he did not inspect the interior, and at the hearing he acknowledged that he did not know whether the home had been "improved or renovated since 2016." (Hrg. Tr. at 90:4-11.) Based on his exterior inspection, and again using the sales comparison approach, he appraised the property's value at $170,000 as of April 25, 2020. (Pl.'s Hrg. Ex. 13.) He also testified that its value did not change before title passed, and consequently he says that the property had a fair market value of $170,000 on August 6, 2020. (Hrg. Tr. at 85:6-9.)

Mr. Morales appraised 1065 Central on March 30, 2021. (Def.'s Hrg. Ex. 4.) He inspected both the interior and exterior of the home. (*Id.*) His interior photographs document a freshly painted home with new or near-new tiled floors and carpets. (*Id.*) His exterior photos document that the rear parking area has been recently repaved. (*Id.*) Using the sales comparison method, Mr. Morales appraised the fair market value of 1065 Central at $290,000 as of March 30, 2021. (*Id.*) He testified that he "wasn't instructed to do an appraisal as of August" 2020. (Hrg. Tr. at 137:15-18.)

The $120,000 difference between the two appraisals results from several factors. First and most curiously, Messrs. Conte and Morales apparently do not agree on how many bedrooms the property has; Mr. Morales says five (Def.'s Hrg. Ex. 4), but Mr. Conte says it has only four. (Pl.'s Hrg. Ex. 13.) Thus, Mr. Morales included two five-bedroom homes in his slate of comparators, but Mr. Conte included none. (*Compare* Def.'s Hrg. Ex. 4 *with* Pl.'s Ex. 13.) Second, even their

three- and four-bedroom comparators are different.  Mr. Conte selected three properties south of
Interstate 95, whereas Mr. Morales chose four properties north of the highway and within a half a
mile of 1065 Central, and one property south of the highway on Seaview Avenue.  (*Compare*
Def.'s Hrg. Ex. 4 *with* Pl.'s Ex. 13.)  Third, Mr. Conte appraised 1065 Central as if it was in
"average" condition – because that is the condition it was in when he inspected it in 2016 (Pl.'s
Hrg. Ex. 13; Hrg. Tr. at 81:2-5, 90:4-11) – while Mr. Morales regarded its condition as "good."
(Def.'s Hrg. Ex. 4.)  Fourth, because their appraisals were done almost a year apart, Mr. Morales's
included more recent sales.  (*Compare* Pl.'s Hrg. Ex. 13 *with* Def.'s Hrg. Ex. 4.)  Indeed, the sale
of one of his comparators post-dated FCR's acquisition of title by over four months.  (Def.'s Hrg.
Ex. 4) (including the December 16, 2020 sale of 152 Deacon Street).

Neither appraisal deserves to be fully adopted by the Court.  On the one hand, Mr. Conte
assessed 1065 Central as being in worse condition than all three of his comparators, but since he
had not inspected the interior in nearly four years, he would appear to have had no basis for doing
so.  (*See* Pl.'s Hrg. Ex. 13) (assessing deductions of up to $8,500 to control for the differences
between the "average" condition 1065 Central and the "average/good" condition comparators).
And his claim that the home's value did not change between April 2020 and August 2020 is in
tension with Mr. Morales's testimony on that subject, which the Court found persuasive; Mr.
Morales explained that "the market ha[s] gone up since" the COVID-19 pandemic because
"[t]here's a lot of people coming from New York."  (Hrg. Tr. at 129:20-25.)  On the other hand,
Mr. Morales used five-bedroom homes as comparators when the property card for 1065 Central
describes it as a four-bedroom home.[7]  And I do not credit some of the adjustments he made to his

---

[7]    The field card is available at http://images.vgsi.com/cards/BridgeportCTCards//5039.pdf
(last visited September 1, 2021).  The Court may take judicial notice of online municipal property
records.  *E.g., Chocolatl v. Rendezvous Café, Inc.*, No. 18-Civ.-3372 (CBA) (VMS), 2020 WL

five comparators.  For example, he adjusted two 0.11-acre properties upward by $20,000 to reflect

their difference in land area (Def.'s Hrg. Ex. 4); but since 1065 Central is only 0.29 acres, his

calculation implicitly values empty land in the east end of Bridgeport at $111,111 per acre.[8]  Mr.

Conte's adjustment of $5,000 is more credible.  (Pl.'s Hrg. Ex. 13.)

As with 729 Union, I conclude that the fairest way to evaluate 1065 Central is to identify

the single closest comparator and make adjustments for dissimilar characteristics.  I further

conclude that the closest comparator is 276 Seaview Avenue.  Of all the homes considered by

Messrs. Conte and Morales, it is the closest to 1065 Central in size.  (*Compare* Pl.'s Hrg. Ex. 13

*with* Def.'s Hrg. Ex. 2.)  Moreover, 276 Seaview sold only seven weeks before the date on which

title to 1065 Central passed to FCR (*see* Def.'s Hrg. Ex. 4), thus minimizing the need for market

timing adjustments.

Mr. Morales says that the $205,000 sale of 276 Seaview suggests a $280,600 value for

1065 Central, but I cannot agree.  While I accept his general statement that Bridgeport real estate

values have been rising during the COVID-19 pandemic, he did not support his claim that there

should be a $10,000 market timing adjustment between the June 18, 2020 sale of 276 Seaview and

the passage of title of 1065 Central only seven weeks later.  (*Id.*)  He also did not support his claim

that 1065 Central is entitled to a $10,000 location adjustment over 276 Seaview; 1065 Central is

next door to a noisy firehouse, while 276 Seaview is virtually a waterfront property.  (*See id.*)

(including map of east end of Bridgeport, showing that 276 Seaview is directly across the street

from Long Island Sound).  Furthermore, he likewise did not support his contention that 1065

---

3002362, at *4 n.1 (E.D.N.Y. Feb. 20, 2020) ("This court can and does take judicial notice of
public [property] records.").

[8]     The difference in acreage between 1065 Central and the two comparators is 0.18 acres.
$20,000.00 divided by 0.18 is $111,111.

Central's additional 537 square feet should result in a $16,100 adjustment; that contention implicitly values each additional square foot at nearly $30, but his other comparators do not suggest such a value.  (*Cf. id.*) (showing that the two smallest comparators had the highest sales prices). Mr. Conte's $20/ft$^2$ adjustment is more credible.  (*See* Pl.'s Hrg. Ex. 13) (adjusting 29 Deforest Ave., which is 572 square feet smaller, by $11,400).  Finally, I am unable to credit Mr. Morales's $20,000 adjustment for 1065 Central's additional 0.18 acre of land area, for the reasons discussed above.  Taking the $205,000 sale price of 276 Seaview as a baseline, and accepting only those of Mr. Morales's upward adjustments that are adequately supported by the record,[9] I conclude that 1065 Central should be valued for deficiency judgment purposes at **$230,240**.

## C.     Adjustments to FCR's "Top Number"

FCR asks the Court to adjust its top line claim upward by $123,420.53 to reflect the attorneys' fees and costs that it has incurred since the judgment of strict foreclosure entered on May 29, 2020.  (*See* Updated Calculation of Deficiency J., ECF No. 241, at 2.)  As noted in Section II above, FCR may obtain such an adjustment provided that the note allowed for recovery of attorneys' fees.  *City Sav. Bank of Bridgeport*, 1 Conn. App. at 36-37.  That is the case here; FCR's notes entitle it "to collect attorneys' fees and all costs of collection."  (*See* Exs. 7, 16, 23 to Aff. of J. Bartlotti, ECF No. 87.)

I have reviewed FCR's attorney fee submission (Pl.'s Hrg. Ex. 20), and I conclude that its $123,420.53 request is reasonable.  That sum reflects nearly a year's worth of legal work on "(i) Defendant's Appeal of the Strict Foreclosure Judgment to the Second Circuit Court of Appeals;

---

[9]     These include a $5,000 adjustment for 1065 Central's additional acreage; a $10,740 adjustment for its additional 537 square feet of gross living area; a $6,000 adjustment for central air conditioning; and a $3,500 adjustment for the fact that 1065 Central has two porches.  (Def.'s Hrg. Ex. 4.)

(ii) the Defendant's filing for bankruptcy protection in June, 2020 in the United States Bankruptcy Court for the District of Connecticut, Case No. 20-50605; (iii) the Defendant's Motion for Relief from Judgment Pursuant to Rule 60(b); (iv) the Defendant's refusal to vacate the properties pursuant to the Executions of Ejectment and resulting trial before this Court on Plaintiff's Motion for Order in Aid of Execution and Ejectment; and (v) the Plaintiff's Motion for Deficiency Judgment."  (Aff. of K. Mayhew, Pl.'s Hrg. Ex. 20, ¶ 14.)  The hours of work listed in the accompanying legal bill exhibit appear proportional to these litigation tasks, and the hourly rates charged by FCR's lawyers are the same rates that Judge Meyer approved when he awarded attorneys' fees in the judgment of strict foreclosure.  (*Compare* Am. Aff. of Attorneys' Fees, ECF No. 151 (seeking rates of $345/hour and $300/hour for Attorneys Mayhew and Smart, respectively) *with* Second Am. Aff. of Attorneys' Fees, Pl.'s Hrg. Ex. No. 20 (same).)  And PTCLI has not objected to FCR's claim for additional attorneys' fees and costs, despite ample opportunity to do so.  (*See* Hrg. Tr. at 158:17 – 159:18 (declining to "dispute the accuracy" of FCR's exhibit of fees and costs, or to "suggest that any of the work was done that shouldn't have been done"); 159:23 – 161:5 (allowing PTCLI additional time to object if it wished)).

FCR also asks the Court to adjust its top line claim upward by $34,110.13 to reflect sewer use fees incurred at 729 Union, 1243 Stratford and 1277 Stratford from the date of the judgment of strict foreclosure to the date of the deficiency judgment hearing.  (*See* Updated Calculation of Deficiency J., ECF No. 241, at 2.)  I agree with PTCLI, however, that such fees are recoverable only through the date that title passed; the Connecticut Appellate Court has held that analogous "expenses incurred . . . after the plaintiff acquired title are not prior claims against the property and, therefore, are precluded" from the deficiency judgment calculation.  *Am. Mortg. Corp.*, 41 Conn. App. at 331.  FCR's Amended Hearing Exhibits 15 and 16 confirm $24,733.74 in sewer use

fees at 729 Union and 1243 Stratford through August 2020,[10] and I recommend that that sum be included in the deficiency judgment calculation.

Finally, FCR requests that interest be included in the deficiency judgment. (Updated Calculation of Deficiency J., ECF No. 241, at 1.) It breaks its interest claim into two parts. First, it seeks interest on the entire judgment entered by Judge Meyer – that is, $15,543,292.48 – from the date of the judgment of strict foreclosure to the date that title passed. (*Id.*) Second, it seeks interest on the deficiency from the date title vested to the date of the deficiency judgment. The first component can be calculated now, and indeed FCR has correctly calculated it at $4,922.75.[11] The second component cannot be calculated until the date of the deficiency judgment is known, but FCR should be awarded $42.18 in interest for each day between August 6, 2020 and the date that judgment enters.[12]

## IV.   CONCLUSION AND RECOMMENDATIONS

For the foregoing reasons, I recommend that the motion of the plaintiff, Foundation Capital Resources, Inc., for a deficiency judgment be **GRANTED**, and that judgment be rendered in its favor and against the defendant, Prayer Tabernacle Church of Love, Inc., in the amount of $9,056,859.98, plus interest in the amount of $42.18 for each day between August 6, 2020 and the date on which the deficiency judgment enters. The $9,056,859.98 deficiency is calculated as follows:

---

[10]   FCR was evidently unable to develop this figure for 1277 Stratford. (ECF No. 243, at 3.)

[11]   As FCR explains, there are 68 days between May 29, 2020 and August 6, 2020, and the federal post-judgment interest rate in effect on May 29, 2020 was 0.17%. At an annual rate of 0.17%, interest on $15,543,292.48 amounts to $73.29 per day. Multiplying that amount by 68 days yields FCR's figure of $4,922.75.

[12]   At an annual rate of 0.17%, interest on $9,056,859.98 accumulates at $15,396.66 annually, or $42.18 per day.

| | | |
|---|---:|---|
| | $15,543,292.48 | Judgment Debt as of May 29, 2020 |
| + | $122,546.00 | Additional attorneys' fees |
| + | $874.53 | Additional costs |
| + | $24,733.74 | Sewer use fees through August 2020 |
| + | $4,922.75 | Interest on judgment debt, 5/29/2020 – 8/6/2020 |
| = | **$15,696,369.50** | **Total Debt** |
| – | $5,160,674.68 | Fair market value of 729 Union |
| – | $671,007.00 | Fair market value of 1243 Stratford |
| – | $412,587.84 | Fair market value of 1277 Stratford |
| – | $165,000.00 | Fair market value of 851 Central |
| – | $230,240.00 | Fair market value of 1065 Central |
| = | **$9,056,859.98** | **Deficiency** |

This is a recommended ruling pursuant to 28 U.S.C. § 636(b)(3). *See LoSacco v. City of Middletown*, 71 F.3d 88, 91 (2d Cir. 1995) (holding that a Magistrate Judge's authority to finally determine a motion under 28 U.S.C. § 636(b)(1) is limited to "'pretrial' matter[s]," and that post-trial matters referred to a magistrate judge are "'not subject to final determination by'" him) (quoting *Massey v. City of Ferndale*, 7 F.3d 506, 509-10 (6th Cir. 1993)). Pursuant to Rule 72.2(a) of the Local Rules for Magistrate Judges, if any party wishes to object to the recommendation, it must file that objection within fourteen days. "A party may not thereafter assign as error a defect in the Magistrate Judge's order to which objection was not timely made." *Id.*

Entered at Hartford, Connecticut this 2nd day of September, 2021.


*/s/ Thomas O. Farrish*
Thomas O. Farrish, USMJ