UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Foundation Capital Resources, Inc.,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Prayer Tabernacle Church of Love, Inc., *et al.*,<br><br>　　　　　　Defendants. | Civil No. 3:17-cv-00135 (JAM)<br><br><br><br>July 10, 2023 |

## RULING ON PLAINTIFF'S MOTION FOR SANCTIONS [ECF NO. 286]

This is a commercial real estate foreclosure case in which the Plaintiff, Foundation Capital Resources, Inc. ("FCR"), obtained a judgment of strict foreclosure and order of possession with respect to several Bridgeport properties formerly owned by the Defendant, Prayer Tabernacle Church of Love, Inc. ("PTCLI") (ECF No. 156.) After title passed to FCR, PTCLI's principal, Pastor Kenneth Moales, Jr., attempted to lease some of the properties to new tenants and collect the rents. (*See* Mot. to Enjoin, ECF No. 284, ¶ 8.) FCR therefore obtained an order from the presiding District Judge, the Hon. Jeffrey A. Meyer, enjoining PTCLI and its agents "including but not limited to Kenneth Moales, Jr. from attempting to lease, or otherwise exercise ownership of, the foreclosed properties to which title has vested in the plaintiff." ("Order," ECF No. 285.)

Months later, FCR learned that two new people had moved into one of the foreclosed properties – the home at 1065 Central Avenue. FCR has asked the Court to sanction PTCLI and its agents for violating Judge Meyer's Order. (Mot. for Sanctions, ECF No. 286) ("Motion"). FCR says that it would be "inequitable in the extreme to permit the Defendant and its agents to continue to derive a benefit from leasing property that they don't own." (*Id.* at 4.)

While PTCLI has indeed acted inequitably throughout this case (*see, e.g.,* discussion in Recommended Ruling, ECF No. 245, at 3-6, 16-19), I am unable to conclude on the current record that it has violated the Order. The conduct that FCR cites as a violation either (1) occurred before Judge Meyer entered the Order, or (2) was committed by persons who have not been shown to have been acting as agents of PTCLI at the time. FCR's Motion is therefore denied, but the denial is without prejudice to resubmission on a more developed record.

I. **BACKGROUND**

The Court will assume the reader's familiarity with the long history of this case and will set forth only those background facts relevant to the Motion. FCR "is a real estate investment trust, affiliated with the Assemblies of God, that lent millions of dollars to [PTCLI] for a major church construction project in Bridgeport, Connecticut." (Findings of Fact & Conclusions of Law, ECF No. 144, at 1.) The loans were secured by mortgages on five buildings and fifteen parcels of land. (*See* Judgment & Order of Strict Foreclosure with Order of Law Days, ECF No. 156, at 1-2) ("Judgment"). PTCLI defaulted on its loans, and FCR filed this action to foreclose. (Findings of Facts and Conclusions of Law, ECF No. 144, at 1.) After more than three years of litigation, including a four-day bench trial before Judge Meyer, FCR obtained a judgment of strict foreclosure with respect to all the buildings and parcels. (Judgment, at 2-3.) PTCLI failed to redeem on its law day, and title and rights of possession passed to FCR on August 6, 2020. (*Id.* at 2; *see also* Order Granting Mot. to Reset Law Days, ECF No. 161; Joint Stipulation, ECF No. 228, ¶ 16.)

One of the foreclosed properties was a residence at 1065 Central Avenue in Bridgeport. (*See* Judgment at 1.) When FCR went to take possession of that property, PTCLI resisted on the ground that it had been rented to other individuals whose leasehold interests had not yet been foreclosed. (*See* discussion, Recommended Ruling, ECF No. 245, at 4-5, 24-25.) Initially, PTCLI

identified only Jenette Holt as a tenant of 1065 Central Avenue. (*See id.* at 24-25; *see also* Suppl. Resp. to Mot. for Order in Aid of Execution, ECF No. 207, at 5.) Later, however, it claimed to have also rented the property to Ofonime Udo-Okon, Idongesit Udo-Okon, Tuesday Cruz, and Yvonne Matthews. (*See* Compl., ECF No. 1, *Found. Cap. Res. v. Udo-Okon*, No. 3:21-cv-1278 (JAM) (D. Conn.), and Exs. B & C thereto.) FCR therefore filed an omitted party action under Conn. Gen. Stat. § 49-30, seeking to foreclose on the alleged leasehold interests of Holt, the Udo-Okons, Cruz, and Matthews. (*Id.*)

After it filed the omitted party action, FCR learned that Pastor Moales was still purporting to lease some of the foreclosed properties, even after title and rights of possession had passed. Specifically, FCR's James Duncan learned that another church corporation controlled by Pastor Moales, Cathedral of the Holy Spirit Inc. ("COHS"), had purported to lease the church building at 1243 Stratford Avenue to the Revelation Church of Jesus Christ in November of 2021. (Aff. of J. Duncan, ECF No. 284-1 in No. 3:21-cv-1278, ¶ 5.) Pastor Moales also purported to rent 1243 Stratford Avenue to Faith Gospel Ministries in January of 2022. (*Id.* ¶¶ 9-10.)

FCR then filed a motion in this case, seeking an order enjoining PTCLI and its agents "from attempting to lease, or otherwise exercise ownership of," any of the foreclosed properties. (Mot. to Enjoin, ECF No. 284.) PTCLI did not oppose or otherwise respond to the motion, and accordingly Judge Meyer granted it on May 26, 2022. (Order, ECF No. 285.) In his Order, he "enjoin[ed] defendant Prayer Tabernacle Church of Love, Inc. and its agents including but not limited to Kenneth Moales, Jr., from attempting to lease, or otherwise exercise ownership of, the foreclosed properties to which title has vested in plaintiff," including 1065 Central Avenue. (*Id.*) Judge Meyer added that "[t]he violation of this order by defendant, by Kenneth Moales, Jr., or by

any agent of the defendant or of Kenneth Moales, Jr., may result in severe sanctions including contempt of court." (*Id.*)

After Judge Meyer issued his Order, FCR learned that two additional people had moved into 1065 Central Avenue. In July of 2022, Mr. Duncan received a call from a Lakyra Crawford, who claimed to be a tenant at the property. (Aff. of J. Duncan, ECF No. 286-1, ¶ 4.) Ms. Crawford explained that she had entered a lease with COHS in September of 2021, and she provided Mr. Duncan with rent receipts signed by Ms. Matthews, who at the time was not only a purported co-tenant at 1065 Central Avenue but also a COHS employee. (*Id.* ¶¶ 4-5; Aff. of Y. Matthews, ECF No. 290-1, ¶ 4.) Weeks later, "[o]n or about September 6, 2022," Mr. Duncan "earned that a male tenant named Eric Croom" had moved in as well. (Aff. of J. Duncan, ECF No. 286, ¶ 7.)

Shortly after learning about the two new occupants, FCR filed the instant Motion. Observing "a clear attempt to continue to tie up [its] possession of the property," FCR asserted that PTCLI "and its agents have been actively soliciting tenants for the 1065 Central Avenue Property in an effort to collect the rental income and continue to exercise their dominion and control" over the home. (Motion, ¶¶ 7-8.) FCR sought unspecified "sanctions against [PTCLI] . . . and its agents, including but not limited to Kenneth Moales, Jr., for violating the Court's Order[.]" (*Id.* at 1.)

PTCLI opposed the Motion (ECF No. 290), and it accompanied its opposition with an affidavit from Ms. Matthews. In her affidavit, Ms. Matthews explained that Ms. Crawford "began residing in one of the bedrooms at 1065 Central in September 2021, well <u>before</u> the entry of the" Order. (ECF No. 290-1, ¶ 6) (emphasis in original). Ms. Matthews added that "[a]fter the entry of the . . . Order, Crawford refused to pay rent and was asked to leave 1065 Central." (*Id.* ¶ 7.) Ms. Crawford declined to leave, and Ms. Matthews "had the locks to 1065 Central changed" in

August of 2022, "hoping this would get her to finally leave." (*Id.*) After these events, Ms. Crawford became "confrontational and belligerent." (*Id.* ¶ 10.) In part to protect herself from the belligerent Crawford, Ms. Matthews invited Mr. Croom "to stay at 1065 Central to provide security." (*Id.*)

Judge Meyer referred the Motion to me, and I heard oral argument. At the argument, three actions were suggested as potential violations of the Order: (1) COHS's leasing of 1065 Central Avenue to Ms. Crawford; (2) Ms. Matthews' changing of the locks; and (3) allowing Mr. Croom to live on the premises. I will discuss each in turn.

II.    DISCUSSION

    A.    **COHS's Purported Leasing of 1065 Central Ave. to Ms. Crawford**

COHS apparently purported to lease 1065 Central Ave. to Ms. Crawford in September of 2021. In her affidavit, Ms. Matthews states that Ms. Crawford "began residing in one of the bedrooms at 1065 Central in" that month. (ECF No. 290-1, ¶ 6.) She added that, "[p]rior to living at 1065 Central, Crawford was homeless and she was allowed to stay at 1065 Central to help her try to get her life together." (*Id.*) Ms. Matthews stated that Ms. Crawford "agreed to pay $500 per month as rent which was to be used toward household expenses, primarily utilities." (*Id.*)

FCR is deeply suspicious of this arrangement on many fronts, but it provided no evidence suggesting that the transaction occurred on a different date. Mr. Duncan's affidavit recounts Ms. Crawford as saying that she had been "renting" 1065 Central Ave. "since September 29, 2021." (ECF No. 286-1, ¶ 4.) He attached a "rental receipt" stating that, on September 29, 2021, Ms. Crawford paid a $500 security deposit and took possession of the keys to the property. (*Id.* at Ex. A.) He also attached two other rental receipts, both of which purport to document Ms. Crawford making rent payments before the date of Judge Meyer's Order. Because the Motion record shows

that COHS purported to lease 1065 Central Ave. to Ms. Crawford before the Order, that transaction cannot serve as a basis for sanctioning PTCLI for a violation of the Order.

      **B.**      **Changing 1065 Central Avenue's Locks and Allowing Mr. Croom to Reside There**

By contrast, the changing of the locks and the admission of Mr. Croom both occurred after Judge Meyer entered his Order. In her affidavit, Ms. Matthews explained that in the spring and summer of 2022, "having [Ms. Crawford] in the house became increasingly difficult." (ECF No. 290-1, ¶ 7.) She therefore "had the locks to 1065 Central changed" in August of 2022, "hoping this would get [Ms. Crawford] to finally leave." (*Id.*) When this tactic failed, Ms. Crawford became "confrontational and belligerent," and Ms. Matthews became "frightened to stay at 1065 Central." (*Id.* ¶ 10.) She therefore "asked a church member, Eric Croom, to stay at 1065 Central to provide security, mainly as to Crawford." (*Id.*) In other words, Ms. Matthews changed the locks on FCR's property about three months after Judge Meyer issued his Order, and she admitted Mr. Croom into the property months after that.

At oral argument, PTCLI contended that these actions did not constitute an "exercise [of] ownership" and, therefore, did not violate the Order. (*See* Order, ECF No. 285) (enjoining PTCLI and its agents "from attempting to lease, or otherwise exercise ownership of, the foreclosed properties"). This contention is frivolous. In changing the locks, Ms. Matthews not only locked out Ms. Crawford; she also locked out FCR. This deprived FCR of access to its own property and, by extension, deprived it of a key incident of ownership. *See, e.g., Fernwood Realty, LLC v. AeroCision, LLC,* No. MMX-CV-10-6001273-S, 2014 WL 7647932, at *6 (Conn. Super. Ct. Dec. 18, 2014), *aff'd*, 166 Conn. App. 345 (2016) ("AeroCision's actions in changing the locks on the Property, illegally barring the plaintiff from its own premises . . . implies an intention by AeroCision to deprive Fernwood of its ownership[.]").

But it is not enough for Ms. Matthews to exercise ownership over 1065 Central Ave. Judge Meyer's Order did not enjoin Ms. Matthews by name, but instead applied to PTCLI "and its agents including but not limited to Kenneth Moales, Jr." (Order, ECF No. 285.) Determining whether Ms. Matthews' actions constitute a violation of the Order therefore requires consideration of whether she was acting as PTCLI's agent at the time.

This question implicates well-settled legal principles. An agent is an individual "who is authorized to act for or in place of another." AGENT, Black's Law Dictionary (11th ed. 2019). The elements required to show existence of an agency relationship are "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Nat'l Pub. Co. v. Hartford Fire Ins. Co.*, 287 Conn. 664, 678, 949 A.2d 1203 (2008) (quoting *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 120, 133, 464 A.2d 6 (1983)). Importantly for purposes of FCR's Motion, "[o]ne may be an agent for some business purposes and not others." *Tirreno v. Mott*, 453 F. Supp. 2d 562, 565 (D. Conn. 2006) (citing *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 541-42, 546, 893 A.2d 389 (2006)). Equally importantly, "[t]he burden of proving agency is on the party asserting its existence." *Lee v. Duncan*, 88 Conn. App. 319, 324, 870 A.2d 1 (2005); *see also Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343, 350 (S.D.N.Y. 2013) ("[U]nder the common law, 'the party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.'").

In this case, Ms. Matthews no doubt served as an agent at some times and for some purposes. While working for COHS, she was the person who rented 1065 Central Ave. to Ms. Crawford in September of 2021. (Ex. A to Aff. of J. Duncan, ECF No. 286-1) ("rental receipt" signed by Ms. Matthews). To judge from the signatures on the subsequent rental receipts – and

their evident similarity to the signature on the first receipt – Ms. Matthews apparently received rent payments from Ms. Crawford on behalf of COHS in January and February of 2022. (Ex. B to Aff. of J. Duncan, ECF No. 286-1.)  At oral argument, PTCLI conceded that at least some of the money that Ms. Matthews collected made its way into COHS's bank account.

But FCR has not shown that, in changing the locks and admitting Mr. Croom, Ms. Matthews was acting on PTCLI's or COHS's behalf rather than her own.  It is an "essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal."  *Nat'l Publ'g*, 949 A.2d at 1213.  The record evidence identifies no way in which changing the locks benefitted PTCLI or COHS; rather, it appears to be something that Ms. Matthews cooked up on her own, to rid herself of a "confrontational and belligerent" housemate. (Aff. of Y. Matthews, ECF No. 290-1, ¶¶ 7, 10.)  Similarly, the record identifies no respect in which admitting Mr. Croom benefitted PTCLI or COHS.  According to her affidavit, Ms. Matthews allowed him to live at 1065 Central Ave. to provide her with protection from Ms. Crawford, and he pays no rent to PTCLI, COHS, or anyone else.  (*Id.* ¶ 10.)

To summarize, granting FCR's order would require the Court to find that (1) Ms. Matthews exercised ownership over 1065 Central Ave., (2) on or after May 26, 2022, (3) in her capacity as an agent of PTCLI.  The record supports the first and second prongs, but not the third. Accordingly, the Court is constrained to deny FCR's motion.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Sanctions for Violation of Order Enjoining Defendant and Its Agents From Leasing Foreclosed Properties to Third Parties (ECF No. 286) is denied on the current record.  The denial is without prejudice to resubmission if FCR develops additional evidence of Ms. Matthews' agency, or of other exercises of ownership by

PTCLI or its agents, whether through post-judgment discovery under Rule 69 or otherwise. It is so ordered.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge